1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

No:  1:25-CV-00591 LF/JFR

DANIEL LE,

　　　　Plaintiff,

 -vs-

BOARD OF EDUCATION FOR
ALBUQUERQUE PUBLIC SCHOOLS,

　　　　Defendant.

VIDEOTAPED DEPOSITION OF DANIEL LE

February 20, 2026
9:00 a.m.
500 Fourth Street, NW, Suite 1000
Albuquerque, NM 87102

PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this VIDEOTAPED DEPOSITION was:

TAKEN BY:  MIA K. LARDY
           ATTORNEY FOR DEFENDANT

REPORTED BY:  SHANON R. MYERS, CCR, RPR, CRR, RMR, CRC
              CCR No. 275
              Trambley's Court Reporting
              P.O. Box 25027
              Albuquerque, NM 87125

**EXHIBIT**

**A**

## 18

A. It's probably in a text message, yes.

Q. What about your sibling on the East Coast?

A. He --

Q. Sir, let me -- that was not a question. When was the last time you spoke with your sibling on the East Coast?

A. It could have been last week.

Q. Was this by phone or by text?

A. It was by phone.

Q. Did you tell your sibling on the East Coast that you had a deposition?

A. He's aware of it, but, no -- I don't know -- but I'm not sure about the day, yeah. Yeah, I would say he's aware of it. He -- he -- yeah, he's probably aware of it, yeah.

Q. Aware that you have a deposition or aware that you have a lawsuit against Albuquerque Public Schools?

A. Of the deposition.

Q. What's your highest level of education?

A. Of formal education? Like, where you actually get a degree?

Q. Yes.

A. That would be a master's degree.

Q. What is your master's degree in?

A. It is in counselor education.

Q. When did you receive that?

## 19

A. In December of 2007.

Q. From where?

A. The University of Hawaii.

Q. You prefaced it with formal -- highest level of formal education.

A. Sure.

Q. What informal education have you received?

A. Buddhist training, the Hawaiian, I'd say esoteric teachings. One difficulty -- and I should say this because this is for the public interest -- is sometimes you -- to share knowledge, you have to get, like, a school and the license, but a lot of people don't have money to do that, and they have valuable knowledge; so I consider that kind of knowledge also very valuable, yeah.

Q. Have you ever sued anyone besides Albuquerque Public Schools?

A. No.

Q. Have you ever been sued?

A. No.

Q. What's your personal e-mail address?

A. One that I share with my attorney or -- or one that --

Q. All of your personal e-mail addresses.

A. One that I share with my attorney is counselor, C-O-U-N-S-E-L-O-R.L-E@gmail.com.

## 20

Q. Do you use any other personal e-mail addresses?

A. I have, yes. Daniel@T-H-E, the number 1, family, F-A-M-I-L-Y.O-R-G.

Q. What's "the1family"?

A. The -- oh, what -- it's a website.

Q. Okay. Is it like Gmail?

A. It's -- it's -- it goes to a Gmail account, yeah. Absolutely, yeah.

Q. So what is the website, the1family.org?

A. It's a website that is designed to share an unfolding memoir, an unfolding journey.

Q. Is this, like, a subscription website? I'm trying to figure out what exactly this is.

A. It was to document -- it may still be to document a work -- a faith-based work.

Q. Do you own this domain or do you -- did you subscribe to -- website?

A. I -- I purchased -- I purchased the main [sic] and I -- I do own it, yes.

Q. Okay. Outside of these two e-mail addresses and your Albuquerque Public Schools e-mail address, any others?

A. Dreamsofdaniel@gmail.com.

Q. What's that e-mail address for?

A. I would say -- that's a good question. It's a personal e-mail. If you're familiar with dreams. Sometimes

## 21

I will have dreams -- I'm not sure if you have had the experience -- but you have a dream, you document it. Sometimes you follow it.

Q. Did you say, "Sometimes you follow it"?

A. Uh-huh.

Q. Do you mean you document it? Is that --

A. Uh-huh.

Q. I need you to use "Yes" or "No."

A. Yes.

Q. All right. Any other e-mail addresses?

A. That I've ever used?

Q. Correct.

A. Oh, personal.

Q. Correct.

A. Not at the moment.

Q. Where do you currently work?

A. At a school, it's called Valle Vista Elementary School.

Q. You are a current APS employee, correct?

A. A school counselor, yes, employed by the -- in the Albuquerque Public School District, yes.

Q. And you'll agree with me today, when I say "APS," that means Albuquerque Public Schools, right?

A. Yes, ma'am.

Q. You said you're a counselor at Valle Vista?

30

Q. Why did you leave Jefferson Middle School for Wherry?

A. The simplest answer is -- can you give me a minute to ponder this?

Q. Sure.

A. Thank you.

I didn't feel safe. There are things that happened, and in the process of advocating for the profession and for students and for a colleague, I felt it was unsafe for me.

Q. Where were you prior to Jefferson Middle School?

A. I was at Sandia High School.

Q. How long were you at Sandia High School?

A. The paperwork transfer began in July of 2023, and then I was placed on administrative leave on January -- around January 19th or January 22nd of 2024, and then my e-mail access was revoked on January 26 of 2024.

Q. So you were at Sandia from July 2023. You then said you were placed on administrative leave on -- around January 19th, 2024?

A. January 19th. They have -- there's two documents that the district produced. One's for January 19th, and the other one's for January 22nd.

Q. Okay. So somewhere in that time range.

When did you come back from administrative leave?

A. I -- when did I -- okay. So when did I fully come

31

back and actually received a laptop is when -- in July of 2024.

Q. So you were on administrative leave from January 19th/22nd, 2024, until July 2024; is that correct?

A. I would say, yeah, I didn't have a laptop, so I -- yeah, I really couldn't do anything, yeah.

Q. Okay. Were you ever physically at Sandia High School at any time between January 19th or 22nd, 2024, and July 2024?

A. I believe that I was.

Q. Why do you say you believe that you were?

A. Because I beli- -- I remember picking up my stuff and that people -- either students or my colleagues had gathered together for me.

Q. All right. At any time from when you were placed on leave in January of 2024, until July of 2024, were you ever back working at Sandia High School?

A. Did you say January -- sorry; did you say January 22nd?

Q. I just said from when you were placed on administrative leave in January -- I'm just trying to figure out --

A. I wrote a letter of recommendation after I was placed on administrative leave, because these kids needed to graduate and get into college, so I still had to do that,

32

yeah.

Q. Okay. But did you ever return to Sandia High School to work as a counselor --

A. No.

Q. Hold on -- after being placed on leave in January of 2024?

A. Not at Sandia High School, no.

Q. Okay. So you were placed on leave in January -- administrative leave on January -- in January of 2024, and then the next time you returned to a school as a counselor was at Jefferson Middle School; is that correct?

A. That would be correct.

Q. Okay. Prior to Sandia High School, where were you a counselor?

A. At Chaparral Elementary School.

Q. How long were you a counselor at Chaparral?

A. 2015 until -- you could either say May of 2022 or October of 2022.

Q. Why do you give those two dates?

A. May 3rd, 2022, is when I was placed on administrative leave, and then October is when the district did something that I feel is illegal and unethical, yeah.

Q. Okay. So what is it in October of 2022 that was illegal and unethical in your opinion?

A. I was -- I realized that the Union wasn't lying to

33

me; that I was framed as a target of investigation. The person who did it earnestly demanded that I be fired immediately, said that they had my back, and omitted the fact that I was complying with school policy, State law and federal law. And then -- yeah, there's more, but I'll leave it at that.

Q. So why are you saying that it's either May or October that you were at -- that you were last at Chaparral?

A. Well, I -- I could still receive e-mails, right, from May to October, and there was no indication in May, to me, that I was the target of an investigation until the Union confirmed that I was at the end of May. And then I received, in October, a document that said Felic- -- the pers- -- there's an administrator who gave a report to the Office of Equal Opportunity Services, and so it helped me understand what the -- what that person did in order to frame me and then protect themselves, and then -- yeah.

Q. Are you referring to Felicia Mondragon?

A. That's what it says, yeah, that -- it says that in the document in -- given to me October, yeah.

Q. What document was given to you in October of 2022?

A. It's clarified that Ms. Mondragon gave a report to the Office of Equal Opportunity Services, and -- which led to me being interviewed by a former member of law enforcement, who omitted the fact that I engaged in

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

86

Q.  Okay.  So do you recognize these documents?
A.  I do.
Q.  And do you agree that these are your initial charge and then two amended charges of discrimination that you filed against Albuquerque Public Schools?
A.  Yes.
Q.  And you filed these with the EEOC, correct?
A.  Yeah, I think it does get filed with the New Mexico Human Rights Bureau.  I think it --
Q.  Agreed.
A.  Yeah.
Q.  You are correct on that.
And please correct me if I'm wrong, but in reviewing these three charges, the only change that I see between them is the discrimination based on category.
A.  Okay.
Q.  Is that --
A.  I think so, yes.
Q.  Okay.  So the first charge from January 19th of 2024, it states that the discrimination is based on color and race, correct?
A.  It does, yeah.
Q.  And then the amended -- the first amended charge from April 4th of 2024, states the discrimination is based on color, national origin, race and sex --

87

A.  Right.
Q.  -- correct?
A.  Right.
Q.  And then the last amended charge from April 9th, 2024, states color, national origin, race, retaliation and sex, correct?
A.  Yes.
Q.  Okay.  And I know it is your dis- -- digital signature on each of these.  You're not disputing in any way that these are the charges that you filed, correct?
A.  I'm not disputing that.
Q.  Okay.  And the dates that the discrimination took place you indicated were the earliest of November 16, 2023, to January 19th, 2024, correct?
A.  That's what it says here, right.
Q.  Okay.  So I want to go through under the Particulars section.  And, again, when I reviewed them, the Particulars section remained the same on all three copies, and I want to go through each of the three instances of discrimination/retaliation that you list.
To start, it states that on November 16th, 2023, you filed a complaint with the New Mexico Attorney General regarding unprofessional behavior by your principal, correct?
A.  Yes.

88

Q.  Was this complaint on the unprofessional behavior by your principal the -- the issues that we have already discussed today that occurred -- that occurred back in 2021 and 2022?
A.  Yes, ma'am.
Q.  Okay.  And then it states that on November 17th, 2023, you were denied access to e-mail; is that correct?
A.  Yes.
Q.  Can you please tell me what happened in terms of you being denied access to e-mail?
A.  I was not able to access the e-mail.  I was given I -- what's called a high school laptop or a Chromebook, and it stopped working, and it asked me to log in to the Google -- it's -- it's in written form, right?  Sorry; I want to be accurate with you.  It asked me to log in to some kind of Google thing on the Chromebook, but you can't access it because you're already blocked, right?  So, yeah, that -- that's -- yeah.
Q.  Okay.
A.  The laptop they gave me didn't work on that day, and it worked prior, prior -- sorry.  It's not a laptop.  It's a Chromebook, but it worked perfectly prior to that.
Q.  So on November 17th of 2023, a Chromebook that you were given by Albuquerque Public Schools did not work, correct?

89

A.  It stopped working, yeah.  It asked me for an impossible thing to do.  It says "Go to your Google settings," and it's not possible, because you can't even log in to get to the Google settings.
Q.  Okay.  Was this fixed?
A.  It was fixed.  It was eventually fixed.  I was given, for the first time, a new laptop.
Q.  When were you given a new laptop?
A.  After I e-mailed the Union, Vicki Price, the school principal of Sandia High School, saying, like, "Thank you so much for this Chromebook; however, it" -- I showed them the prompt, and then it's impossible -- let them know it's impossible to actually access the Chromebook.
Q.  Okay.  So when did you receive this -- the -- the new laptop, the new Chromebook?
A.  I think -- I think they immediately produced it --
Q.  Okay.
A.  -- either that day or the day after.
Q.  So this issue was fixed either on November 17th or November 18th of 2023, correct?
A.  Yes, it was.
Q.  Were you given an explanation about what happened in terms of you not being able to get into the first Chromebook?
A.  It said I don't have my two-step security set up,

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

90

but that's -- it's completely irrelevant to the issue of the Chromebook, yeah.

Q. Were you given an explanation by anyone at APS about what happened?

A. I think that his name is Joseph Lovato, but he says, Oh, yeah, it's because of your two-step security settings, which is not -- which is for a laptop, not for a Chromebook.

Q. Nonetheless, it was fixed, you said, immediately?

A. It was addressed immediately, yes.

Q. Okay. So if this was addressed immediately, can you please tell me how this was an instance of discrimination against you?

A. Oh, because the -- the whole process began after I was framed as a target by Ms. Mondragon, and so when I'm put on a performance plan, and I'm, like, vulnerable, the -- the reality is that anything that you do could be used against you. And so prior to that happening, there was a student who disclosed that she felt unsafe at home due to things happening -- this is a high school student who's on my caseload. And it was brought to our attention that she felt unsafe about either domestic abuse, something about her sibling.

And so I asked the person who heard that to report it, and then they told me no, no, no. And then, later on, that

91

student came in screaming, "My teacher keeps saying I need a female counselor," and she screamed it, and then that person who didn't want to make the CYFD report kept telling everybody, my colleagues, "She needs a female counselor," and then the allegation of -- her name is Ms. Jennifer Mackey. She's, like, Oh -- she was kind of sitting, like, where you are, like, smiling. She's like, Yeah, did you -- did you put Louie the Lobo -- it's a mascot. Did you -- did you -- did you put him on your lap?

And then she's, like -- and she's like imitating, like, somehow it's sexual. She's, like, did you -- did you wave him in the air? And I was just so nauseous. And Vicki's there taking notes, not even questioning, like, whether this is -- actually happened. And then she's had this on letterhead, it's on APS letterhead, that I did all these things. And then the person who was alleged to have witnessed this confirmed that, no, that -- that's not true.

And so I'm led to believe that Ms. Mackey was used to basically create this sexual gash -- allegation about me with Louie the Lobo with the student to create a progressive improvement plan to stick it to me. She's also the same person who wrote a report to the NMPED, I think in September or October of 2022, alleging the -- that I engaged in sexual harassment or employee misconduct with the student I had advocated for.

92

Q. Okay.

A. And that's the nexus.

Q. So -- so when was this meeting with Jennifer Mackey?

A. On October 2nd of 2023.

Q. Were you disciplined at all following a meeting with Ms. Mackey in October of 2023?

A. That's when I got -- yeah, there's this -- this is not accurate. So this thing refers to something that took place -- Exhibit 2. Or is it -- or, no. Sorry; is it Exhibit 1 here? One of -- yeah, it refers to a memo dated 10/30/202- -- sorry; it says October 30th, 2023, but the memo's actually dated 10/03/2023.

Q. Okay.

A. And that's where I'm getting disciplined for something that took place when I'm complying, you know, with school policy, helping a kid process the fact that they felt suicidal. And I'm being penalized for allegedly not following all 51 things, but I completed 50 of them, and the one thing that I couldn't do could only be done by a 504 coordinator --

Q. Okay.

A. -- so it was like set up to stick it to me.

Q. Okay. So that -- the October 3rd memo and this November 6, 2023, directive then culminated in the

93

discriminatory act of you not being able to access your Chromebook; is that correct?

A. The report that I wrote, I think, documenting is very -- very succinctly summarizing what took place with the public acts of dry-humping that I put in the -- for the New Mexico Attorney General that I think eight hours later, or could be six hours later, I wasn't able to access my work e-mail for the first time in my entire employment with the Albuquerque Public School District.

Q. So this complaint that you filed with the New Mexico Attorney General on November 16th of 2023, who did you send that report to?

A. There's a -- like a website intake form. I don't know who reads it, though. But, like, it's -- it just says you submit a form here, and you're given a number.

Q. Did you send that complaint to Albuquerque Public Schools?

A. No, because my -- my hope was that it would be -- operate independently, but the New Mexico Department of Justice doesn't have a civil rights division yet, so -- but I had to hope, you know.

Q. So you sent a complaint to the New Mexico Attorney General's office on November 16th, 2023. You did not send any complaint to APS, but you are correlating your complaint filed with the New Mexico Attorney General's office to you

24 (Pages 90 to 93)

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

106

PIP, I think that would be more accurate, right?

Q. Okay. Except on your charge of discrimination, you -- you have the earliest date of discrimination was November 16th of 2023, correct?

A. November 16th, that's what it says on the first one, right?

Q. That is what it says -- you can look at all of the charges. The dates remained the same.

A. Yeah. I don't have the full -- I -- yeah. So just to clarify, I'm not allowed to produce these. The person who I communicate is the one who types this in, right? I wish I could do this myself, but I can't. So this is not entirely accurate, right?

Q. You signed each of these, correct?

A. I did, and then it was explained to me why it was -- it was done in this way, yeah.

Q. What was the explanation as to why this was done in this way?

A. The explanation was that if -- for their standard operating procedure, you put a couple things, and then it allows the -- whoever the organization is -- could be Walmart, Home Depot -- they have to respond. And then it allows this process to unfold. And then the EOC -- EOC investigators, if they have time, they can get a sense of, you know, what's -- what's going on.

107

Q. What about -- still, I'm back on the fact that the dates the discrimination took place that lists November 16th of 2023, and you're now changing what you think the earliest date of discrimination is, correct?

A. No. I was -- I was actually quite forthright with the EEOC. I think you have those communications. If you don't, I mean, they should be available of, like, where I requested -- like, no, the first one was actually -- I would like it to be August 8th, yeah.

Q. But, again, you -- you're not disputing that you are the one that signed each of these charges and amended charges of discrimination, correct?

A. No, I'm not disputing the fact that -- at all.

Q. So -- and on this charge, the second particular instance of discrimination/retaliation, it states, "On January 10th, 2024, my ability to print was removed from the school printer."

A. It could have been earlier, but I think I noticed it on that day, yeah.

Q. Okay. So can you please tell me what happened regarding your ability to print from the school printer?

A. When you -- on your desktop, when you hit the print button, and you ask it to print from the counseling printer, it just stopped working. You try to send it to the work printer in the administrative office; that doesn't

108

work, and then -- yeah. So it just didn't work anymore.

Q. So you discovered this on January 10th, 2024. Was this fixed?

A. It was fixed after I was placed on administrative leave and -- and no longer on campus.

Q. Okay. So for nine days, you were not able to print from the school printer; is that correct?

A. I would say yeah. Well, I was on campus on the 22nd of January, which is a Monday, of January.

Q. Okay.

A. And that's -- that's the -- yeah. I would say that would be the -- they fixed it after -- sometime after the 22nd of January --

Q. Okay.

A. -- after I was gone from campus.

Q. And you never returned to Sandia campus after that, correct?

A. I did pick up some belongings, maybe in May, that people had gathered for me.

Q. When you returned to campus in May, was -- do you know if your printing capabilities were fixed?

A. They -- they said it was by e-mail, I think --

Q. Okay.

A. -- in February or January. They're like, "Oh, we" -- "we fixed it."

109

Q. Who sent you an e-mail in January or February saying it was fixed?

A. I think it was the technology help desk.

Q. Okay.

A. Someone -- an employee.

Q. Did they give an explanation as to why the printing -- the printer wasn't working for you?

A. They did. Yeah, they did give an explanation. And to be honest, I don't know exactly what it was because the person who I spoke with, her name is Kay, she told me that she tried to put the -- my employee ID back in the counseling printer, and it didn't work. And so I'm not sure what explanation they give for it -- for it not working anymore.

Q. Either way, it looks like it was fixed in either January or February, correct?

A. Likely, yes.

Q. During this time that you were on campus before administrative leave, were you able to print from another printer?

A. I was able to use both the counseling printer and the work printer in December, in November, in October, and in September of 2023.

Q. Sure. But during this time when you say that your ability to print was removed, was it only from one printer

28 (Pages 106 to 109)

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

110

on Sandia's campus, or were you not able to print at all at Sandia's campus?

A. Yeah. I -- I couldn't print on any -- on any -- on any of the remote things. I mean, in theory, if I could bring a printer and hook it up directly to the computer, it would probably work, but I don't -- I don't think you're supposed to do that. So, yeah, in theory, but I don't know if that's actually true.

Q. Okay. So from January 10th to January 22nd, how many times did you need to print?

A. Several. I had parents come in. I had students come in. And they would request either their transcript copy, print something else, yeah.

Q. So what --

A. But I -- I relied on the kindness of my colleagues.

Q. Okay. So you were still able to print through --

A. Yes, ma'am.

Q. -- the kindness of your colleagues?

A. Yes.

Q. Okay. And so how was this -- the January 10th, 2024, inability to print, how was that discrimination and/or retaliation against you?

A. It could be the fact that they had just received my letter of rebuttal where I document the things that you

111

have talked about with the public racialization and sexualization that I basically gave, that I'm allowed to do by the negotiated agreement State law, right?

And then afterwards, if I'm not allowed to print -- if I'm the only one not allowed to print when I complied with negotiated agreement, my rights under State law, it's part of it, you know, but is it going to, like, kill me? No, but it's kind of weird that I have to ask everybody else, and it kind of makes -- puts me in a interesting light, right? Like, "Oh, they cut off Daniel's ability to print," you know.

Q. And to be clear, you said that you submitted this redacted report, the rebuttal, in November of 2023, correct?

A. November, October, yeah.

Q. And you stated earlier that through December, you were able to print, correct?

A. I was.

Q. Is it possible that there was just a technology issue that resulted in this inability to print?

MR. MORROW: Objection; form, foundation.

A. I mean, is it possible that it just happened to me right after a letter of rebuttal, and it's unrelated to that? There's a possibility. I -- I don't think it's very -- yeah, there's a possibility, but I -- not realistic, no.

112

Q. (BY MS. LARDY) And, again, this inability to print was two months after you submitted your redacted report, correct?

A. No. It was a letter of rebuttal that was submitted on December 18th of 2023. Shortly thereafter, we were on holiday break. And then, yeah, I couldn't print when we got back from the holiday break.

Q. Who did you submit this letter of rebuttal to?

A. The people that I was mandated to report to, which is human resources, Vicki Price, and a Union rep.

Q. And that's different from this redacted report, correct?

A. It is different.

Q. Have you produced that document, the letter of rebuttal?

A. I don't have it here with me. I actually asked for it to -- I -- you know what? Under good faith, I -- like, we can remove that. So I had a conversation with Ms. Rivera, but, you know, I can produce it in evidence if you want further down the line.

Q. Have -- I'm asking you if you have produced it to date in this lawsuit?

A. Have I shared it with my attorney? I believe that I have.

Q. No, no. I'm asking if you have -- if I have a

113

copy of it in all the documents that were produced to me thus far?

A. I -- I don't know what's been produced to you and given to you, so I can't answer that for you. Like, I -- so I don't know if they retracted that and didn't show it to you. If they didn't show it to you and if you don't have it, then my suspicion would be that they didn't give it to you, but it's on e-mail record.

Q. Is -- this letter of rebuttal, is it in a similar format as the redacted report, or is it in --

A. No.

Q. -- is it in e-mail?

A. It's -- it's in an e-mail form. It's, I think, in a Word document, yeah.

Q. Does it say, "Letter of Rebuttal"?

A. I believe it does.

Q. I want to go over this last allegation of discrimination/retaliation, and then we'll take a break. January -- the last one on here, it says, January 19th, 2024, you received a letter being placed on administrative leave. I know we have talked about you being placed on administrative leave at that time. How was being placed on paid administrative leave an instance of discrimination and/or retaliation?

A. When -- the last time I was placed on

**114**

administrative leave was right after I engaged in protected conduct, and when this happened after I engaged in protected conduct, advocating for a student with the Section 504 plan, advocating for a student who felt suicidal, advocating for a student that disclosed domestic abuse to their classroom educator, when I was placed on admin leave, they created the narrative -- whatever narrative they did. And then I think eventually someone -- I think it was Ms. Rivera, there's an e-mail where she sends to Ms. Heather Cowan in February recommending my termination.

Q. So what was the event that led to you being placed on leave in January of 2024?

A. They alleged that I had problems scheduling students, and then -- but they omitted the fact that they didn't give me access to the counseling database and that somebody basically gave access to everybody else, except for me, on December 21st. And so I was unable to help students and access the counseling database.

And then on January 10th, students and parents complained or -- because they didn't -- I didn't know, you know, that they had made this request because I was -- I was the only one who was not given access, right?

And then on January 19th or January 22nd, I'm placed on admin leave, and they're like, "Oh, yeah. You've got all these problems of scheduling," I mean, but it's not possible

**115**

for me to schedule students when I'm blocked from actually reading the student and parent requests.

So it was a very convenient kind of like, "Let's place this guy on administrative leave. Let's prevent him, you know, on December 21st, from accessing the counseling database, and let's place" -- "and then we'll have the complaints, and then we'll just place him on administrative leave," right?

And they're only going to give their side of the story, so that's -- and, clearly, when they put that in February of like, "Oh, cool. Let's" -- "Let's recommend the termination," yeah, it's -- it's not a good-faith process.

Q. Are you aware that an individual can be placed on paid administrative leave for any reason at APS?

A. I am aware.

MR. MORROW: Objection; form, foundation.

MS. LARDY: We can go ahead and go off the record.

THE VIDEOGRAPHER: The time is 11:59 a.m. We are off the record.

(Recess taken, 11:59 a.m. to 12:20 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 12:20 p.m.

(Exhibit 6 marked.)

Q. (BY MS. LARDY) Mr. Le, before we went off the record, you had stated that there was an e-mail between

**116**

Jessica Rivera and Heather Cowan talking about you being terminated, correct?

A. Recommending it.

Q. Okay. I'm going to hand you what I've marked as Exhibit 6. Review it, and let me know when you're ready for me to ask --

A. I'm ready.

Q. Okay. So is this the -- the e-mail that you were referencing?

A. Indeed.

Q. Okay. And it does reference here -- on the last sentence of the first paragraph, it states, "Renni" -- and we have established that Renni is another attorney for --

MR. MORROW: Copy?

MS. LARDY: Oh, I am so sorry. There you go.

MR. MORROW: No, no, no. That's for you.

Q. (BY MS. LARDY) "That Renni responded to his demand and has been trying to work something out with him so that Mr. Le can leave APS at the end of this semester," is that what you were referring to?

A. This -- if you're asking me if -- if you've read it correctly, you have, but this process, if you're not aware, it began on November 17th of 2021. And after I was framed as the target of investigation, I lost about 20 pounds. I felt sick.

**117**

They're trying to -- you know, even said they're trying to fire me, and then when I release a request saying I'm going to file a Title VII report to protect myself, loved ones, people with Asian ancestry, and people who hold faith in deity, immediately I get a response from the district, saying, "Oh, you've been transferred -- congratulations -- to Sandia High School." So they understand that they've caused a lot of pain and damage, so this here obviously doesn't include the pain and suffering, and it doesn't include -- you know, that goes on for months, so, yeah. They --

Q. So --

A. But it's -- yeah. What you've read is, in fact, correct.

Q. Right, but my question was, where in here does it say that they are recommending that you be terminated from the district?

A. Well, yeah. It says, "We're going to get him to leave." When they give this attorney all this false information -- for example, when it says, "Oh, as you are aware, a complaint was filed against you on May 2nd," which is complete lie, right? They give you this, which says if you talk about this with anybody, to any community member, you're basically -- yeah, you're gone -- retaliation.

So that's called threatening somebody's employment,

126

A.  Yes.  He --

Q.  Are you talking about the APS EOS office?

A.  He -- he is no longer with the APS EOS office, and when I realized that in March or April of 2025, because he was the only one willing to acknowledge, right, what's the truth, I'm like, "Okay.  This report definitely needs to get in there," yeah.

Q.  So his determination was that the student violated Title IX?

A.  No.  The -- the teacher did, but it was co- -- the teacher kind of coached the student, right, to broadcast that.

Q.  Okay.  Do you consider this to be an act of discrimination and/or harassment -- or, excuse me; discrimination and/or retaliation against you?

A.  It's part of the -- yeah, it's definitely a part of the whole process when you're publicly racialized and sexualized, when you're accused of holding Louie the Lobo, putting it on your lap and waving it around, when a student is coached to say -- you know, and broadcast and scream, "My teacher keeps saying I need a female counselor," that's sexual discrimination.

You might want to call it retaliation as well because they're kind of related, you know.

Q.  Paragraph 50 of your complaint, which is on the

127

next page, Page 9, it states that "Defendant began to subject Plaintiff to false instances of discipline."

What do you mean by "false instances of discipline"?

A.  One example is there's a student, comes from a very musical family, has got the highest GPA.  My caseload, all of them -- all of them are special.  Makes the request, at the request also endorsed by the mom and the music teacher, to have a choir class.  And then I'm penalized for complying with the student's request.  He's at the highest GPA.  He doesn't even need, like, full class to graduate.  The mom has requested it.  They go to BYU.  They're a musical family.  He's like, "Yeah, could you" -- so -- and then that's put in as part of my -- it's in a memo of discipline of -- that I had -- that I had done that.

The -- the Louie the Lobo, the allegation on letterhead that I used it in a sexual way with a student, putting it on my lap, that being false, all stemming back again to being placed on this performance improvement plan stemming from the fact that I engaged in protected conduct way back in November 17th of 2021, and then had to experience this -- all these different events.

Again, your own exhibit here that you have, it says I was given a memo on 10/30/23, but that memo was on 10/03/2023.  And what I had done was help a student process her feelings of suicide.  I was penalized for not finishing

128

the entire protocol.  I completed 50 out of 51, and the one thing that I didn't do is something that can only be done by a Section 504 coordinator.

And then it says here at the bottom, "You're not to communicate about this with any community member."  So it's kind of like, "Okay.  Here's your directive.  Here's your reprimand.  Here's all the things that happened to you.  You can't tell anybody about this."

I'm not given, like, a laptop, right?  I asked for one in written form on September 1st, 2021.  I'm never given one, so I buy one.  As a first-year high school counselor, I'm trying to do the best job that I can.  I'm penalized for using a personal device when, you know -- and then -- yeah.

Being told that every single counselor meeting, Vicki Price always says, "You never use your personal devices."  I have talked to other people.  They do not have that recollection of her ever saying that.  So it got really bad once they made this allegation of the sexual stuff with Louie the Lobo and just went super downhill.  And they're just looking for any reason to, you know, harm my employment, my reputation.

They already harmed my ability to work with colleagues over the summer, right, all the summer things, it harmed my opportunity to do national board certification when you frame me as a target and then do all that kind of stuff.

129

Q.  Okay.

A.  Can't communicate with anybody.  And then my Union rep was thankfully kind enough to say -- when I asked, "Do you think they're going to be unethical?"  And he's like, "I don't know."

(Exhibit 10 marked.)

Q.  (BY MS. LARDY)  I'm going to hand you what I've marked as Exhibit 10.  Do you recognize this document?

A.  I do.

Q.  What is this?

A.  It's a formal whistleblower report.

Q.  Okay.  What do you mean by a "formal whistleblower report"?

A.  A whistleblower complaint is when you give it to -- you file a complaint with any agency that ideally would investigate things.  A report would go into more detail.  That's all.  So it's -- it's another way to say -- it's a complaint, but in the hope that when people who read it in the public interest, they'll have a better understanding of how a school district works and how to basically continue to help people even if there are things that happen to you that are unlawfully discriminatory or retaliatory.

Q.  Did you ever submit this to -- this formal whistleblower report to Albuquerque Public Schools?

Le v. Board of Education for Albuquerque Public Schools

130

A.  By virtue of the fact that it was given to the EEOC, yes, but by -- directly to Albuquerque Public Schools, no, because they had received the civil rights kind of complaint or report in -- I think it was November 28th of 2023.

Q.  What do you mean APS received a civil rights report in November of 2023?

A.  The Federal Office of Civil Rights informed the Office of the Superintendent that a complaint had been filed.

Q.  Okay.

A.  And that's when both Vicki Price and the Union begrudgingly admitted a number of the things that I'm telling you today.

Q.  Okay.  So the Office of Civil Rights informed APS in November of 2023 that you had filed a complaint, correct?

A.  I believe so.

Q.  Okay.  But then you also said that, then, the Office of Civil Rights' complaint was then sent to EEOC, correct?

A.  It was -- yeah, it goes to EEOC, and then the EEOC started the charge -- yeah, this charge actually started on November 6 of 2023, yeah.

Q.  But, again, you directly sending something to APS, you did not send Exhibit 10 to APS?

131

A.  This -- this right here?

Q.  Correct.

A.  No.  I gave my letter of rebuttal.  I was placed on administrative leave, and, basically, I got, "You can't communicate with anybody except for the person who accused you of holding Louie the Lobo in a sexual way," and then the other person who was at your due process meeting then filed the e-mail that you have with Heather Cowan, saying, "Yeah, we're going to fire him," you know.

Q.  Okay.  So this report says that it's purposely released between April 26, 2025, and April 27th, 2025, correct?

A.  Right.

Q.  Okay.  So -- and, again, you did not send this to Albuquerque Public Schools.  Have you received any discipline from Albuquerque Public Schools since April 26, 2025?

A.  None that I'm aware of.  And -- yeah.  None -- none that I'm aware -- since February -- since April 2026?  I haven't received any formal letter of discipline at all from that.  But are you suggesting that the pain and suffering that was caused from November 17th, 2021, between then, is immaterial?  Are you suggesting that?

Q.  So you don't get to ask me questions in the deposition.

132

A.  Okay.  I just want to clarify.

Q.  I only --

A.  Because it feels that way, but okay.  No.  Then -- then there was nothing -- no formal letter of reprimand after this was submitted, but it does go to APS because it goes to the APS EOS once I submit this to the federal EEOC.

Q.  So I -- okay.  If -- is that your understanding of what happened with this report?

A.  That -- that -- that's what I've been told what happens, yes.

Q.  Who told you that?

A.  The person who works at the EEOC.

Q.  Okay.  If that's your understanding, then -- okay.  Did you submit a complaint to the anti-racism division of NMPED?

A.  I did.

Q.  What did that report look like?

A.  It was a report that was issued in December, I believe, of -- November, December of 2023, and it documents the -- what -- what is -- falls under the category of discrimination retaliation, the public -- you know, the Tono Ren Nosaka, the comment about my mom, the fact that -- yeah, a number of different things, yeah.

The fact that the comment was said in front of a student, anti-racism Statute 22-10A-19.3, it includes the

133

New Mexico Civil Rights Act.  Yeah, it includes other people who have experienced and disclosed discrimination/retaliation.

So it's ideally for the public interest because I think it was formed because of the Black Education Act, right, because of what happened with that, and then also with George Floyd, so they -- they kind of put that out there.  So they had kind of felt safe to disclose it to them because that would help, right?

Q.  Did you ever submit that report that you submitted to the anti-racism division of NMPED to APS?

A.  The NMPED -- no, but they already receive it.  So when you give it -- the report to the NMPED anti-racism division, they do give it to the district.  So I didn't do that directly, so -- but that's what they do.

Q.  How do you know that that's what they do?

A.  It's written online.

Q.  Have you submitted -- the report or complaint that you sent to the anti-racism division of NMPED, do you still have that in your possession?

A.  Yeah.  I've shared that, I believe, with the EEOC, yeah.

Q.  Have you produced that in discovery?

A.  I -- I mean, I just -- I'm sorry.  What -- I -- I think my -- my attorney has it.  I'm not sure what you're

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120