# Exhibit 1

# Transcript of the Testimony of

# **Daniel Le**

February 20, 2026

Le v. Board of Education for Albuquerque Public Schools

**Trambley's Court Reporting**

(505) 292-2120

trambley.cr@gmail.com

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

No:  1:25-CV-00591 LF/JFR

DANIEL LE,

Plaintiff,

-vs-

BOARD OF EDUCATION FOR
ALBUQUERQUE PUBLIC SCHOOLS,

Defendant.

VIDEOTAPED DEPOSITION OF DANIEL LE

February 20, 2026
9:00 a.m.
500 Fourth Street, NW, Suite 1000
Albuquerque, NM 87102

PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this VIDEOTAPED DEPOSITION was:

TAKEN BY:  MIA K. LARDY
ATTORNEY FOR DEFENDANT

REPORTED BY:  SHANON R. MYERS, CCR, RPR, CRR, RMR, CRC
CCR No. 275
Trambley's Court Reporting
P.O. Box 25027
Albuquerque, NM 87125

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

**2**

APPEARANCES

For the Plaintiff:
COUNXEL LEGAL FIRM
2222 S. Dobson Road, Suite 1104
Mesa, AZ 85202
(480) 536-6122
amorrow@counxel.com
BY: ANDREW N. MORROW

For the Defendant:
MODRALL SPERLING ROEHL HARRIS & SISK, PA
500 4th Street, NW
Albuquerque, NM 87102
(505) 848-1800
mlk@modrall.com
BY: MIA K. LARDY

Also present:
James Cogswell, Moir Litigation Video

INDEX

WITNESS:                               Page/Line
DANIEL LE
Examination by Ms. Lardy               4:22

Deponent Signature/Correction Page     160:1

Certificate of Completion of Deposition    161:1

EXHIBITS
1   5/3/22 letter from Rivera to Le            59:20
2   8/8/23 letter from Rivera to Le            70:15
3   11/6/23 letter from Rivera to Le           72:2
4   Initial and amended charges or discrimination    85:20

**3**

5   A Redacted Report in Response to Allegations of   99:6
    Sexual Harassment

6   2/9/24 e-mail from Rivera to Cowan           115:23

7   Federal Sworn Statement and Letter of Rebuttal   122:8
    of Daniel Le in black ink
8   Federal Sworn Statement and Letter of Rebuttal   123:3
    of Daniel Le in blue ink

9   Complaint filed 6/23/25                       124:4

10  Formal Whistleblower Report                  129:6

**4**

THE VIDEOGRAPHER: Good morning. Today is the 20th of February 2026. The time is 8:57 a.m. Please silence any electronic devices at this time.

We are now on the record. My name is James Cogswell, of Moir Litigation Video, located in Albuquerque, New Mexico. The court reporter is Shanon Myers, of Trambley's Court Reporting. We are here for the deposition of Daniel Le in the case of Daniel Le v. Board of Education for Albuquerque Public Schools, filed in the United States District Court for the District of New Mexico. Case Number 1:25-cv-00591 LF/JFR.

Counsel will please state their appearances for the record.

MR. MORROW: Andrew Morrow for the plaintiff.

MS. LARDY: Good morning. Mia Lardy on behalf of Defendant Albuquerque Public Schools.

THE VIDEOGRAPHER: The court reporter will now please swear in the witness.

DANIEL LE

was called as a witness and, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. LARDY

Q. Good morning. I know we spoke briefly off the record. My name is Mia Lardy, and I represent Albuquerque

**5**

Public Schools in the lawsuit that you have raised against APS. Do you prefer that I call you "Daniel"? "Mr. Le"?

A. If this is for public record, Mr. Le is probably preferable.

Q. Okay. Mr. Le, have you ever been deposed before?

A. No.

Q. How did you get here today?

A. There was a action that was concerning a violation of school policy and various laws. As a result of my compliance with school policy and laws, there was action taken against me that the American School Counseling Association would consider as adverse. And when I asked for derogatory files to be expunged from my personnel file, that re- -- request was rejected no less than three times, possibly four; and so I was compelled to reach out to an attorney who has a reputation for safeguarding the good of the public interest, and I declared my intention to file a Title VII report to pros- -- protect myself, loved ones, people with Asi- -- Asian ancestry and people who hold faith in deity.

Q. Thank you. So when I asked how did you get here today, I just mean how did you physically get to the building today?

A. Oh, thank you for the narrow question. I drove in a vehicle, and I drove from my residence to -- using the

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

**6**

highway, and then I eventually landed in the parking garage right over here.

Q.  What did you do to prepare for today's deposition?

MR. MORROW:  Objection to the extent it may call for any attorney-client privilege.

Q.  (BY MS. LARDY)  So to the extent you met with your attorney, you can say that you met with your attorney, but I do not want to know any conversation that you have had with your attorney.  Do you understand that?

A.  Are you asking me if I met with Mr. Andrew today, this morning?

Q.  So I am asking you what did you do to prepare for today's deposition.  If that includes talking with your attorney or meeting with your attorney, you can state that, but I do not want to know anything that you talked about with your attorney.

A.  Great.  We had a conversation, and Andrew mentioned --

THE WITNESS:  Sorry; do you prefer "Mr. Morrow" or "Andrew"?

Q.  (BY MS. LARDY)  I don't -- I don't want to hear about anything that you two talked about.

A.  Okay.

Q.  So when I asked "What did you do to prepare for today's deposition," if you met with your attorney, you can

**7**

say, "I met with my attorney."  I don't want to hear any conversations.  Those are attorney-client privilege.  If you did other things to prepare for your deposition, such as review documents or anything like that, you can state that as well.

A.  Okay.  I -- I did refresh my memory, and I made sure I got a good night's sleep, and I went over one document.  It was an e-mail, yeah.

Q.  What -- if the e-mail is not an e-mail with your attorney, what e-mail did you go over?

A.  It -- it's -- sorry; it's not an e-mail that -- it -- it is an e-mail that was a communication between attorney-client privilege, yeah.

Q.  Okay.  Did you review any other documents in preparation for your deposition?

A.  Yesterday, no.  No.

Q.  You prefaced that with "yesterday."  Outside of yesterday, did you review any documents in preparation for your deposition?

A.  When I first learned about this deposition and the date of it, I would say that I looked at a -- yeah, a document that I shared with -- with my attorney that helps me understand what's happened for the past -- not just few years, but in -- in my experience, it -- it goes back longer than three years, yeah.

**8**

Q.  This document that you said you shared with your attorney, is this also a document that you have produced in this lawsuit, or is this something only with your attorney?

A.  It's -- it's attorney-client privilege, meaning that it's only been shared with the person sitting before you -- across from you.  Sorry.

Q.  Okay.  Any other documents that you reviewed?

A.  No.

Q.  Did you bring any documents with you today?

A.  None that relate to this case, unless you're talking about my registration for my vehicle.

Q.  Why did you bring your registration for your vehicle with you today?

A.  Because I wasn't sure if I captured it in my phone.  Or, actually, it's a smog check, I think, yeah, yeah.  And it's -- it recently expired, yeah.

Q.  Do you have your -- is your registration with you in relation to this lawsuit, or did you just happen to bring it with you today?

A.  I just -- you know, I don't capture all my documents on my phone, and so this one -- I can show it to you if you're curious.

Q.  No.  I'm just wondering why you have your registration, if -- if you brought it with you for some purpose separate --

**9**

A.  Oh.

Q.  -- from this deposition?

A.  Yeah.  It's actually very helpful, but I didn't know it at the time.  This morning, when I went to go park, I've never done anything where you have to scan something.  It asked me to -- what my license plate was, and I probably would have got it wrong unless I had that paper with me.

Q.  Okay.

A.  I might have got it right.

Q.  Outside of speaking with your attorney, did you speak with anyone else about this deposition?

A.  No.

Q.  Before we go any further, I want to lay some ground rules for the deposition.  The first is I need you to give audible responses.  If you do not hear any of my questions, will you please tell me?

A.  Thank you.  I will.

Q.  If you do not understand any of my questions, will you please ask me to clarify?

A.  Yes, I will please -- I will definitely do that.

Q.  If you do not ask for clarification, I will assume you understood my question, okay?

A.  Okay.

Q.  In terms of audible responses, our court reporter is writing down everything we say, so any "Uh-huhs,"

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

10

"Uh-huhs," or shakes of the head don't transfer well to a transcript, so please make sure that you use audible responses. Do you understand that?

A. I do.

Q. How are you feeling today?

A. This is the first time I've done this, so I'm not sure how to process that answer. If you're asking me if I'm happy, I'm not happy. If you're asking me if I'm sad, a little bit.

Q. Okay. Why are you a little bit sad?

A. It -- it's painful if you're going to ask me questions about things that happened in the past, but it's your legal obligation to do so, so that's what I understand.

Q. Have you taken any prescribed medications in the last 48 hours?

A. I have not.

Q. Have you taken any illegal drugs in the last 48 hours?

A. I have not taken any illegal drugs, period.

Q. Do you use marijuana?

A. Marijuana is legal, but I have not taken marijuana.

Q. Are there any physical reasons that would prevent you from listening to my questions, understanding them, and giving honest, truthful answers today?

11

A. It helps that you asked -- you stated that I should ask you to clarify, so that's helpful. Thank you. So, no, the -- I can understand you right now at this moment.

Q. Okay. So you don't have any physical reasons that would prevent you from listening to my questions, understanding them, and giving honest and truthful answers?

A. None that I am -- have ever been aware of.

Q. Okay. Is there any other reason that would prevent you from listening to my questions, understanding them, and giving honest, truthful answers today?

A. No.

Q. This is not a marathon, so you can request breaks when needed. I try to be mindful to take breaks every hour, but if you need more frequent breaks, please let me know. I just ask that whatever question is on the table, you answer that before we take a break. Do you understand?

A. I do.

Q. I'm going to ask that we don't speak over each other. Again, that makes it very challenging for the court reporter.

Do you have any questions about the procedures we will follow today?

A. At this moment, I do not.

Q. Do you understand that you have taken an oath to

12

tell the truth?

A. I understand that.

Q. Do you understand that the answers you give today can be used as evidence at trial?

A. I do.

Q. Do you understand that if you do not tell the truth, it could be considered perjury?

A. I do.

Q. What do you understand "perjury" to mean?

A. Perjury, we understand it's if you do not speak truthfully, there's a penalty.

Q. Do you understand why I'm taking your deposition today?

A. Do I understand how you're going to use it? No.

Q. Outside of how I will use your deposition, do you understand that I am taking your deposition because you have filed a lawsuit against Albuquerque Public Schools?

A. Now that you've stated that, I understand exactly what you said.

Q. Using the grading scale, A being the best and F being the worst, how would you grade your memory?

A. My memory, like, from -- can you be specific in terms of whether I -- some people, for example, claim to have knowledge of being in the womb. Some people claim they can remember things from four years old. Can you be

13

specific about a time frame of memory?

Q. So I'm just asking, generally speaking, and then I'm going to ask for specific time frames. So, generally speaking, how would you grade your memory overall?

A. Audiographic, very good; photographic, decent; ideographic, if I have the opportunity to pray and meditate, very good.

Q. How would you grade your long-term memory using the A-to-F scale?

A. It depends on what you're asking me about, so I can give you a specific example. Like, I can remember feeling joy at a early age, and if a child's in front of me and if I feel the child needs help remembering something, I could say, "Well, you know what, this is what I remember at this age," and it -- something in my body will activate a memory to help that child be able to recall certain circumstances or to speak.

So it depends on the context, but if you're asking me to remember something that's very painful and traumatic, there's something called -- sometimes the body wants to protect itself, so it -- it's hard to remember those things, yeah.

Q. So on a scale from A to F, how would you grade your overall long-term memory?

A. I can -- I can be specific with this legal

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

**14**

dispute. I'd say everything that's been shared with my attorney is accurate.

Q. So, again, on a scale from A to F, how would you grade your overall long-term memory?

A. A to A-minus.

Q. Okay. Thank you. On a scale of A to F, how would you grade your short-term memory?

A. Specifically for today?

Q. Overall.

A. Short-term memory from -- okay. If -- if we're using psychological terms, "short-term" is, like, 20 seconds, right, or 60 seconds, or a day. Very accurate, because that would be waking up from today to now.

Q. Mr. Le, have you ever gone by any other names?

A. Yes.

Q. What other names?

A. Mr. Daniel. It's easier for the kids. "Che" is my middle name. Daniel Le; in the written sense, Daniel T. Le; and then Daniel Che Le.

Q. What is your date of birth?

A. December 14th, 1976.

Q. Where were you born?

A. Santa Clara, California.

Q. Have you ever been married?

A. I have not. Well, it depends. If you believe in

**15**

a marriage to God, yes, but if you talk about in the physical sense where you're engaging in the reproductive act in the hope of producing children, no.

Q. Okay. Do you have any children?

A. Biologically, no.

Q. Okay. You prefaced that "biologically." Do you have any adopted children?

A. No.

Q. Do you believe that you have children outside of biological children or adopted children?

A. Like, that are living and breathing and, like -- okay. Like right now, at this moment, no.

Q. Okay.

A. But, yeah, it -- I don't want to get too much in the weeds here. Yeah, yeah.

Q. Well, I think we're -- we're there. So I asked you, "Do you have children?" You prefaced, "Biologically, no." I asked if you had adopted children. You said, "No." So do you consider yourself to have children in any capacity?

A. Am -- am I capable of reproducing? As far as I know, yes.

Q. Okay. That was not my question.

A. Okay.

Q. Do you have children?

**16**

A. None -- none that I could actually point to right here, yeah.

Q. Okay. Where do you live?

A. In an apartment in Albuquerque.

Q. What's the address?

A. 320 Rhode Island Street, Northeast.

Q. Okay. How long have you lived there?

A. Since May of 2022.

Q. Do you live with anyone else?

A. No people. No pets.

Q. Okay. No people and no pets. Do you have any siblings?

A. I do.

Q. How many?

A. Three.

Q. Where do they live?

A. One is overseas. One is in Washington state, and another one is currently on the East Coast.

Q. Do you keep in touch with them?

A. I try my best.

Q. When was the last time you talked with your sibling overseas?

A. It's been a long time.

Q. More than a year?

A. I would say it's been more than a year.

**17**

Q. What about your sibling that lives in Washington?

A. We communicated yesterday.

Q. Did you talk about the deposition with your sibling?

A. We didn't talk on the phone. We communicated by text.

Q. Okay. Did you text with your sibling about the deposition?

A. I did text that I have a big -- we both have something very big, yeah.

Q. So you did tell your sibling about the deposition?

A. I -- she's aware that I'm in a legal process.

Q. So, again, that didn't answer my question. Did you text with your sibling that you had a deposition today?

A. More than likely, she is aware. I -- I'm not going to look at the text message, but more than likely, she's -- she's going through a process. And I will say that because she's going through a procedure, I feel -- still feel protective of her and -- and your client, some people, have alleged certain things. Yeah, so --

Q. So, again, I don't need to know anything about your sibling and, like, I -- I don't want to pry into any of that. I was just asking is your sibling aware that you have a deposition today? Because earlier, you said that you hadn't communicated with anyone else about the deposition.

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

**18**

A. It's probably in a text message, yes.

Q. What about your sibling on the East Coast?

A. He --

Q. Sir, let me -- that was not a question. When was the last time you spoke with your sibling on the East Coast?

A. It could have been last week.

Q. Was this by phone or by text?

A. It was by phone.

Q. Did you tell your sibling on the East Coast that you had a deposition?

A. He's aware of it, but, no -- I don't know -- but I'm not sure about the day, yeah. Yeah, I would say he's aware of it. He -- he -- yeah, he's probably aware of it, yeah.

Q. Aware that you have a deposition or aware that you have a lawsuit against Albuquerque Public Schools?

A. Of the deposition.

Q. What's your highest level of education?

A. Of formal education? Like, where you actually get a degree?

Q. Yes.

A. That would be a master's degree.

Q. What is your master's degree in?

A. It is in counselor education.

Q. When did you receive that?

**19**

A. In December of 2007.

Q. From where?

A. The University of Hawaii.

Q. You prefaced it with formal -- highest level of formal education.

A. Sure.

Q. What informal education have you received?

A. Buddhist training, the Hawaiian, I'd say esoteric teachings. One difficulty -- and I should say this because this is for the public interest -- is sometimes you -- to share knowledge, you have to get, like, a school and the license, but a lot of people don't have money to do that, and they have valuable knowledge; so I consider that kind of knowledge also very valuable, yeah.

Q. Have you ever sued anyone besides Albuquerque Public Schools?

A. No.

Q. Have you ever been sued?

A. No.

Q. What's your personal e-mail address?

A. One that I share with my attorney or -- or one that --

Q. All of your personal e-mail addresses.

A. One that I share with my attorney is counselor, C-O-U-N-S-E-L-O-R.L-E@gmail.com.

**20**

Q. Do you use any other personal e-mail addresses?

A. I have, yes. Daniel@T-H-E, the number 1, family, F-A-M-I-L-Y.O-R-G.

Q. What's "the1family"?

A. The -- oh, what -- it's a website.

Q. Okay. Is it like Gmail?

A. It's -- it's -- it goes to a Gmail account, yeah. Absolutely, yeah.

Q. So what is the website, the1family.org?

A. It's a website that is designed to share an unfolding memoir, an unfolding journey.

Q. Is this, like, a subscription website? I'm trying to figure out what exactly this is.

A. It was to document -- it may still be to document a work -- a faith-based work.

Q. Do you own this domain or do you -- did you subscribe to -- website?

A. I -- I purchased -- I purchased the main [sic] and I -- I do own it, yes.

Q. Okay. Outside of these two e-mail addresses and your Albuquerque Public Schools e-mail address, any others?

A. Dreamsofdaniel@gmail.com.

Q. What's that e-mail address for?

A. I would say -- that's a good question. It's a personal e-mail. If you're familiar with dreams. Sometimes

**21**

I will have dreams -- I'm not sure if you have had the experience -- but you have a dream, you document it. Sometimes you follow it.

Q. Did you say, "Sometimes you follow it"?

A. Uh-huh.

Q. Do you mean you document it? Is that --

A. Uh-huh.

Q. I need you to use "Yes" or "No."

A. Yes.

Q. All right. Any other e-mail addresses?

A. That I've ever used?

Q. Correct.

A. Oh, personal.

Q. Correct.

A. Not at the moment.

Q. Where do you currently work?

A. At a school, it's called Valle Vista Elementary School.

Q. You are a current APS employee, correct?

A. A school counselor, yes, employed by the -- in the Albuquerque Public School District, yes.

Q. And you'll agree with me today, when I say "APS," that means Albuquerque Public Schools, right?

A. Yes, ma'am.

Q. You said you're a counselor at Valle Vista?

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

22

A. Yes.

Q. And I apologize; I think you mentioned this, but Valle Vista is an elementary school, correct?

A. Yes.

Q. Is it K through fifth grade?

A. There's a pre-K --

Q. Okay.

A. -- but I'm K through 5.

Q. What are your duties as a counselor at Valle Vista --

THE WITNESS: God bless you.

THE COURT REPORTER: Thank you.

Q. (BY MS. LARDY) -- Elementary?

A. There's the individual counseling. If a student needs a check-in, social and emotional. There's sometimes classroom lessons. I will take direction from the administrative team and colleagues if there's a concern with any kid. I'd say there's collaboration. I'm a part of an attendance team. There's duties to make sure the kids are safe. I think in loco parentis is one of those. Communicating with parents. If there's concerns I have with kids, modeling confidentiality.

That's not everything, but that would probably be, I think, the most important for -- for an elementary school counselor.

23

Q. Sure. Thank you. How much -- when you say "individual counseling," what does that entail?

A. If a student experiences something that we might consider traumatic; perhaps one of their parents is incarcerated, perhaps somebody passed away, they have an opportunity to share how they feel and to process that. So in the -- the hope would be that they can focus as well -- get back to focusing on their academic growth.

Q. If you conduct individual counseling, is it like a one-time session or do you have students that are on a caseload that you see on a regular basis?

A. It could be a one-time session. That -- that's possible. It usually would take -- depending on -- on what happens to the kid and how they process it, it could take longer. It may take three or four.

Q. So if you have a student that you need to meet with more than once, do you set up regular sessions with them or do they come to you as needed?

A. I -- I'd like to say come to a counselor as needed, but also, the reality of it is they're there to learn academics. So sometimes the counseling office, it could be too comfortable, and they just might want to stay there, and they might not want to go back to the class. So there's a balance to let the kids know that they're -- they're here to learn as well as to process their emotions.

24

Q. Okay. What percentage of your time is spent doing individual counseling?

A. I'd say the very minimum, I would hope. Okay, so -- okay. Are you talking about, like, a face-to-face, one-to-one, or are you talking about if I see a kid in the hallway or if -- because there's -- there's -- I'll expand a little bit.

Sometimes I go in the classroom, and kids will raise their hand and say, "Hey, I need a check-in," right, and sometimes I'll be in the cafeteria, and children will tell me things. And then I'll say, you know what, let's wait till -- I'll check in with you later. So a face-to-face, ideally, I'd say at least 40 percent.

Q. Okay.

A. Yeah.

Q. And that includes seeing them in the halls, seeing them in the cafeteria?

A. Yeah, the kids haven't realized yet that -- yeah, they feel like they can tell me everything, and then at a certain point, I'm like, okay, let -- let's hold on. Let's wait till, like, you know, we -- you don't have to share with everybody, because they feel safe, right? So I'm trying to model for them that if they experience something that was traumatic, they don't have to share it in public, you know. So that -- that's part of the -- my -- my role.

25

Q. So of that 40 percent, how much would you consider to be individual counseling sessions in your office?

A. I try not to frame it as a session, only because for some kids, there's still a stigma around counseling, so we just call it a "check-in."

Q. Okay. So how many individual check-ins in your office?

A. Do -- I try to do at least -- I try to do the minimum. At least half a dozen a day. I -- yeah.

Q. You said that you also do classroom lessons as part of your job?

A. Sure.

Q. What percentage -- I guess how often are you doing classroom lessons?

A. Recently? I would say we did one, two, three -- we did three this -- this past week.

Q. Do you go into, like -- I know there's pullouts for every class, right? Is counseling considered a pullout at Valle Vista?

A. It's not.

Q. Okay.

A. It's not.

Q. So is there some sort of a schedule in which you do classroom lessons, or is it on an as-needed basis?

A. It can be an as-needed, but I do bring, like, a

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

---

26

little document, and I go up to the individual classroom educators and I say, Hey, is there a time we -- we could do this, and they normally give me a great time that works for them, and I like to do it like that, yeah.

Q. So how often do you think you're in the classrooms? I know you said this week, it was -- you did three lessons. Is that about average?

A. It's not the ideal. Ideally, I would be in classrooms more. The -- one of the realities is sometimes the school's short-staffed, and so I don't know if someone says, Hey, I think we're going to need you at a certain place, if the school's short-staffed, I don't want to over-schedule myself and cancel.

Q. Okay.

A. Yeah.

Q. When the school is short-staffed, how else are you utilized at the school?

A. I think, yeah, if we need duties for, you know, class -- like, lunch duties --

Q. Okay.

A. -- or recess duty, stuff like that, right?

Q. Gotcha.

A. It's a great -- I love everybody at Valle Vista. Not -- not sexually. I just care for them. So we work together, yeah.

---

27

Q. Gotcha. So if they're short-staffed, you'll help out more with duties; is that correct?

A. Yeah. And sometimes we have a really good behavior re-director. Are you familiar with that role?

Q. Yes.

A. So if that person is out, it's probably expected, as a team, we'll -- may need to respond to some crises.

Q. You said part of a team. Are you part of, like, a -- I know schools have, like, crisis teams.

A. It -- it's not ideal, but I'll definitely respond if there's a need, right? It's not ideal for the school counselor to do that; but, yeah, I definitely respond if needed.

Q. Okay. What's your favorite job of being a counselor -- or what's your favorite part of being a counselor?

A. That's a really good question. I would say right now, allowing children to believe that their future is beautiful. It's unlimited, that they can change the world, that they're going to be safe, that it's -- of the clinical part, the rates of suicide for males are higher, so for the past probably ten years, it's nice to remind these boys from early as kindergarten that it's a great thing to share your feelings, so they can learn to do that, and then when they get older, the hope is that those rates would decrease for

---

28

both genders.

Q. How long have you been at Valle Vista Elementary?

A. I believe it was in October of 2025 that I really got settled in.

Q. Okay. So you have just been at Valle Vista since October of this past year?

A. Yes. It could have been, like, the last part of -- it could have been September, October, because I was in communication with Ms. Maestas, and I knew that I had worked with her before, and it's -- that September/October time frame.

Q. Okay. Fair enough, but it's been -- it's this academic school year, correct?

A. 2025, right, yeah.

Q. Where did you work before Valle Vista?

A. I was at Wherry Elementary.

Q. How long were you at Wherry Elementary?

A. I believe the -- started in March or March/April of 2025, and then all the way up until, like, September of 2025.

Q. Why did you decide to leave Wherry Elementary?

A. There's a few reasons. It's not ideal for a school counselor to be on a master schedule, and then there's the opportunity to work with somebody who I've worked with before, and it felt right.

---

29

Q. What do you mean "it's not ideal" to have a counselor on a master schedule?

A. So you know what the pullout schedule is, right?

Q. Correct.

A. So when a school counselor is giving classroom lessons, like, let's say if Andrew or if you were the classroom educator. If you and I go in together, and you and I are both there, the kids typically are more receptive. But if it's just a school counselor, and if the kids see that, it's, like, oh, cool this is my time to, like, mess around, they don't -- their view of the counseling profession tends to be less.

Q. So at Wherry Elementary, were you -- was counseling considered a pullout?

A. Only -- it was only -- it only became a necessity because the numbers were low, and it became a necessity -- it wasn't a necessity when I first got there. It became a necessity, I think, in August, yeah, when they realized they didn't have enough specials teachers. The numbers were too low.

Q. Where did you work prior to Wherry Elementary?

A. I was at Jefferson Middle School.

Q. When were you at Jefferson Middle School?

A. I probably landed last -- toward the end of July of 2024, all the way up until that March 2025 time frame.

---

8 (Pages 26 to 29)

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

30

Q.  Why did you leave Jefferson Middle School for Wherry?

A.  The simplest answer is -- can you give me a minute to ponder this?

Q.  Sure.

A.  Thank you.

I didn't feel safe.  There are things that happened, and in the process of advocating for the profession and for students and for a colleague, I felt it was unsafe for me.

Q.  Where were you prior to Jefferson Middle School?

A.  I was at Sandia High School.

Q.  How long were you at Sandia High School?

A.  The paperwork transfer began in July of 2023, and then I was placed on administrative leave on January -- around January 19th or January 22nd of 2024, and then my e-mail access was revoked on January 26 of 2024.

Q.  So you were at Sandia from July 2023.  You then said you were placed on administrative leave on -- around January 19th, 2024?

A.  January 19th.  They have -- there's two documents that the district produced.  One's for January 19th, and the other one's for January 22nd.

Q.  Okay.  So somewhere in that time range.

When did you come back from administrative leave?

A.  I -- when did I -- okay.  So when did I fully come

31

back and actually received a laptop is when -- in July of 2024.

Q.  So you were on administrative leave from January 19th/22nd, 2024, until July 2024; is that correct?

A.  I would say, yeah, I didn't have a laptop, so I -- yeah, I really couldn't do anything, yeah.

Q.  Okay.  Were you ever physically at Sandia High School at any time between January 19th or 22nd, 2024, and July 2024?

A.  I believe that I was.

Q.  Why do you say you believe that you were?

A.  Because I beli- -- I remember picking up my stuff and that people -- either students or my colleagues had gathered together for me.

Q.  All right.  At any time from when you were placed on leave in January of 2024, until July of 2024, were you ever back working at Sandia High School?

A.  Did you say January -- sorry; did you say January 22nd?

Q.  I just said from when you were placed on administrative leave in January -- I'm just trying to figure out --

A.  I wrote a letter of recommendation after I was placed on administrative leave, because these kids needed to graduate and get into college, so I still had to do that,

32

yeah.

Q.  Okay.  But did you ever return to Sandia High School to work as a counselor --

A.  No.

Q.  Hold on -- after being placed on leave in January of 2024?

A.  Not at Sandia High School, no.

Q.  Okay.  So you were placed on leave in January -- administrative leave on January -- in January of 2024, and then the next time you returned to a school as a counselor was at Jefferson Middle School; is that correct?

A.  That would be correct.

Q.  Okay.  Prior to Sandia High School, where were you a counselor?

A.  At Chaparral Elementary School.

Q.  How long were you a counselor at Chaparral?

A.  2015 until -- you could either say May of 2022 or October of 2022.

Q.  Why do you give those two dates?

A.  May 3rd, 2022, is when I was placed on administrative leave, and then October is when the district did something that I feel is illegal and unethical, yeah.

Q.  Okay.  So what is it in October of 2022 that was illegal and unethical in your opinion?

A.  I was -- I realized that the Union wasn't lying to

33

me; that I was framed as a target of investigation.  The person who did it earnestly demanded that I be fired immediately, said that they had my back, and omitted the fact that I was complying with school policy, State law and federal law.  And then -- yeah, there's more, but I'll leave it at that.

Q.  So why are you saying that it's either May or October that you were at -- that you were last at Chaparral?

A.  Well, I -- I could still receive e-mails, right, from May to October, and there was no indication in May, to me, that I was the target of an investigation until the Union confirmed that I was at the end of May.  And then I received, in October, a document that said Felic- -- the pers- -- there's an administrator who gave a report to the Office of Equal Opportunity Services, and so it helped me understand what the -- what that person did in order to frame me and then protect themselves, and then -- yeah.

Q.  Are you referring to Felicia Mondragon?

A.  That's what it says, yeah, that -- it says that in the document in -- given to me October, yeah.

Q.  What document was given to you in October of 2022?

A.  It's clarified that Ms. Mondragon gave a report to the Office of Equal Opportunity Services, and -- which led to me being interviewed by a former member of law enforcement, who omitted the fact that I engaged in

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

34

protected conduct and created a report, it sounds like with Modrall Sperling, to harm my employment, my livelihood, my reputation.

Q.  Are you talking about a report from RCI investigators?

A.  I believe that is, yeah, the organization that you contract with, yes.

Q.  Okay.  And when you say "you contract with," who are you talking about?

A.  I believe in order to contract with that organization, you need a law firm, right?  And --

Q.  So let me just represent to you that RCI investigations works through Albuquerque Public Schools.  They are a contractor.

A.  It says "attorney-work product," and then one -- one thing, I'm not sure if you're aware, but there was a meeting on January 11th of 2023 --

Q.  Okay.

A.  -- and Modrall Sperling was there representing.

Q.  Was it a due process hearing?

A.  I believe that's what they called it.

Q.  Okay.  So a due process hearing is separate from an investigation that is conducted by RCI investigators.  I just want to make it clear that Modrall Sperling did not contract with -- with RCI.

35

Okay.  So October of 2022, you were interviewed.  Is that --

A.  No, I received a document stating that Ms. Mondragon had issued a report to --

Q.  Okay.

A.  -- the Office of Equal Opportunity Services and helped me understand why I -- yeah, I passed out, and I felt sicker around her.  And I woke up to the sound of water sprinklers going off in my brain for two to three minutes, and the nurse had to come in and say, No, there's no water sprinklers.

Q.  Okay.  This was all in this document from October of 2022; is that correct?

A.  No.  It's framed as a target of investigation on May 3rd of 2022, and I received confirmation that Ms. Mondragon is the one who issued that report.

Q.  Okay.

A.  And earnestly demanded me to be fired around May 3rd of 2022.

Q.  To be clear, you have not been fired by Albuquerque Public Schools, correct?

A.  There's -- at this moment, I'm employed, yeah.

Q.  And you have been continuously employed by APS since -- actually, I did not ask you that.  I apologize.

When did you first start working for Albuquerque

36

Public Schools?

A.  It was in 2014, yeah.

Q.  So you have been continuously employed by Albuquerque Public Schools since 2014; is that correct?

A.  Indeed.

Q.  Okay.  As a counselor, who is your supervisor?

A.  I have -- the way it's set up, there's two people who sign off on the annual paperwork:  Jasmine Maestas, Ms. Jasmine Maestas, and Ms. Vicki Price.

Q.  Jasmine Maestas is the principal at Valle Vista, correct?

A.  Yes, ma'am.

Q.  So your supervisors are the principal, and then who is Vicki Price?

A.  Vicki Price would be the district administrator of counseling.

Q.  In the past ten years, have you applied for any jobs outside of Albuquerque Public Schools?

A.  No.

Q.  In the past ten years -- I know you have listed the -- the different schools that you have been at -- have you ever applied to go to other schools besides those that we've talked about so far?

A.  I've heard good things about La Cueva.  I have not applied there.  And I've heard good things about -- no, I

37

haven't.  Those -- that's it.  Yeah.  I pray -- usually I pray a lot about it; so, no, that's it, yeah.  I mean, I worked at another school.  It was Rudolfo Anaya Elementary School, yeah.

Q.  Okay.  When did you work at Rudolfo Anaya Elementary?

A.  That was 2015 to 2019, yeah.

Q.  Okay.  You said that you were at Chaparral from 2015 to 2022.  Were you splitting your time?

A.  Yes, ma'am.

Q.  Were you half-time or a .5 at each school?

A.  Yes.

Q.  Okay.  Thank you for clarifying that.

Do you have any other sources of income besides your job with Albuquerque Public Schools?

A.  No.  Interest from, like, bank accounts is quite minimal.  I -- do I have any other enterprises -- did I have any other enterprises outside?  I did, but, no, not -- not -- no, yeah.

Q.  Okay.  You said you did have enterprises outside APS.  What were those enterprises?

A.  I'm working on a book.  It's about 500 pages.  It's probably one-third done, and I had to stop it after -- I had to stop it in 2022, in -- in October.

Q.  You don't have any other side jobs or anything

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

---

**38**

like that?

A. No.

Q. Have you ever been arrested?

A. No.

Q. Have you ever been charged with a crime?

A. No.

Q. Have you ever been convicted of a crime?

A. No. I'm just curious. Could you be convicted if you've never been charged? Or are some people convicted immediately? Is that possible?

Q. No.

A. Okay, cool. So, yeah, neither convicted or charged.

Q. Have you ever been accused of lying?

A. When I was probably five, yeah.

Q. Fair enough. I won't ask for details about that one.

A. Okay. Yeah.

MS. LARDY: If we can go ahead and go off the record.

THE VIDEOGRAPHER: The time is 9:50 a.m. We are off the record.

(Recess taken, 9:50 a.m. to 9:58 a.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 9:58 a.m.

---

**39**

Q. (BY MS. LARDY) Mr. Le, have you ever been disciplined by APS?

A. The last memory is August 8th of 2023 --

Q. Okay.

A. -- of a written reprimand.

Q. Any other instances in which you've been disciplined by Albuquerque Public Schools?

A. That process ended probably in 2024, I think, or 20- -- yeah, when I was placed on administrative leave, and then continued onward.

Q. You said that process ended in January of 2024 and then --

A. Well, I was placed on administrative leave, and then --

Q. Okay.

A. -- it resulted in a -- a process that unfolded to where we are today.

Q. Okay. So you had your August 2023 reprimand, but then when I asked you any other discipline, you said, "That process ended in January of 2024," so what are you -- is there something that you're talking about between August of 2023 and the administrative leave in January 2024?

A. I mean, I filed a report, a federal report, and so that extended the process.

Q. What process are you talking about?

---

**40**

A. Equal Employment Opportunity Commission.

Q. Okay. But I'm just asking about you being disciplined by Albuquerque Public Schools. So you mentioned the August 2023 reprimand. Are there any other instances of discipline by Albuquerque Public Schools that you recall?

A. Yeah, I mean, I was pulled in to the district in 2015, yeah, and I was asked to -- do you want me to say this? Yeah, I guess you want me to say it. Yeah, I was told I could never talk about God, and I was told that racism is just the icing on the cake and -- and then afterwards, someone confirmed to me that -- yeah, someone was -- they didn't want me to talk about God when a kid felt suicidal and --

Q. Was this in 2015?

A. Yes.

Q. Okay. So I want to talk today about this August 2023 time frame, onward. So -- and you said you were mentioning a process that you said ended in January of 2024. So I'm asking you what process were you talking about from August of 2023 to January of 2024?

A. I was given a letter of reprimand.

Q. All right. And --

A. And then there were unsubstantiated allegations that they used to create what's called a mandatory performance improvement plan.

---

**41**

Q. And you said there were unsubstantiated allegations that resulted in a mandatory performance improvement plan?

A. Yes.

Q. Okay. What were the unsubstantiated allegations that resulted in a -- can we call it a "PIP"?

A. Sure.

Q. Okay.

A. They framed my protected conduct as employee misconduct. Specifically, alleged that when a child was subject to public discrimination and then I advocated for the child, that it was, I believe, harassment.

Q. You said that you were advocating for a child, correct?

A. It's by law, right. It's not necessarily a special relationship, but by law, the principal is called "in loco parentis," and then if there's something happen, it can violate federal and State law, right.

Q. Okay. So this instance of advocating for a child that you said then resulted in a PIP, when did this advocating for a child occur?

A. Specifically, the child reached out in May of 2021. The child was introduced to me on November 17th of 2021, and a colleague asked me to advocate for the child with that child standing next to them, saying, quote, admin

---

11 (Pages 38 to 41)

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

**42**

did not believe, unquote, harassment had taken place.

Q.   So this was an incident that happened in November of '17 -- or November of 2021 that then resulted in you being put on a performance improvement plan in 2023; is that your belief?

A.   That's a nice way that you're trying to frame it. So --

Q.   I -- I'm just trying to get a timeline here. You said that you were advocating for a child and that that was one of the un- -- in your words, an unsubstantiated allegation that resulted in a PIP. So I'm trying to figure out --

A.   I can --

Q.   -- the timeline of those allegations.

A.   Cool. I can be truthful if you wish me to. November 17th, 2021, a child was getting humped in the cafeteria. It was on video feed. Several students were laughing. A colleague came to me and said admin did not believe the child had been harassed. I did not believe that. When I went to the office and saw what I saw and saw the denials, again, from admin, laughter and smiling, saying, "There's no harassment," I engaged in protected conduct in compliance with Erin's law, federal law, school policy, in loco parentis. See something, say something, and then also there's a policy you inform a principal directly,

**43**

right?

That policy came to light through KOB Eyewitness News, and it was -- that was an APS spokesperson who said that, you inform a principal directly if there's concerning behavior taking place on a campus. It could be a parent. It could be someone like me. It could be you.

Q.   Okay. So you saw -- you were advocating for a child in November of 2021, and you said that you abided by federal law, State law. So you went and told the principal; is that what you're saying?

A.   Indeed.

Q.   Okay. Any -- anything else?

A.   That happened after that?

Q.   Is there anyone else that you went and told?

A.   I checked in with the student, and I told the colleague, "I'm glad that you told me." If you want to know why I said that, I can, but I'm not sure if you really want me to say that.

Q.   So who was this colleague?

A.   Marianne Brown.

Q.   And why did you tell her that you were glad that she told you?

A.   Because the child was standing there right next to her, and if admin did nothing, the reputation of admin would go down further, because at that time the fifth graders

**44**

didn't trust the admin, and they didn't respect her and neither did the faculty.

Q.   Okay. So your understanding is that you advocated for a child in November of 2021, and then you were placed on a performance improvement plan in 2023 because of that?

A.   So, no, that's not -- do you want me to clarify?

Q.   Yes, I would like you to clarify.

A.   I can. After I engaged in protected conduct, I was -- had an incident where I was trying to help the principal. She told me that a child -- colleague was screaming in people's faces. This was also in the November time frame. And as a result of that, I advocated for other students. I lost consciousness on January 6, 2022. She told me that she had my back.

When I got -- she said I needed to get back to the school as soon as possible, but I needed time to recover. I did my best. I got back to the school. I was referred to -- in ways that made me un- -- feel uncomfortable -- I can be specific. I was referred to as "Tono Ren Nosaka," and then the person who said that thought that was funny and said, "Tudor, Tono, Tono Nosaka," and that's Principal Tudor who heard that.

And then as I was walking by, the final words I remember was "Tono Nosaka" or "Tono, Breathe With Me," and it refers to a character from a book who is Asian, and he

**45**

fulfills certain sexual fantasies, and it made me feel very uncomfortable. And then there's more things that happened. I can tell you if you want. I can be very specific.

Q.   So as to this incident, you said this occurred in that November 2021 time frame, correct?

A.   I engaged in protected conduct in November. I was publicly racialized and sexualized in January of 2023, and then comments were also made about my mom, racial comments, and then I was framed as a target by the person you know as Ms. Mondragon.

Q.   To be clear, you said January 2023. Do you mean January 2022?

A.   I do mean January 2022. Thank you for helping me with that.

Q.   So these comments, you said that there were also comments made about your mother; is that correct?

A.   In front of another kid, who I talked with about the New Mexico Black Leadership Council, yes.

Q.   Were those comments also in this January 2022 time frame?

A.   They were not. That one -- the one in front of the kids is the one that bothered me, because there's an antiracism statute, and in theory, even if there wasn't, it's not good for any of us, as educators or adults or as lawyers, to say racist things in front of kids. It's -- you

**12 (Pages 42 to 45)**

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

46

know, but there are laws against that, yeah.

Q. Okay. So when was the incident where comments were made in front of kids?

A. **April of 2022.**

Q. Who did you report the January incident to?

A. **I went to -- that's a good question. I went directly to Ms. Mondragon. I asked her, "What do you" -- you know, "Can you help me? What do you mean by that?" And she said, "You're not supposed to know about that." So I'm -- I'm still trying to protect her reputation, because it's still -- it's going downhill in -- at that time.**

Q. So did you report it to anyone else?

A. **Mr. Andrew Morrow knows about it, yeah. You mean --**

Q. In -- so in January of 2022 when this happened --

A. **Yeah.**

Q. -- you said that you went and talked to Ms. Mondragon about it. Did you tell anyone else about it at that time?

A. **Sorry. It feels very uncomfortable for me to tell you that I'm -- that I was referred to that in that way, because there's someone who said -- who's familiar with Ms. Mondragon, who says, "You know, Why won't you sleep with me? You're my Asian fetish," so I don't really feel**

47

**comfortable even saying that because I don't want that behavior to keep happening. Does that make sense? When someone's a superior and they publicly do that in front of other people? Yeah, it's -- it's a power imbalance, right?**

Q. Okay. So my question was: Who else did you tell this January 2022 incident to? You said you went and -- or reported that you went to Ms. Mondragon. Did you report it to anyone else --

A. **I did.**

Q. -- was my question? Who?

A. **The local Office of Civil Rights.**

Q. When did you report it to the Office of Civil Rights?

A. **And I also reported it to the Union. The Union, I reported it to in January of 2023, because I -- yeah. Yeah. I was hoping that they were just going to expunge the whole matter and that I wouldn't have to, like, share this publicly, but they -- they chose to keep going with this, yeah.**

Q. So you reported to the Union in January 2023 what happened in January 2022, correct?

A. **That's correct.**

Q. And for the Office of Civil Rights, when did you report to the Office of Civil Rights?

48

A. **I believe it was around October of 2023.**

Q. So about a year and ten months after it happened?

A. **That would be correct.**

Q. Okay. You also stated a minute ago that there was another comment made to you about you being someone's sexual fetish, correct?

A. **Asian fetish.**

Q. Asian fetish. I apologize. Who stated that?

A. **Someone who's familiar with Ms. Mondragon.**

Q. Okay. So I need to know a name. So who stated that to you?

A. **Someone who works with Ms. Mondragon.**

Q. Okay. So, again, I need you to -- or --

MR. MORROW: Answer the question, please.

A. **Meagan.**

Q. (BY MS. LARDY) Meagan who?

A. **I don't know her last name.**

Q. Is she an employee of APS?

A. **I don't know. I don't have her number. I'm not interested.**

Q. Okay. So how did you get in communication with Meagan?

A. **Like, at a school?**

Q. Correct. So I -- I'm trying to figure out -- you're saying that individuals were making these

49

inappropriate comments to you in January of 2022, and so I'm trying to figure out what those comments were and who made those comments.

A. **Tono Ren Nosaka, that's what I believe -- who started this.**

Q. And you said that it was Ms. Mondragon that used that term with you, correct?

A. **Yes.**

Q. Okay. But then you said that someone talked about -- used the phrase "Asian fetish" with you, and was that Meagan who used that term --

A. **Yes.**

Q. -- toward you? Yes. Okay. When did this happen?

A. **That one, I'm not precise about.**

Q. Did that happen on APS property?

A. **You're asking me to be truthful. I think that it was, but, you know what, I kind of blocked that one out, but, yeah, I do remember hearing those words, yeah.**

Q. Is Meagan an APS employee?

A. **I don't know.**

Q. So why -- what -- what connection is there between Meagan and Ms. Mondragon?

A. **So when someone says you're not supposed to know about that, it leads me to believe that they've shared that**

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

---

**50**

with other people.

Q. Okay. Do you know of any -- how Ms. Mondragon would know Meagan or how Meagan would know Ms. Mondragon?

A. By working together.

Q. Okay. At Albuquerque Public Schools?

A. In the district, right.

Q. Okay. But I thought you told me earlier that Meagan didn't work for Albuquerque Public Schools?

A. I don't know if she still does.

Q. Did she work for Albuquerque Public Schools at the time the comment was made?

A. I believe so.

Q. Why do you say you "believe" so?

A. That's the only way that she would be on the -- I remember working with her -- yeah, I remember interacting with her on property.

Q. At Chaparral?

A. Yes.

Q. All right. So there are these comments made in January of 2022 by Ms. Mondragon and Meagan. You reported those to your Union in January of 2023 and to the Office of Civil Rights in October of 2023, correct?

A. I reported the Tono Ren Nosaka.

Q. You never reported the comment by Meagan; is that correct?

---

**51**

A. I'm not interested in that.

Q. Okay. Why are you not interested in reporting that comment? Or let me rephrase that.

Why were you not interested in reporting that comment?

A. So if somebody -- okay. If there's a source, right, if someone publicly says something, that would be the primary -- that would be the primary thing to report. It's the -- the person who broadcasts that publicly in front of multiple witnesses.

Q. Which, Ms. Mondragon's comment was in front of other witnesses; is that your understanding?

A. It is the reality.

Q. Meagan's comment was made in private; is that the difference?

A. I think it's a huge difference, yeah. I don't think anyone would say that publicly in front of, like, multiple people.

Q. When this comment was made, were you and Meagan by yourselves?

A. As far as I know, unless there were surveillance cal- -- cameras around.

Q. Did you and Meagan ever have a relationship?

A. Absolutely not.

Q. All right. So we have these January 2022 comments, and then I believe you said the next set of

---

**52**

comments were the comments that were made in front of students in April of 2022, correct?

A. Yes, ma'am.

Q. Okay. Those comments, you said, were about your mother; is that correct?

A. The way that she allegedly speaks.

Q. And who made those comments?

A. Ms. Mondragon.

Q. What did you do after those comments were made by Ms. Mondragon in April of 2022?

A. Like, are you asking me how it made me feel?

Q. What did you -- let me ask you this first: What exactly did Ms. Mondragon say?

A. Oh. Yeah, "You know, Daniel's" -- or "Mr. Le's mom probably talks like this," and did her accent.

Q. What do you mean she "did her accent"?

A. Of how an Asian person is supposed to allegedly speak, an Asian female.

Q. Okay. Did you report Ms. Mondra- -- did you report Ms. Mondragon to anyone after those comments were made in April of 2022?

A. The Office of Civil Rights, yeah.

Q. And is that the same time frame, that October of 2023?

A. It is. I -- I probably spoke to the Asian Law

---

**53**

Caucus as well. Yeah, I spoke to the Asian Law Caucus, and that's when I realized -- yeah, that's when I realized a lot more, yeah.

Q. When did you -- I don't want to know any conversations with the Asian Law Caucus, but when did you reach out to them?

A. In the summer of 2023.

Q. All right. So going back to you being placed on a PIP in 2023, you said that was based on unsubstantiated allegations, correct?

A. Indeed.

Q. And then that led us to this conversation about these comments that were made in January and April of 2022. So, again, what were, in your belief, the unsubstantiated allegations that resulted in you being placed on a PIP? I have the advocating for a child in November of 2021. Anything else?

A. Could you -- sorry; I lost you for a little bit. Could you -- could you repeat the question, please?

Q. Sure. I'm just trying to figure out what the other, in your belief, unsubstantiated allegations were that resulted in you being placed on a performance improvement plan in 2023?

A. I think when -- if you -- if any of us engage in protected conduct advocating for a child, and if we're

---

14 (Pages 50 to 53)

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

**54**

penalized for that, I think that would be cause for concern.

So, for example, with respect to the specific instance, if a kid is being publicly humped and then comes to reveal to you privately that she -- that the student interprets that as an invitation for romantic activity and trying to help that child process that, in compliance with Erin's law, if you were to frame that as sexual harassment, I think that's a serious concern.

And the specific allegation is this: It's alleged that -- in a meeting and trying to help a kid process stuff, it's alleged that I said, "Who would you feel comfortable touching and seeing you when you're naked?" Pause. "For me, it would be my sister." Allegedly, the reply from the student is, "I, too, would like my sister to touch me when I'm naked."

Q. Is this another, in your belief, an unsubstantiated allegation that resulted in you being placed on a PIP?

A. Yeah, well, if -- if we can clarify. The student who allegedly remembers that is the one who was getting publicly humped on November 17th of 2021, in front of multiple witnesses captured on the school video feed. It was denied by admin -- that was Ms. Mondragon -- several times.

Q. Okay. So, again, is this incident that you have

**55**

just told me about with a conversation with a student, was that in some way another unsubstantiated allegation that resulted in you being placed on a PIP?

A. I can affirm that those words and that conversation has not taken place on any school property anywhere, on any not school property anywhere.

Q. When did this allegation occur?

A. I was re- -- I received the report that Principal Mondragon framed me as a target in October of 2022.

Q. Okay. So that was not my question. When did this alleged conversation between you and the student occur?

A. Allegedly took place in April of 2022.

Q. Is this what then resulted in you being placed on administrative leave in May of 2022?

A. I would say the accurate answer to that is because I was a witness to concerning behavior taking on -- place on campus in front of multiple witnesses and because I engaged in protected conduct and because Principal Mondragon -- the Union confirmed that she tried to have me fired immediately on May 3rd, 2022, that was the result for this report coming forth where I'm allegedly -- yeah, that alleged conversation took place.

Q. Okay. And, again, as it relates to this November 2021 incident, you did not report that to anyone other than the principal, correct?

**56**

A. Yeah, that's actually APS policy, indeed, yeah.

Q. Did you report it to the Equal Opportunity Services Office?

A. No. The APS spokesperson says quite clearly you inform a principal directly.

Q. Are you aware that there is an Equal Opportunity Services Office at APS?

A. I am now.

Q. Were you aware in November of 2021?

A. I was not.

Q. Did you report what -- this occurrence in November of 2021 to your supervisor, Vicki Price?

A. Yes, I did report that I was publicly racialized and sexualized and that I engaged in protected conduct, yeah.

Q. So my question was solely as to this November 2021 incident with the child. Did you report that to Vicki Price?

A. I informed it to the Union, and Vicki Price told me not to write a letter of rebuttal.

Q. Okay. When did you report this to Vicki Price?

A. I -- we had a meeting in -- we had several meetings. August and November of 2023 and -- yeah, I mentioned -- yeah, that -- that's when I mentioned those things, being publicly racialized and sexualized.

**57**

Q. In No- -- in the fall of 2023?

A. But she may have access to the fact that I shared with the Union, by e-mail, of the Tono Ren Nosaka comment, so I believe that she does have access to that, and I believe that would be in January 2023.

Q. Okay. But, again, so the Fall of 2023 is the first time that you reported to Vicki Price this incident involving a child in the cafeteria from November of 2021?

A. Actually, she would have -- no, I told the Union and -- do -- are you familiar with -- I'm just not being -- trying to -- you're familiar with what a "gag order" is, right? You're familiar with that?

Q. Yes, but I -- I am just asking you to please just answer the question --

A. Yeah.

Q. -- of when -- and I'm just trying to get clarification.

A. Because they'll fire you immediately if I tell any APS employee. That's what it says in the gag order given to me on May 3rd, 2022.

Q. Okay. We will talk about a gag order in a second. This incident in November of 2021, regarding a child in the cafeteria, when did you report that to Vicki Price the first time?

A. By oral communication like this?

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

---

**58**

Q.  Any communication.

A.  Oral communication, after the gag order was partly -- well, no, the gag order was always in place, but I did tell her, in compliance with the law, in August or November of 2022.  I want to be precise, so I don't want to give you a month that's wrong.

Q.  Okay.  So at least ten months after the fact is the first time you told Vicki Price about this?

A.  When there's a gag order that threatens you and you can't tell any APS employee, that's a serious concern, and it's -- to my understanding, Vicki Price is an APS employee.

Q.  So let's go ahead and talk about this gag order.  What do you mean when you are talking about a gag order?

A.  The gag order specifically states, to the best of my memory, "You are not allowed to talk about this case or this situation with any employee of APS, any" -- it may say something like "any family member, and the result and consequences are:  Discharge, nonrenewal, termination, suspension."

This is, yeah, another penalty, yeah, which is very convenient, right, for the organization that places you on a gag order.

Q.  So did you receive a document that said "gag order"?

---

**59**

A.  Sorry, gag clause if -- is -- that might be more accurate.

Q.  You were talking about a gag order, so I was asking you if you received a document from Albuquerque Public Schools that was a gag order?

A.  The stronger gag order, yeah, came in November of -- 6, 2023, according to APS records, but they changed a little bit, yeah.  They sometimes changed the date.

Q.  What did you receive from APS in November of 2023?  Are you talking about a directive?

A.  A dir- -- so the gag order, at the end, says, "If you speak with any community member, it can result in" -- those wonderful things like suspension, termination, nonrenewal, discharge, reprimand.

Q.  And to be clear, you have never -- you have not been terminated by Albuquerque Public Schools, correct?

A.  To my knowledge, I am employed right now by the school district, yes.

Q.  All right.  So let's take these one at a time.

(Exhibit 1 marked.)

Q.  (BY MS. LARDY)  So, actually, let me ask you this first:  You referenced a gag order in May of 2022, correct?

A.  Hmm.

Q.  So why did you --

A.  "Gag clause" is more accurate, if I may.

---

**60**

Q.  Okay.  Did you talk to anyone other than Ms. Mondragon about the November 2021 incident at any point between November 2021 and May of 2022?

A.  Okay.  Did I talk with any person about Tono Ren Nosaka between 11/17/2- --

Q.  (Shook head.)

A.  Let's see.  Sorry.  Oh, the humping, the publicly humping?

Q.  So I -- let me ask this again.  At any time between the incident in November 2021, with the student in the cafeteria --

A.  Yeah.

Q.  -- and this May 2022 gag clause, as you referred to it, did you report what happened in November of 2021 to anyone else?

A.  I think that the only person who I spoke with who would be aware of this would be probably the classroom educator, who would be Mary Ann Brown, the students -- at least four or five of them; but, yeah, I did my best to -- at that time, I did my best to help the children process it and to move forward until something happened, yeah.

Q.  You said, "Until something happened"?

A.  Until I learned that the child who was on the receiving end of the actions interpreted the behavior as an invitation for romantic activity.

---

**61**

Q.  Okay.  So other than telling another -- or telling a classroom educator and talking to students about this incident, you did not report it to anyone up the chain of command, correct?

A.  Yes.  I followed the APS spokes- -- spokesperson policy that's listed on April 15th, 2021.

Q.  And where is this APS spokesperson policy that you are talking about?

A.  It's on -- I believe it's KOB Eyewitness News or could be KRQE.  But what happened is -- what precipitated it is that there was an event --

THE WITNESS:  Can I go into detail on this?

MR. MORROW:  She has asked you a question.  I have not objected or directed you not to talk, so --

A.  Okay.  So, yeah, what happened, there was an incident that took place at Chaparral Elementary, and it was reported.  And then, in response, the APS spokesperson said, "If you have any concerns, if there are any concerns, you're supposed to go to the site manager or the principal directly."

Q.  (BY MS. LARDY)  And this was on the news; is that correct?

A.  Indeed.

Q.  As an APS employee, are you aware that there are APS policies and procedural directives that you, as an

---

16 (Pages 58 to 61)

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

62

employee, are to abide by?

A. Like that one, absolutely.

Q. Okay. And, again, this was an APS spokesperson. This was not from an APS policy or procedural directive, correct?

A. Well, I'm -- I -- you'd have to ask the APS spokesperson who issued that statement to KO- -- I -- KOB.

Q. So in -- in your mind, what an APS spokesperson said on KOB and KRQE to the public is the only thing that you, as an APS employee, need to adhere to?

A. Interesting way to frame it. No, I never said that at all.

Q. Okay. So, again, my question was: Are you aware that there are APS policies and procedural directives that APS employees are to abide by?

A. I am aware of those, yes.

Q. Okay. All right. I am going to hand you -- oops, let me get -- just a second.

I am going to hand you what I've marked as Exhibit 1 to your deposition. Do you recognize this document? And take your time. Let me know when you're ready.

A. I do recognize it.

Q. What is this?

A. It's a hand-delivered letter from Ms. Jessica Rivera. And do you want me to read it?

63

Q. No, I'm just asking you if you recognize this document, and you said, "Yes"?

A. Yes.

Q. And then, what is this document?

A. It's a hand-delivered letter placing me on administrative leave with pay for allegations of employee misconduct.

Q. Okay. Is this the document that you're referring to that has a gag clause in it?

A. "Until further notice, you are not to be at... worksite, nor are you to have contact with students, parents or staff of the Albuquerque Public Schools." Indeed.

Q. Okay. And I think you said earlier that if you were to tell me certain things, that I could be fired because of the gag order?

A. Did I say that? Did you -- sorry; no, then, no, I don't --

Q. I was confused. Okay.

A. No, no, the -- that's not my intention. But if you want to interpret it that way, you're welcome to. But that's definitely not my intention.

Q. Okay. So what in here makes you believe that you were under a gag order?

A. "You are not to be at your worksite or on" -- "or on APS property, nor are you to have contact with students,

64

parents, or staff of the Albuquerque Public Schools." And then if you've read the document -- I'm sure that you have -- they contracted with a former member of law enforcement to spoof my -- to -- to do some things that are illegal, yeah.

Q. Okay. The next part says, "You are expected to cooperate, participate and re-" -- "remain available during the duty day to the APS Human Resources Department," correct?

A. That's --

MR. MORROW: Objection; form, foundation to that one.

Q. (BY MS. LARDY) You can go ahead and answer.

A. "You're expected to cooperate, participate and remain available during the duty day to the APS Human Resources Department." That's what it says, yes.

Q. Okay. And then it also states that, per the APS Employee Handbook, that you are expected to cooperate in investigations, correct?

A. It does say that.

Q. Okay. So is it your testimony today, then, that once you received this May 3rd, 2022, letter, you could not tell Vicki Price what happened in November of 2021?

A. "Until... you are not to have any contact with students, parents, or staff of the Albuquerque Public

65

Schools." Yeah, I think any written communication, with the exception of Union allowing that, would be perceived as a viol- -- could be perceived as a violation of this -- what -- what this says here, when it says, "You are not to have contact"; so I had to ask the Union representative for permission to reach out. Yeah, that's -- that's quite clear, yeah.

Q. And at no time in the six months before you received this May 2022 letter placing you an administrative leave did you feel it necessary to tell Vicki Price about the incident with the student in November of 2021, correct?

A. Can you be specific about what you're asking me about what -- what you feel that needed to be shared? I -- I'm not sure what you're asking.

Q. Well, I asked if you reported it to anyone else, the incident with the student in November of 2021, and you said that you couldn't tell Vicki Price because you were under a gag order.

A. I was not under a gag clause with the Union, right, a union representative, but if you read this right here, it does say "APS," right?

Q. Okay. So that was not my question. You told me earlier, correct, that you could not tell Vicki Price about what happened in November 2021 because you were under a gag order; is that correct?

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

66

A.  I was placed on -- this -- yeah, after this, the May 3rd thingy, yeah, that she's -- she's part of APS.

Q.  Correct.  So I'm asking you at any time prior to May of 2022, why you didn't tell Vicki Price about the incident at Chaparral in November of 2021 with the students?

A.  Because it -- it was addressed.  It was addressed until it came to the conclusion that the person on the receiving end interpreted the incident as an invitation for romantic activity.

Q.  Okay.  So the November 2021 incident was actually addressed at the school; is that correct, then?

A.  I addressed it to the best of my ability.

Q.  You addressed the incident by going to the principal?

A.  Engaging in protected conduct in compliance with the law when there was denial by admin, yes, multiple times.

Q.  Okay.  But you said it was addressed until it came to light that the student felt that it was an invitation for sexual activity.

A.  Romantic, you know, I prefer fris e.

Q.  Romantic activity.

A.  And then, that part, that part of trying to process and help a student to -- are you familiar with what Erin's law is?

Q.  Okay.  So let me ask it this way.

67

A.  Yeah.

Q.  I am just trying to figure out who else within the chain of command at APS, if this November 2021 incident you felt was not being addressed by Ms. Mondragon, who else you reported that to within the APS chain of command?

A.  The federal report, I think, was received to the superintendent on November of 2023, yeah.

Q.  You said a federal report?

A.  I believe so.

Q.  Was this the Office of Civil Rights report or the --

A.  It's --

Q.  -- Office of Civil Rights complaint?

A.  Office of the Civil Rights, which eventually merged with Equal Opportunity -- not Equal Opportunity; sorry.  The Federal Equal Employment Opportunity Commission.

Q.  Okay.  So the first time anyone outside of Ms. Mondragon was made aware of this November 2021 incident within the APS chain of command was in November of 2023, and it was the superintendent?

A.  Well, you -- you would have to ask the Union, because they were informed, and so was the office -- local office of Equal Opportunity of Services, so if it didn't go higher than that, that -- that's with them.

Q.  So the Union, you said January of 2023?

68

A.  No, the Union happened in -- from -- between May of 2022, up until definitely -- yeah, definitely more departments with -- of the Albuquerque Public Schools became aware by January 2023, yeah.

Q.  Of this --

A.  But definitely --

Q.  Of this November 2021 incident?

A.  Yeah, definitely -- after the May thing happened and after the Union confirmed that Ms. Mondragon tried to have me fired immediately, I'm still processing it, because she had said that she had my back, right, and so I'm still trying to protect the confidentiality, so, yeah.

Q.  Okay.  So you received this letter placing you on administrative leave in May of 2022.  And I know that you've already stated that you participated in an investigation with RCI investigators while you were on administrative leave, correct?

A.  Yes.

Q.  Okay.  When did you come back or when did you come off of administrative leave?

A.  I received news in July of 2023.

Q.  Okay.  Who did you receive news from?

A.  I got a call from the Union, and then I received an e-mail from human resources.

Q.  Okay.  And what did that e-mail say?

69

A.  "Congratulations, you have been transferred to Sandia High School."

Q.  Okay.  And then what happened after that?

A.  I met with the Union representative and representatives from the Albuquerque Public Schools.

Q.  When did that meeting with APS and the Union take place?

A.  The end -- tail end of July of 2023, possibly August, but I think it's the tail end of July, yeah.

Q.  Okay.  Is that when you then received this -- the August 2023 letter of reprimand?

A.  I -- yeah, received some kind of reprimand and something, and I didn't read it, because I asked for three things that were rejected.

Q.  So you didn't read the letter of reprimand?

A.  I received it and I glanced over it, and I was shocked, and it took me time to process it.

Q.  Since then, have you read that letter of reprimand?

A.  I've had to, yes.

Q.  What did that letter of reprimand state?

A.  Something to the effect of "You've been placed on a letter of reprimand for allegations of sexual harassment," and then it said something to the effect of, "It doesn't appear that it was sexual in nature, but you broke all these

18 (Pages 66 to 69)

**Page 70**

policies," and it basically omits everything that I did in compliance with the law and school policy. And it says something else, too, that's inaccurate.

It says, "As you know, someone filed a complaint on May 2nd," but that's not logically possible, right? So that's where I knew it was off, and it was quite, painful because you would hope that a school district that professes to care about children would be accurate and truthful.

Q. Why would it be ina- -- inaccurate that someone could have filed a complaint in May of 2022?

A. No, on May 2nd of 2022.

Q. On May 2nd of 2022.

A. Because the internal documents already state otherwise.

(Exhibit 2 marked.)

Q. (BY MS. LARDY) I'm handing you what I've marked as Exhibit 2 to your deposition. Is this the letter of reprimand that we were just referencing?

A. You know, I'd have to read all of it, and it's going to take a while, but it looks accurate. But then there's a habit of them changing certain things every time I receive one of these, so I have to be -- it will take me a while. But with respect to the fact it says on May 2nd that one is -- yeah, that -- that part is the same, yeah.

Q. If you would like, we can go off the record and

**Page 71**

take the time so you can read the -- the letter.

A. Yeah, let's give it about a minute.

Q. Okay.

MS. LARDY: We can go off.

THE VIDEOGRAPHER: The time is 10:48 a.m. We are off the record.

(Recess taken, 10:48 a.m. to 10:56 a.m.)

THE VIDEOGRAPHER: The time is 10:56 a.m. We are back on the record.

Q. (BY MS. LARDY) All right. Mr. Le, have you now had a chance to review the August 8th, 2023, letter of reprimand?

A. I have.

Q. Do you now recognize this document?

A. I do recognize both of these documents.

Q. Okay. And then the other one, I have not marked it yet --

A. Okay.

Q. -- but I did have you review off the record the November 6, 2023, directive.

MS. LARDY: And let me go ahead and just preemptively mark that as Exhibit 3.

A. Okay, sure.

MR. MORROW: I don't believe I have a copy of that one.

**Page 72**

MS. LARDY: Oh, sorry.

(Exhibit 3 marked.)

Q. (BY MS. LARDY) There's Exhibit 3.

A. Thank you.

Q. But for right now, we are talking about Exhibit 2. And you said that you now have had time to review this August 8th letter of reprimand, and you recognize this document, correct?

A. I do.

Q. Okay. And you'll agree with me that it states that the harassment complaint was filed by the child's mother, correct?

A. It -- yeah, that's what it says. Yes, I do. I see that.

Q. Following receipt of this letter of reprimand is when you were then returned to work at Sandia High School, correct?

A. Following this letter -- I think, yeah, around the same time. Right.

Q. Sure. And I won't hold you to the exact timeline, but you were placed back at Sandia High School in August of 2023?

A. In -- yes, yes.

Q. Or I could also say at the beginning of the school year 2023?

**Page 73**

A. Right. Like, the -- it's either the end of July or it's, like, the first day of August.

Q. Okay. Fair enough.

A. There was an all-school counselor meeting right around that time.

Q. And you were able to come back and participate in all of that prior to the school year starting, correct?

A. The -- yeah, the -- yes, yes.

Q. Okay. And then you referenced a performance improvement plan. When were you placed on that?

A. I believe I received that on either August 14th or August 15th of 2023.

Q. Okay. So around the same time as receiving -- receiving the letter of reprimand?

A. Right.

Q. Okay. Did you comply with that performance improvement plan?

A. To the best of my ability, I did.

Q. Were you taken off of that improvement -- performance improvement plan at some point?

A. I believe that it's -- you know, they never said anything. I was placed on administrative leave right around the same time that I would have finished.

Q. Okay. And that was the administrative leave in January of 2024?

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

74

A. Yes.

Q. And then, have -- was part of the performance improvement plan that you had to attend meetings with Vicki Price?

A. Yes.

Q. Did you have to -- have you attended any of those meetings with Vicki Price since your return from administrative leave in 2024?

A. Not to my knowledge, yeah.

Q. Okay. So to your knowledge, the performance improvement plan is complete?

A. I would hope so, yes --

Q. Yeah.

A. -- because the -- yeah, yeah.

Q. Exhibit 3 is a November 6, 2023, directive. And I know you had a chance to review this.

A. I did. I did.

Q. And do you recognize this document?

A. I do.

Q. And what was the directive in regard to?

A. With regard to -- it looks like a laptop issue, and it looks like whether or not protocol was followed with a student that I met with in -- actually, September; and so the -- my concern with this only was that the issue took place in September, and I followed the protocol, and I'm

75

being penalized here. And it alleges that I didn't follow the protocol, but of the 51 items, there's only one that I didn't do, and the one that I didn't do can only be done by a 54 -- 504 coordinator, and that's one I felt the intention of whoever wrote this, they were either directed to or they did -- it was to harm me.

Q. And what harm did this directive cause?

A. Well, the gag order -- I interpret this as a gag order in the sense that at the very end, you'll notice, "This memo's a confidential matter. It should be not be discussed with other staff or community members," but that could apply to, like, everything that we had talked about up to that point. And I had talked with Vicki, for example, the public racialization, sexualization, the public humping, all of that kind of stuff.

Q. And to be clear, it just says "this memo," correct?

A. It does. It does.

Q. Okay. Have you since talked about some of the concerns that -- that you had -- let me rephrase that. I apologize.

Since November 6 of 2023, have you talked with Vicki Price or any others about those racial comments from 2021?

A. My attorney.

Q. Okay.

76

A. My mom.

Q. Anyone from APS?

A. The union. But Jerry's not there anymore.

Q. Okay. And I just want to be clear you have not been disciplined in any way for any of those conversations that you have had since November 6 of 2023, correct?

A. I was -- yeah, the -- I think the administrative leave, that, to me, was concerning only because I would -- at that point, I learned -- like, the good faith stuff wasn't going to happen, and the union rep was kind enough to say he's not sure if they're going to be ethical, yeah.

Q. Are you talking about the administrative leave letter in January of 2024 --

A. Yes.

Q. -- or --

A. I spoke with the Union, I think, several times, and I said, "Dude, do you think they're going to be unethical?" And he said, "I don't know." And that was the first time, like, he gave me a clear indication, because before, it's, like, "No, no, no. It's good faith." And that's when I knew, like, "Oh, Dude." So I appreciated that, because he could have lied, which would be against the law, but, you know, yeah.

Q. So you're talking about when you were placed on leave in January of 2024?

77

A. No.

Q. I just want to make sure we have the timeline right.

A. No, the incident before that is I wrote a letter of rebuttal, which I'm -- hope -- I'm allowed to do, right, by negotiated agreement and State law? And then shortly thereafter, I received an inti- -- invitation to meet with an attorney, yeah.

Q. When was this letter of rebuttal?

A. I wrote it in December of -- 18th, could have been the 19th -- of 2023.

Q. Okay. What was this rebuttal letter in regard to?

A. This process and -- yeah, it -- basically, this -- this whole process starting from this -- you have it as Exhibit 2, the changing of the dates, right; and then process where I'm being -- directive, and then it's going to be used as a PIP -- it's on the website of APS. It says, eventually, you get progressive discipline, then you can be discharged and all that stuff.

Q. Sure. And so the two disciplinary letters that I show is the letter of reprimand and then a directive.

A. Yes.

Q. And those were from 2023, correct?

A. Yes.

Q. And you have not had any other discipline since

**20 (Pages 74 to 77)**

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

**78**

then, correct?

A. No. There are a couple memos that were thrown in there, so sup- -- because this refers to another memo, but they also changed the date on that memo as well. And it's -- it violates the negotiated agreement. It doesn't violate State law, but then when the Union tells me that they're going to operate in good faith, and they're violating three articles within, then I'm, like, okay, this doesn't feel safe, yeah.

Q. What do you mean "They violated the negotiated agreement"?

A. So in certain -- whenever you get feedback, you're supposed to -- if you do something allegedly a mistake, you're supposed to get feedback within ten days. This incident here that you have as Exhibit 3 refers to an incident that took place in September, where it alleges that I didn't complete the checklist. Out of 51 items, I completed 50 of them, and the one that I didn't do, I cannot do, because I'm not the 504 coordinator, right?

So it's somewhat misleading. Yeah. And then the laptop -- I was never given a laptop. I ordered -- I asked for one because the Union negotiated for every single employee, and then I asked for one on September 1st of 2021, and I never received one. I think I'm the only school counselor who never received a laptop. And so I bought a

**79**

work laptop specifically for -- to work as a full first-year high school counselor. And then I get this, and then Vicki told me, "You know what, I say this every meeting. I say you're never, ever supposed to use any personal devices, ever." And I see so many people checking their e-mails on the phones. I see people using their personal laptop. She's like, "Yeah, I say this at every meeting," and I'm, like, hmm. That's when I knew, like, yeah, dude, I'm basically getting screwed, yeah.

Q. So you asked for a school laptop back in --

A. Written. Written. Yeah, I sent e-mail, yeah.

Q. So let me ask the question. You wrote an e-mail asking for a laptop in 2021?

A. Yes.

Q. Did you ever follow up at any point between 2021 and receiving this directive in 2023 about the laptop?

A. Yes. I was told that there's no laptops.

Q. Okay. When were you told that?

A. When I called the APS tech help desk.

Q. When did you call the APS tech help desk?

A. In -- around this same time frames, yeah.

Q. In 2023?

A. Yes.

Q. So at any point between 2021 when you asked for a laptop and then calling the tech desk in 2023, any other

**80**

times that you reached out about a laptop?

A. That's a good question. After I was placed on administrative leave in May of 2022, I can't really ask for a laptop when they're trying to terminate me, right? So, yeah.

Q. Okay. So between No- -- I think you said it was November of 2021 that you reached out about a laptop initially in an e-mail?

A. Right.

Q. So at any point between November of 2021 and May of 2022, when you were placed on leave, did you reach out about a laptop?

A. I asked for one locally, I think. I'm not sure if I called and followed up. I just assumed that I would eventually get one because everybody else got one, yeah.

Q. Okay.

A. I had faith at that time that that would happen.

Q. Under the negotiated agreement, if you disagreed with the directive, you could have appealed it, correct?

A. It's this one right here?

Q. Yes.

A. It's possible, right. I mean, I'm not sure how the appeal process works. I've been told that it goes absolutely nowhere, but I -- I think it's written in there that you can appeal it.

**81**

Q. Okay. And, again, you -- you didn't appeal this directive, correct?

A. I wrote a letter of rebuttal, which res- -- ultimately resulted in them sending an attorney to threaten me.

Q. Who was the attorney that was sent to allegedly threaten you?

A. Well, it -- it was an attorney -- you know, her name is -- I'm drawing a blank right now. Can you give me a minute?

Q. Sure.

A. Zimmerman? I think that was her name. Hold on. I did tell you I have a A or -- A-plus or A-minus. I think it's Zimmerman or -- you know what --

Q. Is it Renni Zifferblatt?

A. Yeah, I think it's Renni -- yeah, I think that's what it is, yeah.

Q. Okay. So she had a meeting with you at some point?

A. No, but I don't feel that she was given accurate information, because if you or I were just to see these things, you would be -- automatically think, yeah, this person's guilty, right? So she just wasn't given good -- good information.

Q. Okay. But she had a meeting with you at some

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

**82**

point, correct?

A. They tried to schedule a meeting, and then I -- I asked my Union, "You don't think, like, they're going to be unethical, do you?" And he's, like, "Um, I don't know," and that's when I felt like, "Wow. Oh, dear, yeah."

Q. Okay. But if you know that there was an attorney by the name of Renni Zifferblatt, did you ever meet with her, with or without the Union, or with or without your attorney?

A. I've never met her in person.

Q. Okay.

A. She's probably -- she may have -- I think she's seen my writings and my rebuttals that -- I'm guessing, right?

Q. Was there ever a phone conversation or e-mail communication with her?

A. I have never spoken with her. I have never e-mailed her directly.

Q. Okay. Then -- I thought you said that APS sent an attorney to talk with you.

A. It's a -- yeah, they -- they basically sent -- this was unexpected for me, but I was scheduled for this meeting with her on -- I want to be accurate here, but it's definitely around December 21 of -- right after -- shortly after I wrote the letter of rebuttal, yeah --

**83**

Q. Okay.

A. -- I received this notice saying, cool, you're going to meet with -- yeah.

Q. And did you ever meet with her?

A. No. I requested to postpone the meeting.

Q. Okay. So the -- you never had any interaction with Renni Zifferblatt. You just saw her name on a notice for a meeting?

A. Yeah, it activated an awareness in my body that this is, like, not safe, and then I asked my Union, like -- and he -- I'm thankful. He's, like, Yeah, I -- are -- "Do you think they're going to be unethical?" He's like, "I don't know."

Q. Okay. So that meeting never happened, correct?

A. It was postponed, yes.

Q. And then you were placed on administrative leave?

A. On -- I got two letters. One's on January 19th of 2024, and the other one is on January 22nd of 2024.

Q. Okay. And then, when did you come back from being on administrative leave?

A. I believe that I received a laptop on July of 2- -- July of 27 -- or July 26 of 2024, and then my chat was restored probably in August, yeah.

Q. Okay. Did you receive any discipline from when you were placed on leave in January of 2024 until you

**84**

returned?

A. I received -- through the EEOC process, I received this document and -- yeah. Well, no, it was -- it was basically a district saying that there's -- these are accurate documents. But here's the thing, right, when the district and the federal agency get involved, and if they're not being fully truthful, then it violates the federal law, right? So that's Title XVIII U.S.C. 1001. That's why I'm, like, Dude, I don't like that when you're breaking the federal law. So, yeah.

Q. Okay. So my question, though, these are all documents from 2022 --

A. Right.

Q. -- and 2023, correct?

A. Right. Right, right, right, right.

Q. Okay. So my question is, when you were placed on leave in January of 2024, until you came back in, you said, July of 2024 --

A. Right.

Q. -- during that time frame only, did you receive any sort of discipline from Albuquerque Public Schools?

A. I didn't receive a letter of discipline, but the internal communication suggests that, yeah, there's a desire to terminate me or discharge me, whatever you want to call it.

**85**

Q. What internal communications are you talking about?

A. It's a communication, I believe, between the director of human resources, Ms. Jessica Rivera, and the Office of Equal Opportunity Services. I believe her name is Miss Heather Cowan. I say "miss." I might be wrong, because she might have a different gender identity.

Q. And, again, you have not been terminated by Albuquerque Public Schools, correct?

A. Yes, I -- that sounds true to me.

Q. Okay. And sorry; that was a bad question. It is correct -- let me just ask you this. You have been continuously employed by APS from 2014 through the present, correct, or 2015?

A. Indeed.

Q. Okay.

A. 2014, yeah, sometime in July or August, yeah.

Q. If you'll just bear with me. I think I'm going to combine all of these as one exhibit.

(Exhibit 4 marked.)

Q. (BY MS. LARDY) All right. I am marking this all as Exhibit 4. And I will represent to you that these are the initial charge and then the two amended charges of discrimination, but feel free to review.

A. I think I got it. Thank you.

22 (Pages 82 to 85)

Le v. Board of Education for Albuquerque Public Schools

86

Q. Okay. So do you recognize these documents?

A. I do.

Q. And do you agree that these are your initial charge and then two amended charges of discrimination that you filed against Albuquerque Public Schools?

A. Yes.

Q. And you filed these with the EEOC, correct?

A. Yeah, I think it does get filed with the New Mexico Human Rights Bureau. I think it --

Q. Agreed.

A. Yeah.

Q. You are correct on that.

And please correct me if I'm wrong, but in reviewing these three charges, the only change that I see between them is the discrimination based on category.

A. Okay.

Q. Is that --

A. I think so, yes.

Q. Okay. So the first charge from January 19th of 2024, it states that the discrimination is based on color and race, correct?

A. It does, yeah.

Q. And then the amended -- the first amended charge from April 4th of 2024, states the discrimination is based on color, national origin, race and sex --

87

A. Right.

Q. -- correct?

A. Right.

Q. And then the last amended charge from April 9th, 2024, states color, national origin, race, retaliation and sex, correct?

A. Yes.

Q. Okay. And I know it is your dis- -- digital signature on each of these. You're not disputing in any way that these are the charges that you filed, correct?

A. I'm not disputing that.

Q. Okay. And the dates that the discrimination took place you indicated were the earliest of November 16, 2023, to January 19th, 2024, correct?

A. That's what it says here, right.

Q. Okay. So I want to go through under the Particulars section. And, again, when I reviewed them, the Particulars section remained the same on all three copies, and I want to go through each of the three instances of discrimination/retaliation that you list.

To start, it states that on November 16th, 2023, you filed a complaint with the New Mexico Attorney General regarding unprofessional behavior by your principal, correct?

A. Yes.

88

Q. Was this complaint on the unprofessional behavior by your principal the -- the issues that we have already discussed today that occurred -- that occurred back in 2021 and 2022?

A. Yes, ma'am.

Q. Okay. And then it states that on November 17th, 2023, you were denied access to e-mail; is that correct?

A. Yes.

Q. Can you please tell me what happened in terms of you being denied access to e-mail?

A. I was not able to access the e-mail. I was given I -- what's called a high school laptop or a Chromebook, and it stopped working, and it asked me to log in to the Google -- it's -- it's in written form, right? Sorry; I want to be accurate with you. It asked me to log in to some kind of Google thing on the Chromebook, but you can't access it because you're already blocked, right? So, yeah, that -- that's -- yeah.

Q. Okay.

A. The laptop they gave me didn't work on that day, and it worked prior, prior -- sorry. It's not a laptop. It's a Chromebook, but it worked perfectly prior to that.

Q. So on November 17th of 2023, a Chromebook that you were given by Albuquerque Public Schools did not work, correct?

89

A. It stopped working, yeah. It asked me for an impossible thing to do. It says "Go to your Google settings," and it's not possible, because you can't even log in to get to the Google settings.

Q. Okay. Was this fixed?

A. It was fixed. It was eventually fixed. I was given, for the first time, a new laptop.

Q. When were you given a new laptop?

A. After I e-mailed the Union, Vicki Price, the school principal of Sandia High School, saying, like, "Thank you so much for this Chromebook; however, it" -- I showed them the prompt, and then it's impossible -- let them know it's impossible to actually access the Chromebook.

Q. Okay. So when did you receive this -- the -- the new laptop, the new Chromebook?

A. I think -- I think they immediately produced it --

Q. Okay.

A. -- either that day or the day after.

Q. So this issue was fixed either on November 17th or November 18th of 2023, correct?

A. Yes, it was.

Q. Were you given an explanation about what happened in terms of you not being able to get into the first Chromebook?

A. It said I don't have my two-step security set up,

**23 (Pages 86 to 89)**

Le v. Board of Education for Albuquerque Public Schools

90

but that's -- it's completely irrelevant to the issue of the Chromebook, yeah.

Q. Were you given an explanation by anyone at APS about what happened?

A. I think that his name is Joseph Lovato, but he says, Oh, yeah, it's because of your two-step security settings, which is not -- which is for a laptop, not for a Chromebook.

Q. Nonetheless, it was fixed, you said, immediately?

A. It was addressed immediately, yes.

Q. Okay. So if this was addressed immediately, can you please tell me how this was an instance of discrimination against you?

A. Oh, because the -- the whole process began after I was framed as a target by Ms. Mondragon, and so when I'm put on a performance plan, and I'm, like, vulnerable, the -- the reality is that anything that you do could be used against you. And so prior to that happening, there was a student who disclosed that she felt unsafe at home due to things happening -- this is a high school student who's on my caseload. And it was brought to our attention that she felt unsafe about either domestic abuse, something about her sibling.

And so I asked the person who heard that to report it, and then they told me no, no, no. And then, later on, that

91

student came in screaming, "My teacher keeps saying I need a female counselor," and she screamed it, and then that person who didn't want to make the CYFD report kept telling everybody, my colleagues, "She needs a female counselor," and then the allegation of -- her name is Ms. Jennifer Mackey. She's, like, Oh -- she was kind of sitting, like, where you are, like, smiling. She's like, Yeah, did you -- did you put Louie the Lobo -- it's a mascot. Did you -- did you -- did you put him on your lap?

And then she's, like -- and she's like imitating, like, somehow it's sexual. She's, like, did you -- did you wave him in the air? And I was just so nauseous. And Vicki's there taking notes, not even questioning, like, whether this is -- actually happened. And then she's had this on letterhead, it's on APS letterhead, that I did all these things. And then the person who was alleged to have witnessed this confirmed that, no, that -- that's not true.

And so I'm led to believe that Ms. Mackey was used to basically create this sexual gash -- allegation about me with Louie the Lobo with the student to create a progressive improvement plan to stick it to me. She's also the same person who wrote a report to the NMPED, I think in September or October of 2022, alleging the -- that I engaged in sexual harassment or employee misconduct with the student I had advocated for.

92

Q. Okay.

A. And that's the nexus.

Q. So -- so when was this meeting with Jennifer Mackey?

A. On October 2nd of 2023.

Q. Were you disciplined at all following a meeting with Ms. Mackey in October of 2023?

A. That's when I got -- yeah, there's this -- this is not accurate. So this thing refers to something that took place -- Exhibit 2. Or is it -- or, no. Sorry; is it Exhibit 1 here? One of -- yeah, it refers to a memo dated 10/30/202- -- sorry; it says October 30th, 2023, but the memo's actually dated 10/03/2023.

Q. Okay.

A. And that's where I'm getting disciplined for something that took place when I'm complying, you know, with school policy, helping a kid process the fact that they felt suicidal. And I'm being penalized for allegedly not following all 51 things, but I completed 50 of them, and the one thing that I couldn't do could only be done by a 504 coordinator --

Q. Okay.

A. -- so it was like set up to stick it to me.

Q. Okay. So that -- the October 3rd memo and this November 6, 2023, directive then culminated in the

93

discriminatory act of you not being able to access your Chromebook; is that correct?

A. The report that I wrote, I think, documenting is very -- very succinctly summarizing what took place with the public acts of dry-humping that I put in the -- for the New Mexico Attorney General that I think eight hours later, or could be six hours later, I wasn't able to access my work e-mail for the first time in my entire employment with the Albuquerque Public School District.

Q. So this complaint that you filed with the New Mexico Attorney General on November 16th of 2023, who did you send that report to?

A. There's a -- like a website intake form. I don't know who reads it, though. But, like, it's -- it just says you submit a form here, and you're given a number.

Q. Did you send that complaint to Albuquerque Public Schools?

A. No, because my -- my hope was that it would be -- operate independently, but the New Mexico Department of Justice doesn't have a civil rights division yet, so -- but I had to hope, you know.

Q. So you sent a complaint to the New Mexico Attorney General's office on November 16th, 2023. You did not send any complaint to APS, but you are correlating your complaint filed with the New Mexico Attorney General's office to you

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

94

not being able to access your e-mail the next day?

MR. MORROW: Objection; form, foundation.

MS. LARDY: I'm --

A. I mean, it's a correlation that anyone could rationally draw, yeah, yeah, absolutely. But, I mean -- yeah.

Q. (BY MS. LARDY) But, again, like you said, you -- you sent that November 16th complaint only to the Attorney General's office. You didn't, like, carbon-copy APS or anything like that?

A. I don't think that would be smart, if they're supposed to operate independently. And if the New Mexico Department of Justice is supposed to regulate and oversee. But I -- there was another one. It was with the Office of Civil Rights that I filed, and it was filed on November 6th of 2023, which coincides with this exhibit here that I received, Exhibit 3.

Q. Okay. So the November 6 -- was it a complaint that you filed with the Office of Civil Rights?

A. Yeah.

Q. Okay. So that complaint that you filed with the Office of Civil Rights on November 6 of 2023, did you forward that to Albuquerque Public Schools or carbon-copy Albuquerque Public Schools on that complaint?

A. No, but -- yeah, it does suggest that on the

95

website for Albuquerque Public Schools that that's something that you can do. It's not a violation of protocol, right?

Q. Sure. I'm just trying to see if you ever sent any of these complaints to Albuquerque Public Schools or if you just sent these to the other agencies fully independent of Albuquerque Public Schools' knowledge?

A. I -- yeah, I sent it in the hope that it would -- like, you're talking about chain of command. My understanding of that, that would be it would be a higher chain of command, yes. But I did try internally with Vicki. I tried that, and she's the district administrator of counseling, and there's a ethical standard called "E.1.D.," and it says that that's who you're supposed to report it to.

Q. And when did you report things to Vicki Price?

A. That would be in the August to September of 2023 time frame.

Q. And what did you report to her in August to September of -- so right when you returned from administrative leave, correct?

A. Right.

Q. What did you report to her in that time frame?

A. The incidents of the kid getting humped, my reaction. I do apologize. I normally don't, but I said, "This is F'd up. She's going to lose faith in the system and the boys are going to think this is funny." I said that

96

maybe two or three times, and then I talked about the fact that my family and I were publicly racialized and sexualized.

Q. What did Vicki say to those things in the August-to-September 2023 time frame?

A. She either said it before or afterwards, but I -- she either said, "Don't write" -- "You don't need to write a letter of rebuttal." So that -- I -- yeah. She said you -- yeah, she didn't recommend -- she's, like, "Yeah, don't write the letter of rebuttal," so that's why I had to let the -- she obviously didn't do those things, but when she said, "Don't need to write a letter of rebuttal," I'm basically omitting the truth of what happened. And so -- but I have to report it, right? So if I'm reporting to Vicki, then that means I have to report to somebody.

So I actually first went to the Bernalillo County Attorney General. I called them. They're, like, "Oh, man, you" -- "you've got to tell this directly to the New Mexico Attorney General," and then I'm -- that's what I did, yeah.

Q. Okay. When she said you don't need to write a letter of rebuttal, was that in regard to the letter of reprimand --

A. Uh-huh.

Q. -- from August?

A. Uh-huh.

97

MR. MORROW: Yes or nos.

A. Yes. Sorry.

Q. (BY MS. LARDY) Okay. That's okay.

A. I made the noise. I thought you heard me.

MR. MORROW: She did. It's for the court reporter.

THE WITNESS: Got it. Got it. Sorry.

Q. (BY MS. LARDY) And then the last report that I believe you filed was with the City of Albuquerque; is that correct?

A. That was the first report, and then afterwards, that -- then it went to the Federal Office of Civil Rights, which then connected to the Equal Employment Opportunity Commission, and that's when I felt a huge shift. And that's when I felt safer. And then talking with the investigator, it's, like, oh, this -- this -- you could just tell he really cares, right? He's been an educator both domestically and overseas. He's a veteran. He's put his life on the line for constitutional freedoms. And that's when more of my truth could come out, and I could be, like, okay, I can actually write this without fear of retaliation and further discrimination.

Q. Was this the EEOC investigator that you're talking about?

A. Yes. Yes, ma'am.

25 (Pages 94 to 97)

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

98

Q.  When did you file a report, though, with the City of Albuquerque; do you remember?

A.  That was in August of 2023.

Q.  Okay.  And then --

A.  I did reach out in September.  Or I reach -- I could have reached out in August, and then they encouraged it.  Like, yeah, you know -- and they told me, "You have certain" -- "this is" -- "these are the timelines you have."  Because I was still hoping and praying that they would just expunge it, but they didn't.  So -- yeah.

Q.  What is it that you were hoping would be expunged?

A.  All derogatory files so that I wouldn't have to write all these letter of rebuttals and then documenting all this stuff.

Q.  Did you ever ask that -- I'm assuming you're talking about the letter of reprimand and the directive, correct?

A.  I'm talking about the letter of reprimand, and I -- initially I wanted this to be, but I realized, no, I -- this -- this -- this was meant to be, right?  I was meant to experience this.  But, yeah, this one, and I think the report that Robert Caswell Investigations did, yeah, because if I have to rebut that, then it exposes their process, which is not very truthful.

Q.  And as it relates to any sort of a rebuttal, you

99

did submit something to -- a report for your personnel file, correct?

A.  I did one for personnel file and one for the Office of Equal Opportunity Services.

Q.  Okay.

(Exhibit 5 marked.)

MS. LARDY:  We're on Exhibit 5, right?

THE COURT REPORTER:  5, uh-huh.

Q.  (BY MS. LARDY)  I'm going to hand you what I've marked as Exhibit 5.  And just let me know whenever you're ready for me to ask some questions.

A.  I'll do my best that I can, yeah.

Q.  Are you ready?

A.  Oh, yes.  Thank you.  I didn't know you were waiting for me.  Thank you.

Q.  Nope, it's okay.  Is this the report that you submitted to be placed in your personnel file?

A.  This is a redacted report, but not -- not the one that I eventually submitted.

Q.  This wasn't what you submitted to APS?

A.  No.  This is a redacted report, but it's not -- it's not everything, no.

Q.  So what did you -- I will represent to you that this is what's in your personnel file.

A.  Okay.

100

Q.  So if this isn't what you submitted to --

A.  There's more than this, so this is not everything.  There's far more than this.

Q.  Are you talking about there's other reports, or --

A.  Yeah, you --

Q.  -- there's other information as it relates to this?  I --

A.  There's other reports, and there's other information as -- yes, both, yeah.

Q.  Okay.  So I will represent to you that I pulled this out of your personnel file because I thought this was the entire redacted report in response to allegations of sexual harassment.

A.  Oh, this -- for redacted report, that would be accurate for redacted report.

Q.  Okay.  So this is what was in your personnel file, and my understanding is that you gave this to human resources for your personnel file.

A.  I think I gave this to the Union representative, right, and the -- I gave this to the Office of Equal Opportunity Services.

Q.  Okay.

A.  Yeah, then -- yeah, but there's -- there's much more than this, yeah.

Q.  Okay.  So what do you mean there's -- there's --

101

there's much more than this?  I'm only saying that because I know there are other reports in your personnel file.  I just want to get clear as -- as to why this.  Why you submitted this report to APS?

A.  Oh, because I was only given limited information.  Like, the person who interviewed me, he said, "Oh, yeah.  This" -- "this kid filed a complaint," but it doesn't make any sense, so I knew that the person was -- well, to me, that person was lying, right?  Because why -- why would you file a complaint to a school counselor when you're trying to process your feelings that you have about the person who was -- dared to publicly hump you in front of multiple people?

Q.  Okay.  So why do you have this as a redacted report?

A.  Because I'm not going to share everything with -- like, this is what I tell the kids, right, and this is why they kind of trust.  So I say, "Look, man, whatever you're telling me here, it stays in here."

And then -- so if an officer asks me, "Hey, what did the kid tell you," that's a violation of confidentiality, but if it's a judge that asks me, "All right.  I really need to know, what did this kid tell you," I'm kind -- I have told kids this, like, "I kind of have to, because I'm under oath," but if it's a cop, it's a very -- or former member of

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

## 102

law enforcement, that's a different -- that's a different story.

Q. Okay. And I apologize. This does say that it -- you sent this to the Office of Equal Opportunity Services.

But you'll agree with me that this is also in your personnel file, correct?

A. It may be. I'm actually not sure if this one is -- yeah, you know what, this probably -- if you're saying it's in my personnel file, then it must be because that's what they've given you, yeah.

Q. Yeah. And my understanding, again, is that this was your rebuttal to the May 2022 allegations?

A. Based on the information that they disclosed, this is what I provided, yeah.

Q. Okay. Agreed. So we -- we at least agree on that. So since this is a redacted report, are you telling me that you have another report somewhere that's an unredacted copy?

A. That's probably the attorney-client privilege, right, if -- that's probably -- yeah, everything that I have shared with my attorney.

Q. Okay. When you created an unredacted report of this, did you have an attorney at that time?

A. I had reached out to attorneys, and then the Union told me, "You don't need one," and so I gave a very far more

## 103

detailed report, and so, like, 200-plus pages.

Q. Okay.

A. And that was shared in April, I think, of 2023, and that one is designed to be released in the year 2047, 2048.

Q. Okay. So where does this 200-page report that's designed to be released in 2047 or 2048 currently reside?

A. It was given to the Union representative, who told me that it was read by Vicki Price, and it was read by Jessica Rivera, but he kind of changed his mind. He's like, "Ah, Jessica did it," when he had prior told me -- he said Vicki and Jessica had read it, so you'd have to ask him.

Q. So your Union representative gave this 200-page report to Jessica Rivera and Vicki Price?

A. He said they read it. I don't know if he handed it, but he said that they read it.

Q. Do you currently have this 200-page report?

A. I -- it's on the e-mail, yeah, that I gave to the Union rep, yeah.

Q. Have you produced that 200-page report in this litigation?

A. I can. I can, absolutely.

Q. Okay. Is there a reason why you haven't produced it to date?

A. Because it's supposed to be -- it was supposed to

## 104

be confidential, yeah, and -- and the idea was that it would expunge this entire matter and that we wouldn't need to be sitting here today.

Q. But you designed it to be released in, like, 21 years from now, correct --

A. That's --

Q. -- or nine --

A. Yeah.

Q. -- 21 years from now?

A. Yeah. The -- the belief that the Union representative disclosed is that it's possible that this student might have some kind of feelings for me, so I'm -- I'm just not -- I want to make it clear that this is really -- if you really want to truly become a counselor or therapist, this document is for -- yeah, this is a perfect time to release that.

Q. Okay. When did you submit this redacted report to EOS? And EOS is the Equal Opportunity Services Office for APS.

A. It would probably be in November. It would probably be in November or October of 2022.

Q. Okay.

A. I'd probably say there was one in October, but then I kind of -- I rewrote it after I met with the Union rep; may have added a couple things at his recommendation --

## 105

at their recommendation.

Q. Did you submit this to anyone other than the EOS office?

A. I don't -- I may have shared it with -- no, I don't think so. Not this one, yeah.

Q. Okay. And, again, you said this was November of 2022, or right around there?

A. Yeah. November, October, yeah.

Q. Okay. Is there a reason why there's not a date or anything on there -- on here? Unless I missed it.

A. That's a really good question. I think, looking back, probably because this is going to evolve because it's redacted, so then the more responses I get from the district, I'll share more because they weren't -- because they weren't forthright, I'm like, "Well, this is what I'll share." And I get the feeling they're trying to get as much information as possible from me to reduce, like, you know, their liability and hide the fact that they violated the law. So, yeah, I -- I felt very unsafe, yeah.

Q. Okay. So going back to Exhibit 4, which is the charge of discrimination, we've talked about the first instance of discrimination retaliation, which was this November 17th denial of access to e-mail, correct?

A. That's what it says here, but re- -- in reality, I would say the first written reprimand on August 8th, the

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

106

PIP, I think that would be more accurate, right?

Q. Okay. Except on your charge of discrimination, you -- you have the earliest date of discrimination was November 16th of 2023, correct?

A. November 16th, that's what it says on the first one, right?

Q. That is what it says -- you can look at all of the charges. The dates remained the same.

A. Yeah. I don't have the full -- I -- yeah. So just to clarify, I'm not allowed to produce these. The person who I communicate is the one who types this in, right? I wish I could do this myself, but I can't. So this is not entirely accurate, right?

Q. You signed each of these, correct?

A. I did, and then it was explained to me why it was -- it was done in this way, yeah.

Q. What was the explanation as to why this was done in this way?

A. The explanation was that if -- for their standard operating procedure, you put a couple things, and then it allows the -- whoever the organization is -- could be Walmart, Home Depot -- they have to respond. And then it allows this process to unfold. And then the EOC -- EOC investigators, if they have time, they can get a sense of, you know, what's -- what's going on.

107

Q. What about -- still, I'm back on the fact that the dates the discrimination took place that lists November 16th of 2023, and you're now changing what you think the earliest date of discrimination is, correct?

A. No. I was -- I was actually quite forthright with the EEOC. I think you have those communications. If you don't, I mean, they should be available of, like, where I requested -- like, no, the first one was actually -- I would like it to be August 8th, yeah.

Q. But, again, you -- you're not disputing that you are the one that signed each of these charges and amended charges of discrimination, correct?

A. No, I'm not disputing the fact that -- at all.

Q. So -- and on this charge, the second particular instance of discrimination/retaliation, it states, "On January 10th, 2024, my ability to print was removed from the school printer."

A. It could have been earlier, but I think I noticed it on that day, yeah.

Q. Okay. So can you please tell me what happened regarding your ability to print from the school printer?

A. When you -- on your desktop, when you hit the print button, and you ask it to print from the counseling printer, it just stopped working. You try to send it to the work printer in the administrative office; that doesn't

108

work, and then -- yeah. So it just didn't work anymore.

Q. So you discovered this on January 10th, 2024. Was this fixed?

A. It was fixed after I was placed on administrative leave and -- and no longer on campus.

Q. Okay. So for nine days, you were not able to print from the school printer; is that correct?

A. I would say yeah. Well, I was on campus on the 22nd of January, which is a Monday, of January.

Q. Okay.

A. And that's -- that's the -- yeah. I would say that would be the -- they fixed it after -- sometime after the 22nd of January --

Q. Okay.

A. -- after I was gone from campus.

Q. And you never returned to Sandia campus after that, correct?

A. I did pick up some belongings, maybe in May, that people had gathered for me.

Q. When you returned to campus in May, was -- do you know if your printing capabilities were fixed?

A. They -- they said it was by e-mail, I think --

Q. Okay.

A. -- in February or January. They're like, "Oh, we" -- "we fixed it."

109

Q. Who sent you an e-mail in January or February saying it was fixed?

A. I think it was the technology help desk.

Q. Okay.

A. Someone -- an employee.

Q. Did they give an explanation as to why the printing -- the printer wasn't working for you?

A. They did. Yeah, they did give an explanation. And to be honest, I don't know exactly what it was because the person who I spoke with, her name is Kay, she told me that she tried to put the -- my employee ID back in the counseling printer, and it didn't work. And so I'm not sure what explanation they give for it -- for it not working anymore.

Q. Either way, it looks like it was fixed in either January or February, correct?

A. Likely, yes.

Q. During this time that you were on campus before administrative leave, were you able to print from another printer?

A. I was able to use both the counseling printer and the work printer in December, in November, in October, and in September of 2023.

Q. Sure. But during this time when you say that your ability to print was removed, was it only from one printer

28 (Pages 106 to 109)

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

**110**

on Sandia's campus, or were you not able to print at all at Sandia's campus?

A. Yeah. I -- I couldn't print on any -- on any -- on any of the remote things. I mean, in theory, if I could bring a printer and hook it up directly to the computer, it would probably work, but I don't -- I don't think you're supposed to do that. So, yeah, in theory, but I don't know if that's actually true.

Q. Okay. So from January 10th to January 22nd, how many times did you need to print?

A. Several. I had parents come in. I had students come in. And they would request either their transcript copy, print something else, yeah.

Q. So what --

A. But I -- I relied on the kindness of my colleagues.

Q. Okay. So you were still able to print through --

A. Yes, ma'am.

Q. -- the kindness of your colleagues?

A. Yes.

Q. Okay. And so how was this -- the January 10th, 2024, inability to print, how was that discrimination and/or retaliation against you?

A. It could be the fact that they had just received my letter of rebuttal where I document the things that you

**111**

have talked about with the public racialization and sexualization that I basically gave, that I'm allowed to do by the negotiated agreement State law, right?

And then afterwards, if I'm not allowed to print -- if I'm the only one not allowed to print when I complied with negotiated agreement, my rights under State law, it's part of it, you know, but is it going to, like, kill me? No, but it's kind of weird that I have to ask everybody else, and it kind of makes -- puts me in a interesting light, right? Like, "Oh, they cut off Daniel's ability to print," you know.

Q. And to be clear, you said that you submitted this redacted report, the rebuttal, in November of 2023, correct?

A. November, October, yeah.

Q. And you stated earlier that through December, you were able to print, correct?

A. I was.

Q. Is it possible that there was just a technology issue that resulted in this inability to print?

MR. MORROW: Objection; form, foundation.

A. I mean, is it possible that it just happened to me right after a letter of rebuttal, and it's unrelated to that? There's a possibility. I -- I don't think it's very -- yeah, there's a possibility, but I -- not realistic, no.

**112**

Q. (BY MS. LARDY) And, again, this inability to print was two months after you submitted your redacted report, correct?

A. No. It was a letter of rebuttal that was submitted on December 18th of 2023. Shortly thereafter, we were on holiday break. And then, yeah, I couldn't print when we got back from the holiday break.

Q. Who did you submit this letter of rebuttal to?

A. The people that I was mandated to report to, which is human resources, Vicki Price, and a Union rep.

Q. And that's different from this redacted report, correct?

A. It is different.

Q. Have you produced that document, the letter of rebuttal?

A. I don't have it here with me. I actually asked for it to -- I -- you know what? Under good faith, I -- like, we can remove that. So I had a conversation with Ms. Rivera, but, you know, I can produce it in evidence if you want further down the line.

Q. Have -- I'm asking you if you have produced it to date in this lawsuit?

A. Have I shared it with my attorney? I believe that I have.

Q. No, no. I'm asking if you have -- if I have a

**113**

copy of it in all the documents that were produced to me thus far?

A. I -- I don't know what's been produced to you and given to you, so I can't answer that for you. Like, I -- so I don't know if they retracted that and didn't show it to you. If they didn't show it to you and if you don't have it, then my suspicion would be that they didn't give it to you, but it's on e-mail record.

Q. Is -- this letter of rebuttal, is it in a similar format as the redacted report, or is it in --

A. No.

Q. -- is it in e-mail?

A. It's -- it's in an e-mail form. It's, I think, in a Word document, yeah.

Q. Does it say, "Letter of Rebuttal"?

A. I believe it does.

Q. I want to go over this last allegation of discrimination/retaliation, and then we'll take a break.

January -- the last one on here, it says, January 19th, 2024, you received a letter being placed on administrative leave. I know we have talked about you being placed on administrative leave at that time. How was being placed on paid administrative leave an instance of discrimination and/or retaliation?

A. When -- the last time I was placed on

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

**114**

administrative leave was right after I engaged in protected conduct, and when this happened after I engaged in protected conduct, advocating for a student with the Section 504 plan, advocating for a student who felt suicidal, advocating for a student that disclosed domestic abuse to their classroom educator, when I was placed on admin leave, they created the narrative -- whatever narrative they did. And then I think eventually someone -- I think it was Ms. Rivera, there's an e-mail where she sends to Ms. Heather Cowan in February recommending my termination.

Q. So what was the event that led to you being placed on leave in January of 2024?

A. They alleged that I had problems scheduling students, and then -- but they omitted the fact that they didn't give me access to the counseling database and that somebody basically gave access to everybody else, except for me, on December 21st. And so I was unable to help students and access the counseling database.

And then on January 10th, students and parents complained or -- because they didn't -- I didn't know, you know, that they had made this request because I was -- I was the only one who was not given access, right?

And then on January 19th or January 22nd, I'm placed on admin leave, and they're like, "Oh, yeah. You've got all these problems of scheduling," I mean, but it's not possible

**115**

for me to schedule students when I'm blocked from actually reading the student and parent requests.

So it was a very convenient kind of like, "Let's place this guy on administrative leave. Let's prevent him, you know, on December 21st, from accessing the counseling database, and let's place" -- "and then we'll have the complaints, and then we'll just place him on administrative leave," right?

And they're only going to give their side of the story, so that's -- and, clearly, when they put that in February of like, "Oh, cool. Let's" -- "Let's recommend the termination," yeah, it's -- it's not a good-faith process.

Q. Are you aware that an individual can be placed on paid administrative leave for any reason at APS?

A. I am aware.

MR. MORROW: Objection; form, foundation.

MS. LARDY: We can go ahead and go off the record.

THE VIDEOGRAPHER: The time is 11:59 a.m. We are off the record.

(Recess taken, 11:59 a.m. to 12:20 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 12:20 p.m.

(Exhibit 6 marked.)

Q. (BY MS. LARDY) Mr. Le, before we went off the record, you had stated that there was an e-mail between

**116**

Jessica Rivera and Heather Cowan talking about you being terminated, correct?

A. Recommending it.

Q. Okay. I'm going to hand you what I've marked as Exhibit 6. Review it, and let me know when you're ready for me to ask --

A. I'm ready.

Q. Okay. So is this the -- the e-mail that you were referencing?

A. Indeed.

Q. Okay. And it does reference here -- on the last sentence of the first paragraph, it states, "Renni" -- and we have established that Renni is another attorney for --

MR. MORROW: Copy?

MS. LARDY: Oh, I am so sorry. There you go.

MR. MORROW: No, no, no. That's for you.

Q. (BY MS. LARDY) "That Renni responded to his demand and has been trying to work something out with him so that Mr. Le can leave APS at the end of this semester," is that what you were referring to?

A. This -- if you're asking me if -- if you've read it correctly, you have, but this process, if you're not aware, it began on November 17th of 2021. And after I was framed as the target of investigation, I lost about 20 pounds. I felt sick.

**117**

They're trying to -- you know, even said they're trying to fire me, and then when I release a request saying I'm going to file a Title VII report to protect myself, loved ones, people with Asian ancestry, and people who hold faith in deity, immediately I get a response from the district, saying, "Oh, you've been transferred -- congratulations -- to Sandia High School." So they understand that they've caused a lot of pain and damage, so this here obviously doesn't include the pain and suffering, and it doesn't include -- you know, that goes on for months, so, yeah. They --

Q. So --

A. But it's -- yeah. What you've read is, in fact, correct.

Q. Right, but my question was, where in here does it say that they are recommending that you be terminated from the district?

A. Well, yeah. It says, "We're going to get him to leave." When they give this attorney all this false information -- for example, when it says, "Oh, as you are aware, a complaint was filed against you on May 2nd," which is complete lie, right? They give you this, which says if you talk about this with anybody, to any community member, you're basically -- yeah, you're gone -- retaliation.

So that's called threatening somebody's employment,

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

118

discipline, suspension. You ruin some people's reputation. Multiple people have access to this personnel file, which, sadly, began on May 3rd. So every administrator who I work for is going to read this and think, "Oh, look." And then when Vicki Price says, "You know what? Don't write a little" -- "You don't need to write a letter of rebuttal," then everyone's going to think this is true when it's, in fact, false.

Q. Okay. But that e-mail that I gave you as Exhibit 6 was the e-mail that you were referencing earlier, correct?

A. So -- yeah. I'm glad you put it as Exhibit 6 because when you put these together and there's actually more documents and memos that were thrown at me in addition to the RCI report, which are basically unsubstantiated, like, allegations, yeah, all this together is -- it's a capstone of everything that happened before, beginning back to May 3rd, '22, so this is not everything.

I didn't tell you that I lost 20 pounds between the time that I -- when Principal Mondragon was saying, "Yeah, yeah, yeah. You've got to get back. You've got to get back. You need to get back," right? I needed to recover.

And then when I get back, she's like, "Hey, I got your back," and then how she gets my back is by recommending my termination immediately and just hiding the fact that I was

119

advocating for that student while she was laughing and denied the fact that the kid was getting humped --

Q. Okay.

A. -- right?

And then my phone was hijacked, right, my cell phone, my personal e-mail, daniel@the1family.org, given administrative access to someone else, which is a violation of the Fourth Amendment, but, yeah, if you want to be specific --

Q. You said that your phone and e-mail was hijacked. Are you --

A. My phone was spoofed, yeah.

Q. Are you alleging that APS did that?

A. The person that they contracted with on -- spoke with me in the day after -- yeah, I couldn't speak with my parents. They didn't call me. They were worried because I had just been in the hospital, so it set our whole family in a huge firestorm of confusion.

Q. So who at APS hijacked your e-mail -- personal e-mail and cell phone?

A. You mean the Board of Education, who did they contract with? It's called Robert Caswell Investigations, and they've been subject to lawsuits for violating the Federal Wiretap Act and the Fourth Amendment.

Q. Okay. So you're alleging that Robert Caswell

120

Investigations hacked your personal e-mail and cell phone?

A. They probably submitted a request, and so I would consider that to be a highjacking. If I engage in protected conduct to help you and if your employer tries to, like, do that to me, yeah, that's -- yeah.

Q. So what do you mean -- "they probably submitted a request," what do you mean by that?

A. In order to basically get access to someone's phone records, you have to submit some kind of request or an allegation of some kind against an employee. So I have never had that before. When Principal Mondragon says, "Oh, yeah. We need to fire him immediately," she obviously has some hand in that.

Q. Okay. And, again, you were not fired, correct?

A. Well, they couldn't because they had violated the law, and they knew I had eyewitness testimony and the fact that multiple people had seen it, they didn't really have a choice, because then they receive -- where you and I are at right now.

Q. And you don't have any proof that Robert Caswell Investigations hacked your personal cell phone or your personal e-mail address, correct?

A. We can get that. You can just submit a request to the -- yeah, the service provider, T-Mobile.

Q. All right. Or we can follow up with additional

121

discovery.

A. You could talk to my dad, and he was concerned for me --

Q. Okay.

A. -- so, yeah.

Q. What is your dad's name?

A. Dr. Sun Le.

Q. Where does he live?

A. In Hawaii, Hawaii.

Q. Okay. Do you have any proof in your possession that Robert Caswell Investigations hacked your cell phone and personal e-mail?

A. Are they going to admit it? Probably not, but, you know, if you put that person Mike Cisneros, if you give him a deposition, it's possible he could speak truthfully. I don't know. I doubt it, but it's possible.

Q. So you don't have any proof in your possession?

A. I mean, the fact that I can't call my parents in Hawaii, and then I can't do -- and they can't call me on the day after that we have a conversation, that it's never happened before, that's kind of interesting.

I would say -- and then also my e-mail being given to administrative access to -- yeah, that -- that's also -- and this is -- this is -- you -- if you're trying to establish this pattern has happened before, it's on the news, right,

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

122

that Robert Caswell Investigations has done this, so I think you know that they've been subject to a lawsuit for that.

Q. So that wasn't my question. My question was just, do you have proof in your possession?

A. At this moment, no.

Q. Okay. Thank you. I'm going to hand you what I've marked as Exhibit 7.

(Exhibit 7 marked.)

Q. (BY MS. LARDY) Earlier, you had referenced a letter of rebuttal. Is this the letter of rebuttal?

A. This is in black ink. It's not in blue ink, but sure.

Q. Okay. I will represent to you I printed it in -- in black and white, but it was in blue ink on the screen.

A. Interesting. You don't have a color printer? It would -- it would indicate the contrast between the truth and then the -- the falseness, that's all, for the public interest. It's okay. Other people have said they don't have a color printer, and then they magically produce one when it becomes necessary.

Q. I didn't say that I don't have a colored printer.

A. Uh-huh.

Q. I went upstairs and printed this. And, in fact --

MS. LARDY: Can we go off the record?

THE VIDEOGRAPHER: The time is 12:29 p.m. We are

123

off the record.

(Recess taken, 12:29 p.m. to 12:34 p.m.)

(Exhibit 8 marked.)

THE VIDEOGRAPHER: The time is 12:34 p.m. We are on the record.

Q. (BY MS. LARDY) All right. Mr. Le, I'm handing you what I've marked as Exhibit 8 to your deposition. This is a color copy of Exhibit Number 7.

Do you recognize this document?

A. Thank you. This is the document that I produced and shared with the APS Office of Equal Opportunity Services.

Q. When did you share this with the Equal Opportunity Services?

A. It was around the March to April 2025 time frame, and the reason why I needed this to be in blue ink is because I needed to -- the reader to differentiate between what was put forth as truth between what was actually true.

Q. And to be clear, the entire document, except for the page that has the Robert Caswell Investigations cover page, is in blue?

A. It looks like that, yes.

Q. All right. And, again, you submitted this to the EOS office in March or April of 2022?

A. Yes, ma'am.

124

Q. Or, excuse me; 2025?

A. 2025, yes.

Q. Okay.

(Exhibit 9 marked.)

Q. (BY MS. LARDY) I am handing you what I've marked as Exhibit 9. I will represent to you that this is the complaint that was filed in this matter on June 23rd of 2025.

Have you ever seen this document?

A. Yes, I have.

Q. Okay. All right. I want to refer you to Paragraph 48. It's on Page 8 of the complaint. And it references that, "In September of 2023, Plaintiff became aware that, at the prompting of a faculty member's open violation of Title IX prohibitions, a school administrator appeared to have been influenced to undermine Plaintiff's credibility by the student body by indicating that it was inappropriate for Plaintiff, a male, to speak with female students."

Do you see that paragraph of the complaint?

A. I do.

Q. Okay. What was this incident in reference to?

A. There was a -- the colleague, the teacher, disclosed that a student said that they were worried about their mom and younger brother, domestic abuse. The

125

colleague came, disclosed that. I encouraged the reporting to CYFD.

The student came -- the student, on a Friday -- it was disclosed to me on a Monday, and on a Friday, the student came back from that teacher's office, screaming, "My teacher keeps saying I need a female counselor." And then the colleague told that to -- the teacher told that to admin, told that to counseling colleagues. The student went home to share that with family. That's a violation of Title IX, according to the Title IX office.

Q. What was the violation of Title IX again?

A. Openly shouting -- broadcasting outdated ger- -- gender stereotypes that a male -- that it's not appropriate for a male to counsel female students.

Q. Who made this determination that it was a violation of Title IX?

A. The Title IX office specialist, his name is Mr. Max Bode, or Bode.

Q. Okay. And so is this someone within APS?

A. It's the -- if you consider the Office of Equal Opportunities Services part of APS, then that would be -- they're kind of similar, but then there's -- they're quasi -- it's, like, a -- because they're quasi independent because they do receive reports from the federal EEOC.

Q. So is this -- does Max Bode work at APS?

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

126

A. Yes. He --

Q. Are you talking about the APS EOS office?

A. He -- he is no longer with the APS EOS office, and when I realized that in March or April of 2025, because he was the only one willing to acknowledge, right, what's the truth, I'm like, "Okay. This report definitely needs to get in there," yeah.

Q. So his determination was that the student violated Title IX?

A. No. The -- the teacher did, but it was co- -- the teacher kind of coached the student, right, to broadcast that.

Q. Okay. Do you consider this to be an act of discrimination and/or harassment -- or, excuse me; discrimination and/or retaliation against you?

A. It's part of the -- yeah, it's definitely a part of the whole process when you're publicly racialized and sexualized, when you're accused of holding Louie the Lobo, putting it on your lap and waving it around, when a student is coached to say -- you know, and broadcast and scream, "My teacher keeps saying I need a female counselor," that's sexual discrimination.

You might want to call it retaliation as well because they're kind of related, you know.

Q. Paragraph 50 of your complaint, which is on the

127

next page, Page 9, it states that "Defendant began to subject Plaintiff to false instances of discipline."

What do you mean by "false instances of discipline"?

A. One example is there's a student, comes from a very musical family, has got the highest GPA. My caseload, all of them -- all of them are special. Makes the request, at the request also endorsed by the mom and the music teacher, to have a choir class. And then I'm penalized for complying with the student's request. He's at the highest GPA. He doesn't even need, like, full class to graduate. The mom has requested it. They go to BYU. They're a musical family. He's like, "Yeah, could you" -- so -- and then that's put in as part of my -- it's in a memo of discipline of -- that I had -- that I had done that.

The -- the Louie the Lobo, the allegation on letterhead that I used it in a sexual way with a student, putting it on my lap, that being false, all stemming back again to being placed on this performance improvement plan stemming from the fact that I engaged in protected conduct way back in November 17th of 2021, and then had to experience this -- all these different events.

Again, your own exhibit here that you have, it says I was given a memo on 10/30/23, but that memo was on 10/03/2023. And what I had done was help a student process her feelings of suicide. I was penalized for not finishing

128

the entire protocol. I completed 50 out of 51, and the one thing that I didn't do is something that can only be done by a Section 504 coordinator.

And then it says here at the bottom, "You're not to communicate about this with any community member." So it's kind of like, "Okay. Here's your directive. Here's your reprimand. Here's all the things that happened to you. You can't tell anybody about this."

I'm not given, like, a laptop, right? I asked for one in written form on September 1st, 2021. I'm never given one, so I buy one. As a first-year high school counselor, I'm trying to do the best job that I can. I'm penalized for using a personal device when, you know -- and then -- yeah.

Being told that every single counselor meeting, Vicki Price always says, "You never use your personal devices." I have talked to other people. They do not have that recollection of her ever saying that. So it got really bad once they made this allegation of the sexual stuff with Louie the Lobo and just went super downhill. And they're just looking for any reason to, you know, harm my employment, my reputation.

They already harmed my ability to work with colleagues over the summer, right, all the summer things, it harmed my opportunity to do national board certification when you frame me as a target and then do all that kind of stuff.

129

Q. Okay.

A. Can't communicate with anybody. And then my Union rep was thankfully kind enough to say -- when I asked, "Do you think they're going to be unethical?" And he's like, "I don't know."

(Exhibit 10 marked.)

Q. (BY MS. LARDY) I'm going to hand you what I've marked as Exhibit 10. Do you recognize this document?

A. I do.

Q. What is this?

A. It's a formal whistleblower report.

Q. Okay. What do you mean by a "formal whistleblower report"?

A. A whistleblower complaint is when you give it to -- you file a complaint with any agency that ideally would investigate things. A report would go into more detail. That's all. So it's -- it's another way to say -- it's a complaint, but in the hope that when people who read it in the public interest, they'll have a better understanding of how a school district works and how to basically continue to help people even if there are things that happen to you that are unlawfully discriminatory or retaliatory.

Q. Did you ever submit this to -- this formal whistleblower report to Albuquerque Public Schools?

33 (Pages 126 to 129)

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

130

A.  By virtue of the fact that it was given to the EEOC, yes, but by -- directly to Albuquerque Public Schools, no, because they had received the civil rights kind of complaint or report in -- I think it was November 28th of 2023.

Q.  What do you mean APS received a civil rights report in November of 2023?

A.  The Federal Office of Civil Rights informed the Office of the Superintendent that a complaint had been filed.

Q.  Okay.

A.  And that's when both Vicki Price and the Union begrudgingly admitted a number of the things that I'm telling you today.

Q.  Okay.  So the Office of Civil Rights informed APS in November of 2023 that you had filed a complaint, correct?

A.  I believe so.

Q.  Okay.  But then you also said that, then, the Office of Civil Rights' complaint was then sent to EEOC, correct?

A.  It was -- yeah, it goes to EEOC, and then the EEOC started the charge -- yeah, this charge actually started on November 6 of 2023, yeah.

Q.  But, again, you directly sending something to APS, you did not send Exhibit 10 to APS?

131

A.  This -- this right here?

Q.  Correct.

A.  No.  I gave my letter of rebuttal.  I was placed on administrative leave, and, basically, I got, "You can't communicate with anybody except for the person who accused you of holding Louie the Lobo in a sexual way," and then the other person who was at your due process meeting then filed the e-mail that you have with Heather Cowan, saying, "Yeah, we're going to fire him," you know.

Q.  Okay.  So this report says that it's purposely released between April 26, 2025, and April 27th, 2025, correct?

A.  Right.

Q.  Okay.  So -- and, again, you did not send this to Albuquerque Public Schools.  Have you received any discipline from Albuquerque Public Schools since April 26, 2025?

A.  None that I'm aware of.  And -- yeah.  None -- none that I'm aware -- since February -- since April 2026?  I haven't received any formal letter of discipline at all from that.  But are you suggesting that the pain and suffering that was caused from November 17th, 2021, between then, is immaterial?  Are you suggesting that?

Q.  So you don't get to ask me questions in the deposition.

132

A.  Okay.  I just want to clarify.

Q.  I only --

A.  Because it feels that way, but okay.  No.  Then -- then there was nothing -- no formal letter of reprimand after this was submitted, but it does go to APS because it goes to the APS EOS once I submit this to the federal EEOC.

Q.  So I -- okay.  If -- is that your understanding of what happened with this report?

A.  That -- that -- that's what I've been told what happens, yes.

Q.  Who told you that?

A.  The person who works at the EEOC.

Q.  Okay.  If that's your understanding, then -- okay.  Did you submit a complaint to the anti-racism division of NMPED?

A.  I did.

Q.  What did that report look like?

A.  It was a report that was issued in December, I believe, of -- November, December of 2023, and it documents the -- what -- what is -- falls under the category of discrimination retaliation, the public -- you know, the Tono Ren Nosaka, the comment about my mom, the fact that -- yeah, a number of different things, yeah.

The fact that the comment was said in front of a student, anti-racism Statute 22-10A-19.3, it includes the

133

New Mexico Civil Rights Act.  Yeah, it includes other people who have experienced and disclosed discrimination/retaliation.

So it's ideally for the public interest because I think it was formed because of the Black Education Act, right, because of what happened with that, and then also with George Floyd, so they -- they kind of put that out there.  So they had kind of felt safe to disclose it to them because that would help, right?

Q.  Did you ever submit that report that you submitted to the anti-racism division of NMPED to APS?

A.  The NMPED -- no, but they already receive it.  So when you give it -- the report to the NMPED anti-racism division, they do give it to the district.  So I didn't do that directly, so -- but that's what they do.

Q.  How do you know that that's what they do?

A.  It's written online.

Q.  Have you submitted -- the report or complaint that you sent to the anti-racism division of NMPED, do you still have that in your possession?

A.  Yeah.  I've shared that, I believe, with the EEOC, yeah.

Q.  Have you produced that in discovery?

A.  I -- I mean, I just -- I'm sorry.  What -- I -- I think my -- my attorney has it.  I'm not sure what you're

34 (Pages 130 to 133)

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

134

asking.

Q. Sure. So I'm trying to figure out in the documents that you have produced, what that complaint to the anti- -- or report to the anti-racism division of the NMPED, what it is in the documents.

A. It's a report just documenting the concerning behavior that violates certain policies and laws, and it gives specific examples.

Q. And it's not this whistleblower report?

A. No.

Q. And it's not the letter of reprimand or the --

A. Are you talking about this?

Q. -- the letter of rebuttal?

A. No. It's not that, no.

Q. Is it on regular letterhead or regular-type paper?

A. I believe --

Q. What -- what does it look like?

A. Yeah. I believe it's -- it's similar in the sense of it's either in -- I believe it's done in Arial font. I believe it's anywhere from 10 to 12. And it documents specifically everything going back from -- well, actually, November 6, 2020, leading up until that time frame of December 2023.

Q. Okay.

A. And I -- I disclosed that after the report to the

135

New Mexico Attorney General.

Q. So I know you've submitted the whistleblower report that's before you. Did you ever submit a whistleblower report directly to APS?

A. You mean other than this one that was sent to -- and the NMPED one? I would say the letter of rebuttal. I would say the Union -- you could call it legally protected whistleblower activity, the confidential report, 200-plus pages, in April. The redacted report, it -- it can qualify as whistleblower activity, is my understanding. The -- where I actually did it on video and it's recorded that laughing and smiling, we're happy when a kid is getting publicly humped, they're re-watching it, and I say, "This is F'ed up. She's going to lose faith in the system, and the boys are going to think it's funny," I mean, that's on -- that's on video recorded, and in front of multiple witnesses.

Q. What is on video recording? You saying that?

A. That I documented that's how I engaged in protected conduct in compliance with Erin's law, federal law, State law school policy, in loco parentis.

Q. So where -- where's this video recording of you saying that?

A. The Office of Equal Opportunity Services record -- records that interaction.

136

Q. EOS recorded their interaction with you?

A. When we had, like, a meeting to discuss what happened.

Q. Was it a Zoom meeting?

A. I was at the union location on Jefferson Street, and it was over Zoom.

Q. Was this part of the interview process?

A. This was part of the trying to figure out what's happening with -- with everything and sharing the redacted report, and in my hope, establishing the truth, my compliance with the law, and the hope that this would just all be expunged.

Q. Okay.

A. It didn't go in that direction. I requested an expungement, and then now, here -- here we are.

Q. I want to talk with you a little bit about the damages that you're seeking in this case. What damages are you seeking?

A. Are you -- do you want me to, like -- to read, like, what's on here, or --

Q. No. I'm -- I'm just asking you what damages you're seeking from this case?

A. My hope initially was to have this entire matter expunged and an apology. Because it didn't go in that direction, yeah, I -- I'm basically looking to hold any

137

government agency, right, to account, no matter where you -- where we're employed.

So the damages are the fact that I lost weight. I couldn't talk with my family. I couldn't communicate with anybody. I was framed as the target. And you already see it right here, we have discussed, right? The information is inaccurate, so --

And for livelihood, reputation, I couldn't get for national board certification. Ideally, you can do that in -- you can do it -- some people said they've done it in one year, and I couldn't do that at all, right?

I couldn't do -- I was invited to be part of a summer program, working with other school counselors. I can't connect professionally with people. Try imagining getting hired by somebody, and they're like, "Oh, really? What's in your personnel file," and you have all these things that are false, that's -- that's basically harming your livelihood, right? So if you calculate that -- we can calculate it here if you want.

Q. I'm asking you what damages you're seeking in this case.

A. Emotional. Basically -- let's -- let's look at it here. When this is put out on the -- and when this is litigated in public court, it says here, essentially, I would receive everything, all the national board

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

---

**138**

certification that I could have had, all the summer school opportunities that I could have had, freedom of movement to go -- basically, to stay at the same school and to build -- I don't know if you are aware of this. Ideally, a school counselor can be situated at a place and build a program, but I don't know if you're aware that after I was framed as a target of investigation and framed as someone who commits sexual harassment, I have to basically -- and I can't write a letter of rebuttal because I'm told, "Don't write a letter of rebuttal," no administrator is going to look at this, right, and say, like, "Oh, great. Let's help this person. Let's help this person advance," right?

So that's -- and to make a long story short, when you -- yeah, when you create all these things and put them in a personnel file and the administrator can read that and keep adding to that, yeah, you're destroying somebody's livelihood and their reputation and their ability to grow professionally. And that's -- that's for life, right?

Q. So to be --

A. And --

Q. To be clear, you put -- you do have a letter of rebuttal, correct?

A. I was told not to, and then when I put it in, I receive all these false instances of discipline that are documented here.

---

**139**

Q. Okay. And I think you said earlier that your current principal, it's Ms. Maestas, correct?

A. It is.

Q. And that you had worked with her before, correct?

A. It -- yes, I have.

Q. And are you enjoying being at Valle Vista now?

A. I enjoy working with her because of the fact that this here and all these things, if I -- because I was able to hire a lawyer and write a letter of rebuttal, like, she can see it.

But, no, I wouldn't enjoy it if -- if they only gave her this and only allowed her to read all these things that are, like, false and defamatory, I wouldn't enjoy working for anybody, because the administrator would be like, "Oh, great. I have leverage over this person. Let's keep adding more things."

Q. Okay. So I have that you're seeking emotional distress damages and then also physical distress. What do you mean when you say that you've suffered physical distress?

A. The first instance that I think I can remember dates back to January 6, and I lost consciousness, and, basically, I tried to advocate for a student that had been placed in a outdoor garbage bin who has epilepsy. It's -- colleague was screaming, and the administrator asked me for

---

**140**

help, and then somehow, you know, I get this very disturbing news.

I need time to rest. I lose about 20 pounds, but I get back to the school because the principal says, "We really, really need you back." And then I hear these comments of Tono Ren Nosaka, publicly, you know -- we describe what that is -- among multiple witnesses.

Then my mom, right, receiving that kind of treatment in front of another student who I'm working with closely, and then that person meeting behind closed doors with the parent of the student who was subjected to hip thrusts, but personally omitting the fact that I engaged in protected conduct pretty much my entire career.

Q. So, Mr. Le, I'm just asking what physical distress. So you said that you passed out on January 26 of 2020 and that you lost 20 pounds. Any other physical distress?

A. I lost consciousness again on May 3rd of 2022.

Q. Okay.

A. I was transported for the first time in my life to an emergency room hospital. I thought I was going to die. And, basically, after that, I was told, although I had a hard time believing it, that Principal Mondragon tried to have me fired immediately because she had told me, "Hey, man. I have your back."

---

**141**

And so I couldn't drive for that time from May until January of 2023. I had to write a letter -- the chief neurologist of New Mexico, Dr. Baljinder Sandhu, I had to let him know that because of that deception, my mirror neurons were thrown off. And I woke up to the sound of water sprinklers going off in my brain because my body knew that something -- you're familiar with the body keeps a score, the body never lies. Your body can feel it when something's wrong, when you feel sick or unsafe. That's just that, right?

And then the principal who issued the report to APS EOS omitted the fact that I'm the one who said, "Hey, man. This is F'ed up. She's going to lose faith in the system, and the boys are going to think it's funny." I had to say that like three times, and then I helped all the kids process that, and they completely omit the fact that I did that.

Q. Okay. So for your physical distress symptoms, I have that you passed out twice, you weren't able to drive from May 3rd, 2022, to January of 2023, and that you lost 20 pounds. When did you lose the 20 pounds?

A. Between January of 2022 and May of 2022.

Q. Okay. Anything -- any other physical distress?

A. Well, yeah. In terms of family, I'm trying to explain to them, it's emotional because my sister, who I

---

36 (Pages 138 to 141)

142

care about, I'm not sure which sister they're referring to. When I have to explain that this is the allegation of, like, who would you feel comfortable touching and seeing you when you're naked?  Pause.  For me, it would be my sister, right?  And, allegedly, the student says, "I, too, would like my sister to touch me when I'm naked."

If I go to another employer and, like, tell them that, this is just really defamatory, and there's no way that, like, someone's going to hire me, especially when the principal knows that I engaged in protected conduct with Erin's Law since it was passed, ever since I moved here.

And I do a child protection unit, so I think the omission of all that fact and then putting these things here, just omitting that fact, definitely makes me unemployable.

How can I get national board certification from an administrator and say, "Hey, could you write me a letter of recommendation?"

"Sure.  Let me see what's in your personnel file."

"Oh, right, all these things that are false and defamatory."

Q.  Okay.  Any other physical distress symptoms?  That's all I've asked about.

A.  Right now, I still feel it, because -- yeah, it's stressful to me that I'm -- I'm Asian.  I don't know if

143

you're aware of that.  And the last person who was able to advocate for civil rights for Asians is Norman Mineta.  He died on May 3rd, 2022.  Do you know of any other Asians right now that are visible?  No. I don't.  I've heard of, like, Bruce Lee.  He's long dead.

So I have to kind of like do this for myself and my family, right, and all people of Asian ancestry, so, yeah, it's this huge problem.  I don't know if you are aware, if you've studied by, like, there were a lot of things that happened to people with Asian ancestry during the time of COVID.  And my nephew being called a China doll publicly as someone being -- like, my mom, making fun of her, like, the way she allegedly speaks in front of another student publicly.

Q.  Okay.  Mr. Le, again, I was just asking about physical -- just any other symptoms of physical distress.

A.  Yes.

Q.  Are there any other symptoms than what we have talked about?

A.  I have shared some with my attorney, yeah.  I mean, am I -- should I share the -- yeah, I've shared it with a therapist.  I mean, it's painful.  I -- are you asking me, like, on a scale of 1 to 10 how painful it is?  It's very painful.  It's very high.

I have never experienced anything like this before.

144

And, frankly, if I have any kid who says -- all these kids who want to be a counselor, I have to prepare them for the fact that they may be in these kind of situations when you advocate for people.  And then somebody feels it's funny to -- to make you look like you're the sexual harasser when you're the one who actually engaged in protected conduct for your entire life.

Q.  Okay.  So I take that as no other physical distress symptoms.

MR. MORROW:  Objection; form, foundation.  Or was that a question or a statement?  Perhaps I could have a moment?

MS. LARDY:  That would be great.

THE VIDEOGRAPHER:  The time is 1:07 p.m.  We are off the record.

(Recess taken, 1:07 p.m. to 1:09 p.m.)

THE VIDEOGRAPHER:  The time is 1:09 p.m.  We are back on the record.

Q.  (BY MS. LARDY)  Mr. Le, any other symptoms of physical distress that we have not talked about?

A.  There are no other symptoms of physical distress.

Q.  Okay.  Thank you.  I know you are claiming emotional distress damages in this case.  It is my understanding that you have engaged in therapy sess- -- excuse me.

145

It is my understanding that you have engaged in therapy sessions.  Is that correct?

A.  It is correct.

Q.  And are those therapy sessions due to events that have occurred while you worked at Albuquerque Public Schools?

A.  Yes, that is correct.

Q.  Are those therapy sessions connected to any of the incidents that we have talked about today?

A.  I'd say they're directly connected to the incidents that we are talking about today.

Q.  Okay.  Who are your therapist or therapists?

A.  Christy Tackwell.

Q.  How long have you been seeing Christy Tackwell?

A.  Definitely since June of 2022.

Q.  Okay.  Do you -- have you been seeing her -- are you seeing her currently?

A.  Right at this -- at this moment, I am not seeing her currently, but I have seen her for quite some time, yeah.

Q.  When was the last time that you had a therapy session with Christy Tackwell?

A.  Formal therapy session, I believe, took place in 2024, yeah.

Q.  Do you recall a month or a ballpark even?

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

146

A. I want to be completely accurate, so I don't want to give you a wrong answer, but it would probably be in January. It could have been -- it could have been in April.

Q. So anywhere between January and April of 2024?

A. Right.

Q. And you said that was a formal therapy session, correct?

A. Yes.

Q. Are there informal therapy sessions?

A. Yeah. I would say -- okay. So this is how I see it. I'm not sure if this fits the legal definition, but when I'm speaking with my attorney, I do feel safer because my attorney is able to help me understand how to protect myself. Whereas, a therapist typically is a helping person, and they don't think about strategies and the law. And I felt safer with Mr. Andrew because he understands how I need to protect myself.

Q. Okay. So are you saying --

A. Someone who has legal knowledge and -- yeah, it helps.

Q. Hold on. Hold on. Let me ask the question.

So you had therapy sessions with Christy Tackwell between June of 2022 and Janu- -- anywhere between January and April of 2024, correct?

A. Yes.

147

Q. And then I asked you about informal therapy sessions.

Are you saying that you consider conversations with your attorney to be informal therapy sessions? Is that --

A. I feel safer.

Q. Okay. All right. But as it relates to Christy Tackwell, any other -- any other interactions with her since that January/April 2024 timeline?

A. I had to reach out to request what's called a return -- release of information, and I had to let her know to release it to, yeah, attorney.

Q. Okay. What about Colleen McKernan? Does that name sound familiar?

A. It does.

Q. Who's that?

A. She's somebody -- she's a therapist, and I believe she operates out of Colorado.

Q. Okay.

A. And she helps people. I believe she has her license -- it's a -- it's a substance abuse credential, but also some kind of therapist credential.

Q. So have you had therapy sessions with her?

A. She opened -- it was therapeutic for me in the sense of she -- she cares about people, and she -- she had compassion for me at a time that I really needed it.

148

Q. So when did you have a therapeutic relationship with Colleen McKernan?

A. I would say informal, and it took place in September, October of 2023.

Q. Okay. Why do you say it was informal? Did you ever --

A. There was no payment.

Q. -- pay for services?

A. Out of the kindness of her heart, you know. She -- Colleen was willing to open a space for me to hear what's going on.

Q. Why haven't -- when was the last time you talked with Colleen?

A. She let me know that she was being inundated with requests for information, and I reached out to my attorney and said, "If there's any way, could you please let the opposing counsel know that this makes her feel very uncomfortable?" And it's -- it's like -- yeah. It's inappropriate, yeah.

Q. So --

MR. MORROW: Could we repeat -- could we get that read back, question and answer? I didn't quite catch it.

(Previous question and answer was read by the reporter.)

MR. MORROW: Can we go off the record for a

149

second?

MS. LARDY: Yes.

THE VIDEOGRAPHER: The time is 1:15 p.m. We are off the record.

(Discussion held off the record.)

THE VIDEOGRAPHER: We are back on the record. The time is 1:16 p.m.

MS. LARDY: Thank you.

I want to make it clear that within the context of this litigation, we did receive releases for medical and mental health records, which we are entitled to under the law, and that we have reached out to Ms. McKernan to receive any records, as we are entitled to do, and we have not received a response to date. I do not believe she has been inundated. I think we have followed up at appropriate intervals.

MR. MORROW: And I wish to make clear that neither plaintiff nor plaintiff's counsel has reached out to any of the providers sent releases to direct them not to respond to them.

MS. LARDY: Thank you.

Q. (BY MS. LARDY) Mr. Le, outside of this conversation that you said you had with Ms. McKernan regarding us seeking the release of any records, other than that, when was the last time that you spoke with her?

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

150

A. I think that was on the day that it happened in September or October of 2023.

Q. Okay. So that was the last time that you had a conversation --

A. I think.

Q. -- with her other than this instance we just put on the record?

A. I thanked her, and I left her a voice mail, yeah. It could -- I probably left her -- I left her a voice mail --

Q. Okay.

A. -- thanking her for that.

Q. And then I wanted to clarify.

Why -- as it relates to Christy Tackwell, again -- and I don't want any substance of any conversations that you have had with your attorney, but why -- is the reason that you have not spoken with Ms. Tackwell since January or April 2024 is because you feel that you have this informal therapeutic relationship with your attorney?

A. No.

Q. Okay. Why have you not engaged in any therapy sessions with Ms. Tackwell since the latest, April 2024?

A. I'm pursuing national board certification, and so the time is really impacted. I have had the opportunity with people who meet -- who say you can do it in one year,

151

and I'm trying to finish two components this year, in addition to meeting with you and being truthful and honest under oath. So there's only so many things that I'm capable of doing. I can only be so many places at once.

Q. Okay.

A. I haven't seen my family face-to-face for quite some time, so I'd like to see them once this is -- process is done.

Q. You are claiming as part of your damages lost earning capacity. Are you aware of that?

A. Indeed.

Q. Okay. Why do you feel that you have a lost earning capacity?

A. When you're placed on administrative leave and asked not to have any contact with anybody in the Albuquerque Public School District, you're not allowed to, one, work; you're not allowed to communicate with colleagues. You can't pursue national board certification. You can't go in the summer programs that are available for every school counselor. So you can't go to a TOPS school, Transformational Opportunity Pilot school.

And so all of those are opportunities that you can't take advantage of when you're framed as a target of investigation, and then the person who does it omits the fact that you complied with the law, and they ask for you to

152

be terminated immediately, yeah.

Q. When was the last time that you participated in a summer program at APS?

A. It was in 20- -- 2015.

Q. Okay.

A. And I was told about the opportunity that was taking place in 2022. I obviously couldn't take advantage of that, yeah.

Q. Okay. So the last time you participated in a summer program for APS -- and when we talk about a summer program, we're talking about summer school, correct?

A. Right.

Q. Okay. So the last time you participated as a counselor in summer school was 2015?

A. It was.

Q. Okay. Why did you not participate in the summer school program at any time between 2015 and 2022 --

A. There --

Q. -- or, excuse me; it would be 2016 to 2022?

A. There were spiritual retreats I took over the summer, and so those were times to engage in learning, and that would have interfered. And if I had done those retreats, I would not have the opportunity to meet every single day at that summer school site.

Q. Okay. What about the summer of 2024?

153

A. I didn't have a -- so can I think back -- I want to be accurate here. Summer of 2024, that's right before I started at Jefferson. I didn't have a laptop, and I -- my -- my e-mail chat -- my e-mails were kind of like -- they -- they kind of disabled the chat or -- yeah, some -- some things, yeah, yeah.

Q. Okay. And then what about the summer of 2025?

A. I'm involved in, I think, part of this. I mean -- yeah, this here.

Q. Okay.

A. Sorry. I can only do so many things at once. It takes several hours of prayer, meditation, and reading this and then trying to be as accurate as possible, putting in blue ink as opposed to black for the reader, right, to be able to digest and understand how to protect themselves.

Q. You said that there's this lost opportunity for employment at a TOPS school?

A. It's called a -- I think it's Transformational Opportunity Pilot Schools.

Q. And they have extended school years, correct?

A. They do.

Q. Was Chaparral Elementary a TOPS school?

A. It's not considered one.

Q. So have you ever worked at a TOPS school?

A. Not yet. Would I be able to after being framed as

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

**154**

a target of investigation?  Probably not, right, especially when this stuff is put in your personnel file.

Q.   You also have this lost opportunity for national board certification.  When were you first eligible to receive your national board certification?

A.   The moment that I was hired probably, but then the State legislature started valuing school counselors just as much as classroom educators, so that was around 2023, and they put in that legislation, yeah, 2022, 2023.

Q.   So I'm -- I'm not tracking.

So you said as soon as you started working, you could have become national -- you could have --

A.   I --

Q.   Hold on.

You could have received your national board certification, correct?

A.   I could have, yeah, received compensation that's available.  Like, it's about $10,000.  I could have started receiving that around 2023, 2022.  Probably -- I want to be accurate.  Definitely 2023, yeah.

Q.   Okay.  Prior to that, though, could you have been -- could you have received your national board certification?

A.   I think they give you a $1,000 bonus or something.  Yeah, it's possible, and the people have told me it's not

**155**

worth it at 1,000, yeah.

Q.   Okay.  But I -- but I want to be clear.  Back in 2015, could you have applied for your national board certification?

A.   I could have, yes.

Q.   Okay.  And you chose not to, correct?

A.   For compensation for, like, that much of time, you only get $1,000 back, no, I did not, and I was told it's not worth it.

Q.   Okay.  So it became worth it in 2023, correct?

A.   1,000 versus 10,000 and you compound that over retirement, most people have said it's worth it to do.

Q.   And to be clear, you were working at Sandia High School and off of administrative leave beginning in July of 2023, correct?

A.   That's -- I was transferred in July of 2023 to Sandia High School, right, and placed on the administrative -- I was given this letter of reprimand and then given the performance improvement plan mandatory.

Q.   How long does it take to get your national board certification?

A.   It's possible to -- several people have completed it in one year.

Q.   Do you know what the average is?

A.   Nationally, I do not know what -- the average, but

**156**

there are one, two, three, four -- at least four or five people who have -- maybe six who have done it in one year, and this is over the past couple years.

Q.   Does it take other people, like, two years; do you know?

A.   I would hope that you could do it in two.  My intention is to do it in two.

Q.   Okay.

MS. LARDY:  Can we go off the record, please?

THE VIDEOGRAPHER:  The time is 1:26 p.m.  We are off the record.

(Recess taken, 1:26 p.m. to 1:30 p.m.)

THE VIDEOGRAPHER:  The time is 1:30 p.m.  We are on the record.

Q.   (BY MS. LARDY) All right.  Mr. Le, one of your interrog- -- one of the interrogatories that we asked for was for you to identify the conversations that you've had with individuals regarding the allegations in your complaint.  And this interrogatory stated that you would submit to a deposition to explain to the best of your ability the conversations that you've had with individuals.

I do not need to know the context of the conversations.  I don't want any conversations or names of people at Mr. Morrow's law firm, including Mr. Morrow, but who have you had conversations with regarding this case?

**157**

A.   The -- my therapist, Christy Tackwell.

Q.   Anyone else?

A.   Vicki Price.

Q.   Okay.  Anyone else?

A.   My parents, my brother.  It felt too gross to tell my sister, but I may have told her.  I don't know.  I kind of want to block out that memory.  I probably did tell her.  Yeah, I probably did tell her about the Tono Ren Nosaka and the old stuff.  Who else?  The EEOC, Mr. -- Mr. Ortha (phonetic).

Q.   Okay.

A.   I do notice that I feel safer as a result of this around males who I feel are safe because I don't feel safe around females because I feel they plant seeds of stuff.  But I probably have told -- yeah, that's what's coming to mind right now.

Q.   Okay.

A.   Because I feel like he's a veteran, good dude.

Q.   Do you have any social media accounts?

A.   I have no Facebook, no TikTok, no Instagram.  I think that's what's requested, right?  So, no, I don't have any of those.

Q.   What about Snapchat?

A.   I do not have a Snapchat.

Q.   MySpace, is that even around still?

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

---

**158**

A. I do remember MySpace, but I do not have one.

MR. MORROW: It is, by the way.

MS. LARDY: It is?

MR. MORROW: Uh-huh.

Q. (BY MS. LARDY) Mr. Le, have you been able to understand my questions today?

A. To the best of my ability, I have.

Q. Have you been able to answer my questions honestly?

A. To the best ability, I have. If you feel there's one that needs more clarification, I'm happy to provide clarification.

Q. Do you have any concern about the way this deposition has gone?

A. In terms of, like -- no. I feel like you've asked the questions, and I've provided them -- you know, provided the answers.

Q. Have I let you give complete answers?

A. To the best of your ability, I believe that you have, but, however, I think I -- yeah. Given the fact you're representing the client, sure, yeah.

Q. Are there any answers you wish to change?

A. None to change, but I haven't shared every single detail, yeah, but, yeah. No. That -- it's -- it's fine.

Q. Is there any other information -- I know you said

---

**159**

you haven't shared any other detail. Is there any other information -- this is my one opportunity before trial to get all the information, you know, I need in order to properly evaluate the case.

Is there any other information that you feel that's important that I know today?

A. This -- I feel like that this is comprehensive, this -- this complaint. If I -- if I -- if something else does come up, I could let you know.

Q. And, of course, any communication would be through your attorney.

A. Absolutely.

MS. LARDY: I don't have any further questions.

MR. MORROW: I do not have any questions for Mr. Le either.

THE COURT REPORTER: Read and sign?

MR. MORROW: Yeah, we'll read and sign.

THE VIDEOGRAPHER: This will conclude today's deposition of Daniel Le. The time is 1:35 p.m. We are going off the record. Thank you.

(Deposition concluded at 1:35 p.m.)

---

**160**

Le v. Board of Education for APS

DEPONENT SIGNATURE/CORRECTION PAGE

If there are any typographical errors to your deposition, indicate them below:

PAGE  LINE

_____ Change to _____

_____ Change to _____

_____ Change to _____

_____ Change to _____

Any other changes to your deposition are to be listed below with a statement as to the reason for such change.

PAGE  LINE  CORRECTION          REASON FOR CHANGE

_____

_____

_____

_____

_____

_____

I, DANIEL LE, do hereby certify that I have read the foregoing pages of my testimony as transcribed and that the same is a true and correct transcript of the testimony given by me in this deposition on February 20, 2026, except for the changes made.

_____    _____
Date signed              DANIEL LE

---

**161**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

No: 1:25-CV-00591 LF/JFR

DANIEL LE,
        Plaintiff,
-vs-
BOARD OF EDUCATION FOR
ALBUQUERQUE PUBLIC SCHOOLS,

        Defendant.

CERTIFICATE OF DEPOSITION

I, SHANON R. MYERS, CCR, RPR, RMR, CRR, CRC, DO HEREBY CERTIFY that on February 20, 2026, the Deposition of DANIEL LE was taken before me at the request of, and sealed original thereof retained by:

MODRALL SPERLING ROEHL HARRIS & SISK, PA
500 4th Street, NW
Albuquerque, NM 87102
(505) 848-1800
mlk@modrall.com
BY:  MIA K. LARDY

I FURTHER CERTIFY that copies of this Certificate have been mailed or delivered to all Counsel, and parties to the proceedings not represented by counsel, appearing at the taking of the deposition.

I FURTHER CERTIFY that examination of this transcript and signature of the witness was REQUESTED by the witness and all parties present. On _____, a letter was mailed or delivered to ANDREW N. MORROW regarding obtaining signature of the witness, and any corrections, if any, were appended to the original and each copy of the Deposition.

---

41 (Pages 158 to 161)

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

162

I FURTHER CERTIFY that the recoverable cost of the original and one copy of the deposition, including exhibits, to MIA K. LARDY is $_____.

I FURTHER CERTIFY that I did administer the oath to the witness herein prior to the taking of this Deposition; that I did thereafter report in stenographic shorthand the questions and answers set forth herein, and the foregoing is a true and correct transcript of the proceeding had upon the taking of this Deposition to the best of my ability.

I FURTHER CERTIFY that I am neither employed by nor related to nor contracted with (unless excepted by the rules) any of the parties or attorneys in this case, and that I have no interest whatsoever in the final disposition of this case in any court.

_____
SHANON R. MYERS, CCR, RPR, RMR, CRR, CRC
CCR No. 275
License Expires: 12/31/26

42 (Page 162)

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 163

**A**

**A-minus** 14:5 81:13
**A-plus** 81:13
**A-to-F** 13:9
**a.m** 1:13 4:2 38:21,23,23,25 71:5,7,7,8 115:18,20
**abide** 62:1,15
**abided** 43:8
**ability** 66:12 73:18 107:16 107:21 109:25 111:10 128:22 138:17 156:21 158:7,10,19 162:6
**able** 13:16 73:6 88:11 89:23 93:1,7 94:1 108:6 109:19 109:21 110:1 110:17 111:16 139:8 141:19 143:1 146:13 153:15,25 158:5,8
**absolutely** 20:8 51:23 62:2 80:24 94:5 103:22 159:12
**abuse** 90:22 114:5 124:25 147:20
**academic** 23:8 28:13
**academics** 23:21
**accent** 52:15,16
**access** 30:16 57:2,4 88:7,10 88:11,16 89:13 93:1,7 94:1 105:23 114:15 114:16,18,22

118:2 119:7 120:8 121:23
**accessing** 115:5
**account** 20:7 137:1
**accounts** 37:16 157:19
**accurate** 14:2,12 55:15 59:2,25 70:8,20 81:20 82:23 84:5 88:15 92:9 100:15 106:1 106:13 146:1 153:2,13 154:20
**accused** 38:14 126:18 131:5
**acknowledge** 126:5
**act** 15:2 93:1 119:24 126:13 133:1,5
**action** 5:8,10
**actions** 60:24
**activate** 13:15
**activated** 83:9
**activity** 54:5 60:25 66:9,19 66:21 135:8,10
**acts** 93:5
**added** 104:25
**adding** 138:16 139:15
**addition** 118:14 151:2
**additional** 120:25
**address** 16:5 19:20 20:21,23 120:22
**addressed** 66:6 66:6,11,12,13 66:17 67:4 90:10,11

**addresses** 19:23 20:1,20 21:10
**adhere** 62:10
**admin** 41:25 42:18,21 43:24 43:24 44:1 54:23 66:16 114:6,24 125:7
**administer** 162:3
**administrative** 22:17 30:14,18 30:24 31:3,21 31:24 32:9,21 39:9,13,22 55:14 63:6 65:9 68:14,16 68:20 73:22,24 74:8 76:7,12 80:3 83:16,20 95:19 107:25 108:4 109:19 113:21,22,23 114:1 115:4,7 115:14 119:7 121:23 131:4 151:14 155:14 155:18
**administrator** 33:14 36:15 95:11 118:3 124:15 138:10 138:15 139:14 139:25 142:17
**admit** 121:13
**admitted** 130:13
**adopted** 15:7,10 15:18
**adults** 45:24
**advance** 138:12
**advantage** 151:23 152:7
**adverse** 5:12
**advocate** 41:24 139:23 143:2

144:4
**advocated** 41:11 44:3,12 91:25
**advocating** 30:8 41:13,19,21 42:9 43:7 53:16,25 114:3 114:4,4 119:1
**affirm** 55:4
**age** 13:12,15
**agencies** 95:5
**agency** 84:6 129:15 137:1
**ago** 48:4
**agree** 21:22 72:10 86:3 102:5,15
**Agreed** 86:10 102:15
**agreement** 77:6 78:5,11 80:18 111:3,6
**Ah** 103:11
**ahead** 38:19 58:13 64:13 71:21 115:17
**air** 91:12
**Albuquerque** 1:7,14,24 2:9 4:5,9,16,25 12:17 16:4 18:16 19:15 20:21 21:21,23 34:13 35:21,25 36:4,18 37:15 39:7 40:3,5 50:5,8,10 59:4 59:16 63:12 64:1,25 68:3 69:5 84:21 85:9 86:5 88:24 93:9,16 94:23,24 95:1 95:4,6 97:9 98:2 129:25

130:2 131:15 131:16 145:5 151:16 161:7 161:16
**all-school** 73:4
**allegation** 42:11 54:9,17 55:2,7 91:5,19 113:17 120:10 127:15 128:18 142:2
**allegations** 3:1 40:23 41:2,5 42:14 53:10,15 53:21 63:6 69:23 100:12 102:12 118:16 156:18
**alleged** 17:20 41:10 54:9,11 55:11,21 91:16 114:13
**allegedly** 52:6 52:17 54:13,20 55:12,21 78:13 81:6 92:18 142:5 143:13
**alleges** 75:1 78:16
**alleging** 91:23 119:13,25
**allowed** 58:16 77:5 106:10 111:2,4,5 139:12 151:16 151:17
**allowing** 27:18 65:2
**allows** 106:21,23
**amended** 2:25 85:23 86:4,23 86:23 87:4 107:11
**Amendment** 119:8,24
**American** 5:11

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 164

**amorrow@co...**
2:5
**Anaya** 37:3,5
**ancestry** 5:19
117:4 143:7,10
**and/or** 110:22
113:24 126:14
126:15
**Andrew** 2:6
4:14 6:10,17
6:20 29:6
46:14 146:16
161:23
**Ann** 60:18
**annual** 36:8
**answer** 10:7
11:16 17:13
30:3 48:14
55:15 57:14
64:13 113:4
146:2 148:22
148:23 158:8
**answers** 10:25
11:7,11 12:3
158:17,18,22
162:4
**anti-** 134:4
**anti-racism**
132:14,25
133:11,13,19
134:4
**antiracism**
45:23
**anybody** 117:23
128:8 129:2
131:5 137:5
139:14 151:15
**anymore** 76:3
108:1 109:14
**apartment** 16:4
**apologize** 22:2
35:24 48:8
75:21 95:23
102:3
**apology** 136:24

**appeal** 80:23,25
81:1
**appealed** 80:19
**appear** 69:25
**appearances**
4:12
**appeared**
124:16
**appearing**
161:20
**appended**
161:24
**applied** 36:17,22
36:25 155:3
**apply** 75:12
**appreciated**
76:21
**appropriate**
125:13 149:15
**April** 46:4 52:2
52:10,21 53:13
55:12 61:6
86:24 87:4
103:3 123:15
123:24 126:4
131:11,11,16
131:19 135:9
146:3,4,24
150:18,22
**APS** 5:2 21:19
21:22 35:23
37:21 39:2
43:3 48:18
49:16,20 56:1
56:4,7 57:19
58:10,11,17
59:7,9 61:5,7
61:17,24,25
62:3,4,6,8,10
62:14,15 63:25
64:8,15,17
65:21 66:2
67:3,5,19 69:6
76:2 77:17
79:19,20 82:19

85:13 90:3
91:15 93:24
94:9 99:20
101:4 104:19
115:14 116:19
119:13,19
123:11 125:19
125:21,25
126:2,3 130:6
130:15,24,25
132:5,6 133:11
135:4 141:11
152:3,10 160:1
**Arial** 134:19
**arrested** 38:3
**articles** 78:8
**as-needed** 25:24
25:25
**Asi-** 5:19
**Asian** 5:19
44:25 46:25
48:7,8 49:10
52:17,18,25
53:1,5 117:4
142:25 143:7
143:10
**Asians** 143:2,3
**asked** 5:12,21
6:24 9:6 11:1
15:16,18 39:19
40:7 41:24
46:7 61:13
65:15 69:13
78:21,23 79:10
79:24 80:13
82:3 83:10
88:13,15 89:1
90:24 112:16
128:9 129:3
139:25 142:23
147:1 151:15
156:16 158:15
**asking** 6:10,12
10:7,8 13:2,10
13:18 17:23

40:2,19 49:17
52:11 57:13
59:4 63:1
65:12,14 66:3
79:13 112:21
112:25 116:21
134:1 136:21
137:20 140:14
143:15,23
**asks** 101:20,22
**Association** 5:12
**assume** 9:21
**assumed** 80:14
**assuming** 98:15
**attend** 74:3
**attendance**
22:19
**attended** 74:6
**attention** 90:21
**attorney** 1:21
5:16 6:7,7,9,14
6:14,16,25 7:1
7:10,22 8:2,3
9:10 14:2
19:21,24 75:24
77:8 81:4,6,8
82:6,9,20
87:22 93:6,11
93:22,25 94:8
96:17,19
102:21,23
112:23 116:13
117:19 133:25
135:1 143:20
146:12,13
147:4,11
148:15 150:16
150:19 159:11
**attorney-client**
6:5 7:2,13 8:4
102:19
**attorney-work**
34:15
**attorneys**
102:24 162:8

**audible** 9:15,24
10:2
**Audiographic**
13:5
**August** 29:18
39:3,18,21
40:4,17,20
56:23 58:4
69:9,11 71:11
72:7,21 73:2
73:11,12 83:23
85:17 95:15,17
96:24 98:3,6
105:25 107:9
**August-to-Sep...**
96:5
**automatically**
81:22
**available** 64:7
64:15 107:7
151:19 154:18
**average** 26:7
155:24,25
**aware** 11:8
17:12,15,23
18:11,13,13,15
18:15 34:16
56:6,9 60:17
61:24 62:13,16
67:18 68:4
115:13,15
116:23 117:21
124:14 131:18
131:19 138:4,6
143:1,8 151:10
**awareness** 83:9
**AZ** 2:4

___

**B**

**B** 2:21
**back** 7:24 23:8
23:23 30:24
31:1,17 33:3
38:24 44:14,15
44:17 53:8

Le v. Board of Education for Albuquerque Public Schools

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 165

68:11,19 71:9 72:21 73:6 79:10 83:19 84:17 88:3 105:12,20 107:1 109:11 112:7 115:21 118:17,21,22 118:22,23,24 118:24 125:5 127:17,20 134:21 139:22 140:4,5,25 144:18 148:22 149:6 153:1 155:2,8
**bad** 85:11 128:17
**balance** 23:24
**Baljinder** 141:3
**ballpark** 145:25
**bank** 37:16
**based** 53:9 86:15,20,24 102:13
**basically** 70:1 77:13 79:9 82:21 84:4 91:19 96:13 111:2 114:16 117:24 118:15 120:8 129:21 131:4 136:25 137:17,22 138:3,8 139:23 140:22
**basis** 23:11 25:24
**bear** 85:18
**beautiful** 27:19
**began** 30:13 90:14 116:23 118:3 127:1
**beginning** 72:24 118:17 155:14

**begrudgingly** 130:13
**behalf** 4:15
**behavior** 27:4 43:5 47:2 55:16 60:24 87:23 88:1 134:7
**beli-** 31:12
**belief** 42:5 53:14 53:21 54:16 104:10
**believe** 14:25 15:9 27:18 28:3,18 31:10 31:11 34:6,10 34:21 41:12 42:1,19,19 48:1 49:4,25 50:12,13 51:25 57:4,5 61:9 63:22 67:9 71:24 73:11,21 83:21 85:3,5 91:18 97:9 112:23 113:16 130:17 132:19 133:21 134:16 134:18,19,20 145:23 147:16 147:19 149:14 158:19
**believing** 140:23
**belongings** 108:18
**Bernalillo** 96:16
**best** 12:20 16:20 44:17 58:15 60:19,20 66:12 73:18 99:12 128:12 156:20 158:7,10,19 162:6
**better** 129:19
**big** 17:9,10

**bin** 139:24
**biological** 15:10
**biologically** 15:5 15:6,17
**birth** 14:20
**bit** 10:9,10 24:7 53:18 59:8 136:16
**black** 3:4 45:18 122:11,14 133:5 153:14
**blank** 81:9
**bless** 22:11
**block** 157:7
**blocked** 49:18 88:17 115:1
**blue** 3:5 122:11 122:14 123:16 123:21 153:14
**board** 1:7 4:8 119:21 128:24 137:9,25 142:16 150:23 151:18 154:4,5 154:15,22 155:3,20 160:1 161:7
**Bode** 125:18,18 125:25
**body** 13:15,20 83:9 124:17 141:6,7,8,8
**bonus** 154:24
**book** 37:22 44:25
**born** 14:22
**bothered** 45:22
**bottom** 128:4
**bought** 78:25
**Box** 1:23
**boys** 27:22 95:25 135:15 141:14
**brain** 35:9 141:6
**break** 11:17

112:6,7 113:18
**breaking** 84:9
**breaks** 11:13,14 11:15
**Breathe** 44:24
**breathing** 15:11
**briefly** 4:24
**bring** 8:9,12,18 25:25 110:5
**broadcast** 126:11,20
**broadcasting** 125:12
**broadcasts** 51:8
**broke** 69:25
**brother** 124:25 157:5
**brought** 8:24 90:21
**Brown** 43:20 60:18
**Bruce** 143:5
**Buddhist** 19:8
**build** 138:3,5
**building** 5:23
**Bureau** 86:9
**button** 107:23
**buy** 128:11
**BYU** 127:11

**C**

**C** 2:1
**C-O-U-N-S-E-...** 19:25
**cafeteria** 24:10 24:17 42:17 57:8,23 60:11
**cake** 40:10
**cal-** 51:21
**calculate** 137:18 137:18
**California** 14:23
**call** 5:2 6:4 25:5 41:6 68:23 79:20 84:24

119:16 121:18 121:19 126:23 135:7
**called** 4:20 13:20 21:17 34:21 40:24 41:16 79:19 80:14 88:12 95:12 96:17 117:25 119:22 143:11 147:9 153:18
**calling** 79:25
**cameras** 51:21
**campus** 43:5 55:17 108:5,8 108:15,16,20 109:18 110:1,2
**cancel** 26:13
**capabilities** 108:21
**capable** 15:21 151:3
**capacity** 15:20 151:10,13
**capstone** 118:17
**capture** 8:20
**captured** 8:14 54:22
**carbon-copy** 94:9,23
**care** 26:24 70:8 142:1
**career** 140:13
**cares** 97:17 147:24
**case** 4:8,10 8:10 58:16 136:17 136:22 137:21 144:23 156:25 159:4 162:8,9
**caseload** 23:11 90:21 127:5
**Caswell** 98:22 119:22,25

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 166

120:20 121:11 122:1 123:20
**catch** 148:22
**category** 86:15 132:20
**Caucus** 53:1,1,5
**cause** 54:1 75:7
**caused** 117:8 131:22
**CCR** 1:22,22 161:13 162:12 162:12
**cell** 119:5,20 120:1,21 121:11
**certain** 13:16 17:20 24:20 26:11 45:1 63:14 70:21 78:12 98:8 134:7
**Certificate** 2:19 161:12,19
**certification** 128:24 137:9 138:1 142:16 150:23 151:18 154:4,5,16,23 155:4,21
**certify** 160:18 161:13,19,21 162:1,3,7
**chain** 61:3 67:3 67:5,19 95:8 95:10
**challenging** 11:20
**chance** 71:11 74:16
**change** 27:19 86:14 158:22 158:23 160:5,6 160:7,8,9,11
**changed** 59:7,8 78:4 103:10

**changes** 160:9 160:20
**changing** 70:21 77:15 107:3
**Chaparral** 32:15,16 33:8 37:8 50:17 61:16 66:5 153:22
**character** 44:25
**charge** 85:23 86:4,19,23 87:4 105:21 106:2 107:14 130:22,22
**charged** 38:5,9 38:13
**charges** 2:25 85:23 86:4,14 87:10 106:8 107:11,12
**chat** 83:22 153:4 153:5
**Che** 14:17,19
**check** 8:15 24:12
**check-in** 22:15 24:9 25:5
**check-ins** 25:6
**checked** 43:15
**checking** 79:5
**checklist** 78:17
**chief** 141:2
**child** 13:13,16 41:10,12,13,19 41:21,22,23,24 41:25 42:9,16 42:19 43:8,23 44:4,10 53:16 53:25 54:6 56:17 57:8,22 60:23 142:12
**child's** 13:12 72:11
**children** 15:3,4

15:7,9,10,10 15:17,18,19,25 24:10 27:18 60:20 70:8
**China** 143:11
**choice** 120:18
**choir** 127:8
**chose** 47:19 155:6
**Christy** 145:13 145:14,22 146:22 147:6 150:14 157:1
**Chromebook** 88:12,16,22,23 89:11,13,15,24 90:2,8 93:2
**circumstances** 13:17
**Cisneros** 121:14
**City** 97:9 98:1
**civil** 1:18 47:12 47:13,24,25 50:22 52:22 67:10,13,14 93:20 94:15,19 94:22 97:12 130:3,6,8,15 130:19 133:1 143:2
**claim** 12:23,24
**claiming** 144:22 151:9
**Clara** 14:23
**clarification** 9:21 57:17 158:11,12
**clarified** 33:22
**clarify** 9:19 11:2 44:6,7 54:19 106:10 132:1 150:13
**clarifying** 37:13
**class** 23:23 25:18 26:19

127:8,10
**classroom** 22:16 24:8 25:10,14 25:24 26:1 29:5,7 60:17 61:2 114:5 154:8
**classrooms** 26:6 26:9
**clause** 59:1,25 60:13 63:9 65:19
**clear** 34:24 35:20 45:11 59:15 65:7 75:16 76:4,19 101:3 104:13 111:12 123:19 138:21 149:9 149:17 155:2 155:13
**clearly** 56:4 115:10
**client** 17:19 158:21
**clinical** 27:20
**closed** 140:10
**closely** 140:9
**co-** 126:10
**coached** 126:11 126:20
**Coast** 16:18 18:2,5,9
**Cogswell** 2:13 4:4
**coincides** 94:16
**collaboration** 22:18
**colleague** 30:9 41:24 42:18 43:16,19 44:10 124:23 125:1,7 139:25
**colleagues** 22:17 31:13 91:4

110:16,19 125:8 128:22 151:18
**Colleen** 147:12 148:2,10,13
**college** 31:25
**color** 86:20,25 87:5 122:15,19 123:8
**Colorado** 147:17
**colored** 122:21
**combine** 85:19
**come** 23:18,19 30:24,25 35:10 68:19,19 73:6 83:19 97:20 110:11,12 159:9
**comes** 54:3 127:4
**comfortable** 23:22 47:1 54:11 142:3
**coming** 55:20 157:15
**command** 61:4 67:3,5,19 95:8 95:10
**comment** 48:5 50:11,24 51:3 51:4,10,13,18 57:3 132:22,24
**comments** 45:8 45:8,15,16,19 46:2 49:1,2,3 50:19 51:25 52:1,1,4,7,9,20 53:13 75:23 140:6
**Commission** 40:1 67:16 97:14
**commits** 138:7
**communicate**

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 167

106:11 128:5
129:2 131:5
137:4 151:17
**communicated**
17:2,5,25
**Communicating**
22:21
**communication**
7:12 28:9
48:21 57:25
58:1,2 65:1
82:16 84:23
85:3 159:10
**communicatio...**
85:1 107:6
**community**
59:12 75:11
117:23 128:5
**compassion**
147:25
**compelled** 5:15
**compensation**
154:17 155:7
**complained**
114:20
**complaint** 3:6
67:13 70:4,10
72:11 87:22
88:1 93:10,16
93:22,24,24
94:8,18,21,24
101:7,10
117:21 124:7
124:12,20
126:25 129:14
129:15,18
130:4,9,16,19
132:14 133:18
134:3 156:19
159:8
**complaints** 95:4
115:7
**complete** 74:11
78:17 117:22
158:18

**completed** 78:18
92:19 128:1
155:22
**completely** 90:1
141:16 146:1
**Completion**
2:19
**compliance** 5:10
42:23 54:6
58:4 66:15
70:2 135:20
136:11
**complied** 111:5
151:25
**comply** 73:16
**complying** 33:4
92:16 127:9
**components**
151:1
**compound**
155:11
**comprehensive**
159:7
**computer** 110:5
**concern** 22:17
54:1,8 58:10
74:24 158:13
**concerned** 121:2
**concerning** 5:8
43:4 55:16
76:8 134:6
**concerns** 22:21
61:18,18 75:20
**conclude** 159:18
**concluded**
159:21
**conclusion** 66:7
**conduct** 23:9
34:1 41:9
42:23 44:8
45:6 53:25
55:18 56:14
66:15 114:2,3
120:4 127:19
135:20 140:13

142:10 144:6
**conducted** 34:23
**confidential**
75:10 104:1
135:8
**confidentiality**
22:22 68:12
101:21
**confirmation**
35:15
**confirmed** 33:12
40:11 55:19
68:9 91:17
**confused** 63:18
**confusion**
119:18
**congratulations**
69:1 117:7
**connect** 137:14
**connected** 97:13
145:8,10
**connection**
49:22
**consciousness**
44:13 139:22
140:18
**consequences**
58:19
**consider** 5:12
15:19 19:13
23:4 25:1
120:3 125:20
126:13 147:3
**considered** 12:7
25:18 29:14
153:23
**constitutional**
97:19
**contact** 63:11,25
64:24 65:5
151:15
**context** 13:18
149:9 156:22
**continue** 129:21
**continued** 39:10

**continuously**
35:23 36:3
85:13
**contract** 34:7,8
34:10,25
119:22
**contracted** 64:3
119:14 162:7
**contractor**
34:14
**contrast** 122:16
**convenient**
58:22 115:3
**conversation** 6:8
6:17 53:12
55:1,5,11,21
82:15 112:18
121:20 149:23
150:4
**conversations**
7:2 53:5 76:5
147:3 150:15
156:17,21,23
156:23,25
**convicted** 38:7,8
38:9,12
**cool** 29:10 38:12
42:15 83:2
115:11
**cooperate** 64:7
64:14,18
**coordinator**
75:4 78:19
92:21 128:3
**cop** 101:25
**copies** 87:18
161:19
**copy** 71:24
102:18 110:13
113:1 116:14
123:8 161:24
162:1
**correct** 21:12,14
21:19 22:3
27:2 28:13

29:4 31:4
32:11,12 35:13
35:21 36:4,11
41:14 45:5,16
47:22,23 48:3
48:6,24 49:7
50:22,25 52:2
52:5 53:10
55:25 59:16,22
61:4,22 62:5
64:9,19 65:11
65:23,25 66:3
66:11 68:17
72:8,12,17
73:7 75:17
76:6 77:23
78:1 80:19
81:2 82:1
83:14 84:14
85:9,12,14
86:7,12,13,21
87:2,6,10,14
87:24 88:7,25
89:20 93:2
95:19 97:10
98:17 99:2
102:6 104:5
105:23 106:4
106:14 107:4
107:12 108:7
108:17 109:16
111:13,16
112:3,12 116:2
117:14 118:11
120:14,22
130:16,20
131:2,12
138:22 139:2,4
145:2,3,7
146:7,24
152:11 153:20
154:16 155:6
155:10,15
160:19 162:5
**CORRECTION**

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 168

**corrections**
161:23
**correctly** 116:22
**correlating**
93:24
**correlation** 94:4
**cost** 162:1
**Council** 45:18
**counsel** 4:12
125:14 148:17
149:18 161:19
161:20
**counseling** 5:11
22:14 23:2,9
23:21 24:2
25:2,4,18
29:11,14 36:16
95:12 107:23
109:12,21
114:15,18
115:5 125:8
**counselor** 18:24
19:24 21:20,25
22:9,25 23:19
27:12,15,16
28:23 29:2,5,9
32:3,10,14,16
36:6 73:4
78:25 79:2
91:2,4 101:10
104:14 125:6
126:21 128:11
128:14 138:5
144:2 151:20
152:14
**counselors**
137:13 154:7
**County** 96:16
**COUNXEL** 2:3
**couple** 78:2
104:25 106:20
156:3
**course** 159:10
**court** 1:1,23 4:6
4:7,10,17 9:24

11:20 22:12
97:5 99:8
137:24 159:16
161:1 162:9
**cover** 123:20
**COVID** 143:11
**Cowan** 3:2 85:6
114:9 116:1
131:8
**CRC** 1:22
161:13 162:12
**create** 40:24
91:19,20
138:14
**created** 34:1
102:22 114:6
**credential**
147:20,21
**credibility**
124:17
**crime** 38:5,7
**crises** 27:7
**crisis** 27:9
**CRR** 1:22
161:13 162:12
**Cueva** 36:24
**culminated**
92:25
**curious** 8:22
38:8
**current** 21:19
139:2
**currently** 16:18
21:16 103:7,17
145:17,19
**cut** 111:10
**CYFD** 91:3
125:2

—————
**D**
—————
**D** 2:15
**dad** 121:2
**dad's** 121:6
**damage** 117:8
**damages** 136:17

136:17,21
137:3,20
139:18 144:23
151:9
**Daniel** 1:4,12
2:17 3:4,5 4:8
4:8,19 5:2
14:17,18,19,19
159:19 160:18
160:23 161:4
161:14
**Daniel's** 52:14
111:10
**Daniel@T-H-E**
20:2
**daniel@the1f...**
119:6
**dared** 101:12
**database** 114:15
114:18 115:6
**date** 7:21 14:20
59:8 78:4
103:24 105:9
106:3 107:4
112:22 149:14
160:23
**dated** 92:11,13
**dates** 32:19
77:15 87:12
106:8 107:2
139:22
**day** 14:12 18:12
25:9 64:8,15
73:2 88:20
89:18,18 94:1
107:19 119:15
121:20 150:1
152:24
**days** 78:14
108:6
**dead** 143:5
**dear** 82:5
**December** 14:21
19:1 77:10
82:24 109:22

111:15 112:5
114:17 115:5
132:18,19
134:23
**decent** 13:5
**deception** 141:4
**decide** 28:21
**declared** 5:17
**decrease** 27:25
**defamatory**
139:13 142:8
142:21
**Defendant** 1:8
1:21 2:7 4:16
127:1 161:8
**definitely** 9:20
27:10,12 63:21
68:2,2,6,8
82:24 126:6,16
142:14 145:15
154:20
**definition**
146:11
**degree** 18:20,22
18:23
**deity** 5:20 117:5
**delivered** 161:19
161:23
**demand** 116:18
**demanded** 33:2
35:18
**denial** 66:16
105:23
**denials** 42:21
**denied** 54:23
88:7,10 119:2
**Department**
64:8,16 93:19
94:13
**departments**
68:3
**depending**
23:13
**depends** 13:10
13:18 14:25

**Deponent** 2:18
160:2
**deposed** 5:5
**deposition** 1:12
1:19 2:19 4:7
6:3,13,25 7:3
7:15,19,20 9:2
9:11,14 12:12
12:15,16 17:3
17:8,11,14,24
17:25 18:10,15
18:17 62:20
70:17 121:15
123:7 131:25
156:20 158:14
159:19,21
160:3,9,19
161:12,14,20
161:24 162:1,4
162:5
**Depot** 106:22
**derogatory** 5:13
98:12
**describe** 140:7
**designed** 20:10
103:4,7 104:4
**desire** 84:23
**desk** 79:19,20,25
109:3
**desktop** 107:22
**destroying**
138:16
**detail** 61:12
129:17 158:24
159:1
**detailed** 103:1
**details** 38:16
**determination**
125:15 126:8
**device** 128:13
**devices** 4:3 79:4
128:15
**die** 140:21
**died** 143:3
**difference** 51:14

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 169

51:15
**different** 36:21 85:7 102:1,1 112:11,13 127:21 132:23
**differentiate** 123:17
**difficulty** 19:9
**digest** 153:15
**digital** 87:8
**dir-** 59:11
**direct** 149:19
**directed** 61:14 75:5
**direction** 22:16 136:14,25
**directive** 59:10 62:4 71:20 74:15,20 75:7 77:16,21 79:16 80:19 81:2 92:25 98:16 128:6
**directives** 61:25 62:14
**directly** 42:25 43:4 46:7 56:5 61:20 82:18 96:18 110:5 130:2,24 133:15 135:4 145:10
**director** 85:4
**dis-** 87:8
**disabled** 153:5
**disagreed** 80:18
**discharge** 58:19 59:14 84:24
**discharged** 77:19
**disciplinary** 77:20
**discipline** 39:19 40:5 77:18,25 83:24 84:21,22

118:1 127:2,3 127:14 131:16 131:20 138:24
**disciplined** 39:2 39:7 40:3 76:5 92:6,15
**disclose** 133:8
**disclosed** 90:19 102:13 104:11 114:5 124:24 125:1,4 133:2 134:25
**discovered** 108:2
**discovery** 121:1 133:23
**discrimination** 2:25 41:11 85:24 86:4,15 86:20,24 87:12 90:13 97:22 105:21,22 106:2,3 107:2 107:4,12 110:22 113:24 126:14,15,22 132:21
**discriminatio...** 87:20 107:15 113:18 133:3
**discriminatory** 93:1 129:22
**discuss** 136:2
**discussed** 75:11 88:3 137:6
**Discussion** 149:5
**disposition** 162:8
**dispute** 14:1
**disputing** 87:9 87:11 107:10 107:13
**distress** 139:18 139:18,20

140:15,17 141:18,23 142:22 143:16 144:9,20,21,23
**district** 1:1,1 4:10,10 21:21 30:21 32:21 36:15 40:6 50:6 59:18 70:7 84:4,6 93:9 95:11 105:14 117:6 117:17 129:20 133:14 151:16 161:1,1
**disturbing** 140:1
**division** 93:20 132:14 133:11 133:14,19 134:4
**Dobson** 2:3
**document** 7:8 7:22 8:1,2 20:14,14 21:2 21:6 26:1 33:13,20,21 35:3,12 58:24 59:4 62:20 63:2,4,8 64:2 71:14 72:8 74:18 84:3 104:15 110:25 112:14 113:14 123:9,10,19 124:9 129:8
**documented** 135:19 138:25
**documenting** 93:3 98:13 134:6
**documents** 7:4 7:14,18 8:7,9 8:21 30:20 70:13 71:15

84:5,12 86:1 113:1 118:14 132:19 134:3,5 134:20
**doing** 24:1 25:13 151:4
**doll** 143:11
**domain** 20:16
**domestic** 90:22 114:5 124:25
**domestically** 97:18
**doors** 140:10
**doubt** 121:16
**downhill** 46:11 128:19
**dozen** 25:9
**Dr** 121:7 141:3
**draw** 94:5
**drawing** 81:9
**dream** 21:2
**dreams** 20:25 21:1
**Dreamsofdani...** 20:22
**drive** 141:1,19
**drove** 5:24,25
**drugs** 10:17,19
**dry-humping** 93:5
**dude** 76:17,21 79:8 84:9 157:18
**due** 34:20,22 90:19 131:7 145:4
**duly** 4:20
**duties** 22:9,19 26:18,19 27:2
**duty** 26:21 64:8 64:15

---
**E**
---

**e** 2:1,1,15,21 66:20

**e-mail** 3:2 7:8,9 7:9,10,11,12 19:20,23 20:1 20:20,21,23,25 21:10 30:16 57:3 68:24,25 79:11,12 80:8 82:15 88:7,10 88:11 93:8 94:1 103:18 105:23 108:22 109:1 113:8,12 113:13 114:9 115:25 116:8 118:9,10 119:6 119:10,19,20 120:1,22 121:12,22 131:8 153:4
**e-mailed** 82:18 89:9
**e-mails** 33:9 79:5 153:4
**E.1.D** 95:12
**earlier** 17:24 50:7 63:13 65:23 107:18 111:15 118:10 122:9 139:1
**earliest** 87:13 106:3 107:3
**early** 13:12 27:23
**earnestly** 33:2 35:18
**earning** 151:10 151:13
**easier** 14:17
**East** 16:18 18:2 18:5,9
**education** 1:7 4:8 18:18,19 18:24 19:5,7 119:21 133:5 160:1 161:7

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 170

**educator** 29:7
60:18 61:2
97:17 114:6
**educators** 26:2
45:24 154:8
**EEOC** 84:2 86:7
97:23 107:6
125:24 130:2
130:19,21,21
132:6,12
133:21 157:9
**effect** 69:22,24
**eight** 93:6
**either** 31:13
32:17 33:7
73:1,11 75:5
89:18,19 90:22
96:6,7 109:15
109:15 110:12
134:19 159:15
**electronic** 4:3
**elementary**
21:17 22:3,13
22:24 28:2,16
28:17,21 29:13
29:21 32:15
37:3,6 61:16
153:22
**eligible** 154:4
**emergency**
140:21
**emotional** 22:15
137:22 139:17
141:25 144:23
**emotions** 23:25
**employed** 21:20
35:22,23 36:3
59:17 85:13
137:2 162:7
**employee** 21:19
41:9 48:18
49:20 57:19
58:10,12,17
61:24 62:1,10
63:6 64:18

78:23 91:24
109:5,11
120:10
**employees** 62:15
**employer** 120:4
142:7
**employment**
34:2 40:1
67:16 93:8
97:13 117:25
128:21 153:17
**encouraged** 98:6
125:1
**ended** 39:8,11
39:20 40:18
**endorsed** 127:7
**enforcement**
33:25 64:4
102:1
**engage** 53:24
120:3 152:21
**engaged** 33:25
42:22 44:8
45:6 55:17
56:14 91:23
114:1,2 127:19
135:19 140:12
142:10 144:6
144:24 145:1
150:21
**engaging** 15:2
66:15
**enjoy** 139:7,11
139:13
**enjoying** 139:6
**entail** 23:2
**enterprises**
37:17,18,20,21
**entire** 93:8
100:12 104:2
123:19 128:1
136:23 140:13
144:7
**entirely** 106:13
**entitled** 149:11

149:13
**EOC** 106:23,23
**EOS** 104:18,18
105:2 123:24
126:2,3 132:6
136:1 141:12
**epilepsy** 139:24
**Equal** 33:15,23
35:6 40:1 56:2
56:6 67:15,15
67:16,23 85:5
97:13 99:4
100:20 102:4
104:18 123:11
123:13 125:20
135:24
**Erin's** 42:23
54:7 66:24
135:20 142:11
**errors** 160:3
**esoteric** 19:8
**especially** 142:9
154:1
**essentially**
137:24
**establish** 121:24
**established**
116:13
**establishing**
136:10
**ethical** 76:11
95:12
**evaluate** 159:4
**event** 61:11
114:11
**events** 127:21
145:4
**eventually** 6:1
67:14 77:18
80:15 89:6
99:19 114:8
**everybody** 24:22
26:23 80:15
91:4 111:8
114:16

**everyone's**
118:7
**evidence** 12:4
112:19
**evolve** 105:12
**exact** 72:20
**exactly** 12:18
20:13 52:13
109:9
**examination**
2:17 4:22
161:21
**examined** 4:21
**example** 12:23
13:11 54:2
75:13 117:20
127:4
**examples** 134:8
**excepted** 162:7
**exception** 65:2
**excuse** 124:1
126:14 144:25
152:19
**exhibit** 59:20
62:19 70:15,17
71:22 72:2,3,5
74:15 77:15
78:15 85:19,20
85:22 92:10,11
94:16,17 99:6
99:7,10 105:20
115:23 116:5
118:10,12
122:7,8 123:3
123:7,8 124:4
124:6 127:22
129:6,8 130:25
**exhibits** 162:1
**expand** 24:6
**expected** 27:6
64:6,14,18
**experience** 7:24
21:2 24:23
98:21 127:21
**experienced**

133:2 143:25
**experiences** 23:3
**expired** 8:16
**Expires** 162:13
**explain** 141:25
142:2 156:20
**explained**
106:15
**explanation**
89:22 90:3
106:17,19
109:6,8,13
**exposes** 98:23
**expunge** 47:17
98:10 104:2
**expunged** 5:13
98:11 136:12
136:24
**expungement**
136:15
**extended** 39:24
153:20
**extent** 6:4,6
**eyewitness** 43:2
61:9 120:16

---

**F**

**F** 12:20 13:23
14:3,6
**F'd** 95:24
**F'ed** 135:14
141:13
**F-A-M-I-L-Y....**
20:3
**face-to-face** 24:4
24:12 151:6
**Facebook**
157:20
**faces** 44:11
**fact** 33:4,25 57:2
58:7 70:23
92:17 96:1
105:18 107:1
107:13 110:24
114:14 117:13

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 171

118:8,25 119:2 120:16 121:18 122:23 127:19 130:1 132:22 132:24 137:3 139:7 140:12 141:12,16 142:13,14 144:3 151:25 158:20
**faculty** 44:2 124:14
**Fair** 28:12 38:16 73:3
**faith** 5:19 76:9 76:20 78:7 80:17 95:24 112:17 117:5 135:14 141:13
**faith-based** 20:15
**fall** 57:1,6
**falls** 132:20
**false** 117:19 118:8 127:2,3 127:17 137:17 138:24 139:13 142:20
**falseness** 122:17
**familiar** 20:25 27:4 46:23 48:9 57:10,11 57:12 66:23 141:7 147:13
**family** 20:2 58:18 96:2 119:17 125:9 127:5,12 137:4 141:24 143:7 151:6
**fantasies** 45:1
**far** 15:21 36:23 51:20 100:3 102:25 113:2
**favorite** 27:14

27:15
**fear** 97:21
**February** 1:13 4:2 108:24 109:1,16 114:9 115:11 131:19 160:19 161:13
**federal** 1:18 3:3 3:5 33:5 39:23 41:18 42:23 43:9 67:6,8,16 84:6,7,10 97:12 119:24 125:24 130:8 132:6 135:20
**feed** 42:17 54:22
**feedback** 78:12 78:14
**feel** 13:13 17:18 17:19 23:6 24:19,22 30:7 32:22 44:18 45:1 46:25 52:11 54:11 65:10,13 78:9 81:20 85:24 141:8,9 142:3 142:24 146:12 147:5 148:17 150:18 151:12 157:12,13,13 157:14,18 158:10,15 159:5,7
**feeling** 10:5 13:12 105:16
**feelings** 27:24 101:11 104:12 127:25
**feels** 46:21 132:3 144:4
**Felic-** 33:13
**Felicia** 33:18
**felt** 28:25 30:9 35:7 40:12

66:18 67:4 75:4 82:5 90:19,21 92:17 97:14,15 105:19 114:4 116:25 133:8 146:16 157:5
**female** 52:18 91:2,4 124:18 125:6,14 126:21
**females** 157:14
**fetish** 46:25 48:6 48:7,8 49:10
**fifth** 22:5 43:25
**figure** 20:13 31:21 42:11 48:24 49:2 53:20 67:2 134:2 136:8
**file** 5:13,17 98:1 99:1,3,17,24 100:11,16,18 101:2,10 102:6 102:9 117:3 118:2 129:15 137:16 138:15 142:19 154:2
**filed** 3:6 4:9 12:17 39:23 70:4,10 72:11 86:5,7,8 87:10 87:22 93:10,25 94:15,15,19,21 97:9 101:7 117:21 124:7 130:10,16 131:7
**files** 5:13 98:12
**final** 44:23 162:8
**fine** 158:24
**finish** 151:1
**finished** 73:23
**finishing** 127:25

**fire** 57:18 117:2 120:12 131:9
**fired** 33:2 35:18 35:20 55:19 63:14 68:10 120:14 140:24
**firestorm** 119:18
**firm** 2:3 34:11 156:24
**first** 4:20 7:20 9:14 10:6 29:17 35:25 52:12 57:7,23 58:8 59:22 67:17 73:2 76:19 86:19,23 89:7,23 93:8 96:16 97:11 105:21,25 106:5 107:8 116:12 139:21 140:20 154:4
**first-year** 79:1 128:11
**fits** 146:11
**five** 38:15 60:19 156:1
**fixed** 89:5,6,6,19 90:9 108:3,4 108:12,21,25 109:2,15
**Floyd** 133:7
**focus** 23:7
**focusing** 23:8
**follow** 11:23 21:3,4 75:1 79:15 120:25
**followed** 61:5 74:22,25 80:14 149:15
**following** 72:15 72:18 92:6,19
**follows** 4:21
**font** 134:19

**foregoing** 160:18 162:5
**form** 64:11 88:14 93:13,15 94:2 111:20 113:13 115:16 128:10 144:10
**formal** 3:7 18:19 19:4,5 129:11 129:12,24 131:20 132:4 145:23 146:6
**format** 113:10
**formed** 133:5
**former** 33:24 64:3 101:25
**forth** 55:21 123:18 162:4
**forthright** 105:15 107:5
**forward** 60:21 94:23
**foundation** 64:11 94:2 111:20 115:16 144:10
**four** 5:15 12:25 23:15 60:19 156:1,1
**Fourth** 1:14 119:8,24
**frame** 13:1 25:3 28:11 29:25 33:17 40:17 42:6 44:12 45:5,20 52:23 54:7 62:11 84:20 95:16,21 96:5 123:15 128:25 134:22
**framed** 33:1 35:14 41:9 45:9 55:9 90:15 116:24 137:5 138:6,7

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 172

151:23 153:25
**frames** 13:3
   79:21
**frankly** 144:1
**free** 85:24
**freedom** 138:2
**freedoms** 97:19
**frequent** 11:15
**Friday** 125:3,4
**fris** 66:20
**front** 13:12
   45:17,21,25
   46:3 47:3 51:8
   51:10,16 52:1
   54:21 55:17
   101:12 132:24
   135:16 140:9
   143:13
**fulfills** 45:1
**full** 79:1 106:9
   127:10
**fully** 30:25 84:7
   95:5
**fun** 143:12
**funny** 44:20
   95:25 135:15
   141:14 144:4
**further** 9:13
   43:25 63:10
   97:22 112:20
   159:13 161:19
   161:21 162:1,3
   162:7
**future** 27:18

_____
**G**
_____
**gag** 57:11,19,21
   58:2,3,9,13,14
   58:15,23,24
   59:1,3,5,6,11
   59:22,25 60:13
   63:9,15,23
   65:18,19,24
   75:8,8
**garage** 6:1

**garbage** 139:24
**gash** 91:19
**gathered** 31:14
   108:19
**gender** 85:7
   125:13
**genders** 28:1
**General** 87:22
   93:6,11 96:17
   96:19 135:1
**General's** 93:23
   93:25 94:9
**generally** 13:2,3
**George** 133:7
**ger-** 125:12
**getting** 42:16
   54:20 79:9
   92:15 95:22
   119:2 135:12
   137:14
**give** 9:15 12:3
   13:11 26:3
   30:3 32:19
   58:6 71:2 81:9
   109:6,8,13
   113:7 114:15
   115:9 117:19
   117:22 121:14
   129:14 133:13
   133:14 146:2
   154:24 158:18
**given** 33:20,21
   40:21 57:19
   78:21 81:20,23
   88:11,24 89:7
   89:8,22 90:3
   93:15 101:5
   102:10 103:8
   113:4 114:22
   119:6 121:22
   127:23 128:9
   128:10 130:1
   155:18,19
   158:20 160:19
**gives** 134:8

**giving** 10:25
   11:7,11 29:5
**glad** 43:16,21
   118:12
**glanced** 69:16
**Gmail** 20:6,7
**go** 7:10 9:4,13
   23:23 24:8
   25:17 26:1
   29:7 36:22
   38:19,19 43:25
   58:13 61:12,19
   64:13 67:23
   70:25 71:4,21
   87:16,19 89:2
   113:17 115:17
   115:17 116:15
   122:24 127:11
   129:16 132:5
   136:14,24
   138:3 142:7
   148:25 151:19
   151:20 156:9
**God** 15:1 22:11
   40:9,12
**goes** 7:24 20:7
   80:23 117:10
   130:21 132:6
**going** 10:11
   11:19 12:14
   13:3 17:16,17
   17:18 26:11
   27:20 35:9
   46:11 47:17,19
   53:8 62:17,19
   66:13 70:20
   76:10,11,17
   77:16 78:7
   82:3 83:3,12
   85:18 95:24,25
   99:9 101:16
   105:12,20
   106:25 111:7
   115:9 116:4
   117:3,18 118:4

118:7 121:13
   122:6 129:4,7
   131:9 134:21
   135:14,15
   138:10 140:21
   141:6,13,14
   142:9 148:11
   159:20
**good** 4:1,15,24
   5:16 7:7 13:5,7
   20:24 27:3,17
   36:24,25 45:24
   46:6 76:9,20
   78:7 80:2
   81:23,24
   105:11 112:17
   157:18
**good-faith**
   115:12
**Google** 88:14,16
   89:2,4
**Gotcha** 26:22
   27:1
**government**
   137:1
**GPA** 127:5,10
**grade** 12:21
   13:4,8,23 14:4
   14:7 22:5
**graders** 43:25
**grading** 12:20
**graduate** 31:25
   127:10
**great** 6:17 26:3
   26:23 27:23
   138:11 139:15
   144:13
**gross** 157:5
**ground** 9:14
**grow** 138:17
**growth** 23:8
**guess** 25:13 40:8
**guessing** 82:13
**guilty** 81:23
**guy** 115:4

_____
**H**
_____
**H** 2:21
**habit** 70:21
**hacked** 120:1,21
   121:11
**half** 25:9
**half-time** 37:11
**halls** 24:16
**hallway** 24:6
**hand** 24:9 62:17
   62:19 99:9
   116:4 120:13
   122:6 129:7
**hand-delivered**
   62:24 63:5
**Handbook**
   64:18
**handed** 103:15
**handing** 70:16
   123:6 124:5
**happen** 8:18
   41:17 49:14,16
   76:10 80:17
   129:22
**happened** 7:23
   10:12 30:7
   42:2 43:13
   45:2 46:16
   47:22 48:2
   60:14,21,22
   61:10,15 64:23
   65:24 68:1,8
   69:3 83:14
   88:9 89:22
   90:4 91:14
   96:13 107:20
   111:21 114:2
   118:17 121:21
   121:25 128:7
   132:8 133:6
   136:3 143:10
   150:1
**happening** 47:2
   90:18,20 136:9
**happens** 23:14

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 173

132:10
**happy** 10:8,8
135:12 158:11
**harassed** 42:19
**harasser** 144:5
**harassment** 3:1
41:12 42:1,22
54:7 69:23
72:11 91:24
100:13 126:14
138:8
**hard** 13:21
140:23
**harm** 34:2 75:6
75:7 128:20
**harmed** 128:22
128:23
**harming** 137:17
**HARRIS** 2:8
161:15
**Hawaii** 19:3
121:9,9,19
**Hawaiian** 19:8
**head** 10:1 60:6
**health** 149:11
**hear** 6:21 7:1
9:15 140:5
148:10
**heard** 36:24,25
44:22 90:24
97:4 143:4
**hearing** 34:20
34:22 49:19
**heart** 148:9
**Heather** 85:6
114:9 116:1
131:8
**held** 149:5
**help** 13:13,16
27:1 44:9 46:8
54:6,10 60:20
66:23 79:19,20
109:3 114:17
120:4 127:24
129:21 133:9

138:11,12
140:1 146:13
**helped** 33:15
35:7 141:15
**helpful** 9:3 11:2
**helping** 45:13
92:17 146:14
**helps** 7:22 11:1
146:20 147:19
**Hey** 24:9 26:2
26:11 101:20
118:23 140:24
141:12 142:17
**hide** 105:18
**hiding** 118:25
**high** 30:11,12
31:7,17 32:2,7
32:13 69:2
72:16,21 79:2
88:12 89:10
90:20 117:7
128:11 143:24
155:13,17
**higher** 27:21
67:24 95:9
**highest** 18:18
19:4 127:5,9
**highjacking**
120:3
**highway** 6:1
**hijacked** 119:5
119:10,19
**hip** 140:11
**hire** 139:9 142:9
**hired** 137:15
154:6
**hit** 107:22
**hmm** 59:23 79:8
**hold** 5:19 24:20
32:5 72:20
81:12 117:4
136:25 146:21
146:21 154:14
**holding** 126:18
131:6

**holiday** 112:6,7
**home** 90:19
106:22 125:8
**honest** 10:25
11:7,11 109:9
151:2
**honestly** 158:9
**hook** 110:5
**hope** 15:3 23:7
24:3 27:25
70:7 74:12
77:5 93:18,21
95:7 129:18
136:10,11,23
156:6
**hoping** 47:17
98:9,11
**hospital** 119:17
140:21
**hour** 11:14
**hours** 10:15,18
93:6,7 153:12
**huge** 51:15
97:14 119:18
143:8
**human** 64:8,15
68:24 85:4
86:9 100:17
112:10
**hump** 101:12
**humped** 42:16
54:3,21 95:22
119:2 135:13
**humping** 60:7,8
75:14

---

**I**

**icing** 40:10
**ID** 109:11
**idea** 104:1
**ideal** 26:8 27:10
27:11 28:22
29:1
**ideally** 24:13
26:8 129:15

133:4 137:9
138:4
**identify** 156:17
**identity** 85:7
**ideographic**
13:6
**illegal** 10:17,19
32:22,24 64:5
**imagining**
137:14
**imbalance** 47:4
**imitating** 91:10
**immaterial**
131:23
**immediately**
33:3 38:10
55:19 57:18
68:10 89:16
90:9,10,11
117:5 118:25
120:12 140:24
152:1
**impacted** 150:24
**important** 22:24
159:6
**impossible** 89:2
89:12,13
**improvement**
40:25 41:3
42:4 44:5
53:22 73:10,17
73:19,20 74:3
74:11 91:21
127:18 155:19
**ina-** 70:9
**inability** 110:22
111:19 112:1
**inaccurate** 70:3
70:9 137:7
**inappropriate**
49:1 124:18
148:19
**incarcerated**
23:5
**incident** 42:2

44:9 45:4 46:2
46:5 47:6
54:25 55:24
56:17 57:7,22
60:2,10 61:3
61:16 65:11,16
66:5,8,10,13
67:3,18 68:7
77:4 78:15,16
124:22
**incidents** 95:22
145:9,11
**include** 117:9,10
**includes** 6:13
24:16 132:25
133:1
**including**
156:24 162:1
**income** 37:14
**independent**
95:5 125:23
**independently**
93:19 94:12
**indicate** 122:16
160:3
**indicated** 87:13
**indicating**
124:17
**indication** 33:10
76:19
**individual** 22:14
23:2,9 24:2
25:2,6 26:1
115:13
**individuals**
48:25 156:18
156:21
**influenced**
124:16
**inform** 42:25
43:4 56:5
**informal** 19:7
146:9 147:1,4
148:3,5 150:18
**information**

Trambley's Court Reporting

(505) 292-2120

trambley.cr@gmail.com

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 174

81:21,24 100:6 100:9 101:5 102:13 105:17 117:20 137:6 147:10 148:15 158:25 159:2,3 159:5
**informed** 56:19 67:22 130:8,15
**initial** 2:25 85:23 86:3
**initially** 80:8 98:19 136:23
**ink** 3:4,5 122:11 122:11,14 123:16 153:14
**Instagram** 157:20
**instance** 41:19 54:3 90:12 105:22 107:15 113:23 139:21 150:6
**instances** 39:6 40:4 87:19 127:2,3 138:24
**intake** 93:13
**intention** 5:17 63:19,21 75:4 156:7
**interacting** 50:15
**interaction** 83:6 135:25 136:1
**interactions** 147:7
**interest** 5:17 19:10 37:16 122:18 129:19 133:4 162:8
**interested** 48:20 51:1,2,4
**interesting** 62:11 111:9 121:21 122:15

**interfered** 152:22
**internal** 70:13 84:23 85:1
**internally** 95:10
**interpret** 63:20 75:8
**interpreted** 60:24 66:8
**interprets** 54:5
**interrog-** 156:16
**interrogatories** 156:16
**interrogatory** 156:19
**intervals** 149:16
**interview** 136:7
**interviewed** 33:24 35:1 101:6
**inti-** 77:7
**introduced** 41:23
**inundated** 148:14 149:15
**investigate** 129:16
**investigation** 33:1,11 34:23 35:14 68:15 116:24 138:7 151:24 154:1
**investigations** 34:13 64:19 98:22 119:22 120:1,21 121:11 122:1 123:20
**investigator** 97:15,23
**investigators** 34:5,23 68:16 106:24
**invitation** 54:5 60:25 66:8,18

77:7
**invited** 137:12
**involved** 84:6 153:8
**involving** 57:8
**irrelevant** 90:1
**Island** 16:6
**issue** 74:21,24 89:19 90:1 111:19
**issued** 35:4,16 62:7 132:18 141:11
**issues** 88:2
**items** 75:2 78:17
**IX** 124:15 125:9 125:10,11,16 125:17 126:9

———— **J** ————

**James** 2:13 4:4
**Janu-** 146:23
**January** 30:14 30:15,15,16,19 30:20,21,22 31:4,8,16,18 31:19,21 32:5 32:8,9,9 34:17 39:11,20,22 40:18,20 44:13 45:7,11,12,13 45:19 46:5,16 47:6,16,21,22 49:1 50:20,21 51:24 53:13 57:5 67:25 68:4 73:25 76:13,25 83:17 83:18,25 84:17 86:19 87:14 107:16 108:2,9 108:9,13,24 109:1,16 110:9 110:9,21 113:19,20

114:12,19,23 114:23 139:22 140:15 141:2 141:20,22 146:3,4,23 150:17
**January/April** 147:8
**Jasmine** 36:8,9 36:10
**Jefferson** 29:22 29:23 30:1,10 32:11 136:5 153:3
**Jennifer** 91:5 92:3
**Jerry's** 76:3
**Jessica** 62:24 85:4 103:10,11 103:12,14 116:1
**job** 25:11 27:14 37:15 128:12
**jobs** 36:18 37:25
**Joseph** 90:5
**journey** 20:11
**joy** 13:12
**judge** 101:22
**July** 29:24 30:13 30:17 31:1,4,9 31:16 68:21 69:8,9 73:1 83:21,22,22 84:18 85:17 155:14,16
**June** 124:7 145:15 146:23
**Justice** 93:20 94:13

———— **K** ————

**K** 1:20 2:11 22:5 22:8 161:18 162:2
**Kay** 109:10

**keep** 16:19 47:2 47:19 138:16 139:15
**keeps** 91:1 125:6 126:21 141:7
**kept** 91:3
**kid** 22:18 23:14 24:5 40:12 45:17 54:3,10 92:17 95:22 101:7,21,23 119:2 135:12 144:1
**kids** 14:17 22:19 22:22 23:24 24:8,18 25:4 29:8,9 31:24 45:22,25 46:3 101:17,24 141:15 144:1
**kill** 111:7
**kind** 19:13 49:18 69:12 75:15 76:10 88:16 91:6 101:18,23,24 103:10 104:12 104:24 111:8,9 115:3 120:9,10 121:21 125:22 126:11,24 128:6,25 129:3 130:3 133:7,8 140:8 143:6 144:3 147:21 153:4,5 157:6
**kindergarten** 27:23
**kindness** 110:15 110:19 148:9
**knew** 28:9 70:6 76:21 79:8 101:8 120:16 141:6
**know** 4:24 6:8

6:15 8:20 9:4
11:15 13:14
15:22 17:21
18:11 23:24
24:11,21,25
25:17 26:6,10
26:18 27:9
29:3 36:20
43:16 45:9
46:1,8,9,24
48:10,17,19
49:18,21,24
50:2,3,3,9
51:20 52:14
53:4 62:21
66:20 68:14
70:4,19 73:21
74:16 76:18,23
79:3 81:8,14
82:4,6 83:13
87:8 89:12
92:16 93:14,21
98:7 99:10,14
101:2,23 102:8
103:15 105:17
106:25 108:21
109:9 110:7
111:7,11
112:17,19
113:3,5,21
114:20,21
115:5 116:5
117:1,10 118:5
121:14,16
122:2 126:20
126:24 128:13
128:20 129:5
131:9 132:21
133:16 135:2
138:4,6 140:1
140:6 141:4
142:25 143:3,8
144:22 147:10
148:9,14,17
155:24,25

156:5,22 157:6
158:16,25
159:3,6,9
**knowledge**
12:24 19:11,13
19:14 59:17
74:9,10 95:6
146:19
**knows** 46:14
142:10
**KO-** 62:7
**KOB** 43:2 61:9
62:7,9
**KRQE** 61:10
62:9

--- **L** ---

**La** 36:24
**landed** 6:1 29:24
**lap** 91:9 126:19
127:17
**laptop** 31:1,5
74:21 78:21,21
78:25 79:1,6
79:10,13,16,25
80:1,4,7,12
83:21 88:12,20
88:21 89:7,8
89:15 90:7
128:9 153:3
**laptops** 79:17
**Lardy** 1:20 2:11
2:17 4:15,15
4:23,25 6:6,21
22:13 38:19
39:1 48:16
59:21 61:21
64:13 70:16
71:4,10,21
72:1,3 85:21
94:3,7 97:3,8
99:7,9 112:1
115:17,24
116:15,17
122:9,24 123:6

124:5 129:7
144:13,19
149:2,8,21,22
156:9,15 158:3
158:5 159:13
161:18 162:2
**latest** 150:22
**laughing** 42:18
119:1 135:12
**laughter** 42:21
**law** 33:4,5,24
34:11 41:15,16
41:18 42:23,23
43:9,9 52:25
53:1,5 54:7
58:4 64:3
66:16,24 70:2
76:23 77:6
78:6 84:7,10
102:1 105:19
111:3,6 120:16
135:20,21,21
136:11 142:11
146:15 149:12
151:25 156:24
**laws** 5:9,10 46:1
134:7
**lawsuit** 5:1 8:3
8:18 12:17
18:16 112:22
122:2
**lawsuits** 119:23
**lawyer** 139:9
**lawyers** 45:25
**lay** 9:13
**Le** 1:4,12 2:17
2:22,23,24 3:4
3:5 4:8,8,19
5:2,3,5 14:14
14:18,19,19
39:1 71:10
115:24 116:19
121:7 123:6
140:14 143:15
144:19 149:22

156:15 158:5
159:15,19
160:1,18,23
161:4,14
**Le's** 52:14
**Leadership**
45:18
**leading** 134:22
**leads** 49:25
**learn** 23:21,25
27:24
**learned** 7:20
60:23 76:9
**learning** 152:21
**leave** 28:21 30:1
30:14,18,24
31:3,16,21,24
32:5,8,9,21
33:5 39:9,13
39:22 55:14
63:6 65:10
68:14,17,20
73:22,24 74:8
76:8,12,25
80:3,11 83:16
83:20,25 84:17
95:19 108:5
109:19 113:21
113:22,23
114:1,6,12,24
115:4,8,14
116:19 117:19
131:4 151:14
155:14
**led** 33:23 53:12
91:18 114:11
**Lee** 143:5
**left** 150:8,9,9
**legal** 2:3 10:13
10:21 13:25
17:12 146:11
146:19
**legally** 135:7
**legislation** 154:9
**legislature** 154:7

**lessons** 22:16
25:10,14,24
26:7 29:6
**let's** 24:11,20,20
29:6 58:13
59:19 60:7
71:2 115:3,4,6
115:11,11
137:22,22
138:11,12
139:15
**letter** 2:22,23,24
3:3,5 31:23
40:21 56:20
62:24 63:5
64:22 65:9
68:13 69:11,15
69:18,21,23
70:17 71:1,11
72:7,15,18
73:14 76:13
77:4,9,12,21
81:3 82:25
84:22 96:8,10
96:12,21,21
98:13,16,18
110:25 111:22
112:4,8,14
113:9,15,20
118:6 122:10
122:10 131:3
131:20 132:4
134:11,13
135:6 138:9,9
138:21 139:9
141:2 142:17
155:18 161:22
**letterhead** 91:15
91:15 127:16
134:15
**letters** 77:20
83:17
**level** 18:18 19:4
**leverage** 139:15
**LF/JFR** 1:3 4:11

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 176

161:3
**liability** 105:18
**license** 9:6 19:12
  147:20 162:13
**lie** 117:22
**lied** 76:22
**lies** 141:8
**life** 97:19 138:18
  140:20 144:7
**light** 43:2 66:18
  111:9
**limited** 101:5
**line** 97:19
  112:20 160:4
  160:11
**list** 87:20
**listed** 36:20 61:6
  160:9
**listening** 10:24
  11:6,10
**lists** 107:2
**litigated** 137:24
**litigation** 2:13
  4:5 103:21
  149:10
**little** 10:9,10
  24:7 26:1
  53:18 59:8
  118:6 136:16
**live** 16:3,9,16
  121:8
**lived** 16:7
**livelihood** 34:2
  137:8,17
  138:17
**lives** 17:1
**living** 15:11
**Lobo** 91:8,20
  126:18 127:15
  128:19 131:6
**local** 47:12
  67:22
**locally** 80:13
**located** 4:5
**location** 136:5

**loco** 22:20 41:17
  42:24 135:21
**log** 88:13,15
  89:3
**logically** 70:5
**long** 16:7,23
  28:2,17 30:12
  32:16 138:13
  143:5 145:14
  155:20
**long-term** 13:8
  13:24 14:4
**longer** 7:24
  23:15 108:5
  126:3
**look** 17:16
  101:18 106:7
  118:4 132:17
  134:17 137:22
  138:10 144:5
**looked** 7:21
**looking** 105:11
  128:20 136:25
**looks** 70:20
  74:21,22
  109:15 123:22
**lose** 95:24
  135:14 140:3
  141:13,21
**lost** 44:13 53:18
  116:24 118:19
  137:3 139:22
  140:16,18
  141:20 151:9
  151:12 153:16
  154:3
**lot** 19:12 37:2
  53:2 117:8
  143:9
**Louie** 91:8,20
  126:18 127:15
  128:19 131:6
**Lovato** 90:5
**love** 26:23
**loved** 5:18 117:4

**low** 29:16,20
**lunch** 26:19
**lying** 32:25
  38:14 101:9

──────────
**M**

**ma'am** 21:24
  36:12 37:10
  52:3 88:5
  97:25 110:18
  123:25
**Mackey** 91:6,18
  92:4,7
**Maestas** 28:9
  36:8,9,10
  139:2
**magically**
  122:19
**mail** 150:8,10
**mailed** 161:19
  161:23
**main** 20:18
**making** 48:25
  143:12
**male** 124:18
  125:13,14
**males** 27:21
  157:13
**man** 96:17
  101:18 140:25
  141:12
**manager** 61:19
**mandated** 112:9
**mandatory**
  40:24 41:2
  155:19
**marathon** 11:13
**March** 28:18
  29:25 123:15
  123:24 126:4
**March/April**
  28:18
**Marianne** 43:20
**marijuana**
  10:20,21,22

**mark** 71:22
**marked** 59:20
  62:19 70:15,16
  71:16 72:2
  85:20 99:6,10
  115:23 116:4
  122:7,8 123:3
  123:7 124:4,5
  129:6,8
**marking** 85:21
**marriage** 15:1
**married** 14:24
**Mary** 60:18
**mascot** 91:8
**master** 28:23
  29:2
**master's** 18:22
  18:23
**matter** 47:18
  75:10 104:2
  124:7 136:23
  137:1
**Max** 125:18,25
**McKernan**
  147:12 148:2
  149:12,23
**Meagan** 48:15
  48:16,22 49:11
  49:20,23 50:3
  50:3,8,20,24
  51:18,22
**Meagan's** 51:13
**mean** 5:22 12:9
  21:6 29:1 37:2
  39:23 40:6
  45:11,13 46:8
  46:15 52:16
  58:14 78:10
  80:22 94:4,5
  100:25 107:7
  110:4 111:21
  114:25 119:21
  120:6,7 121:18
  127:3 129:12
  130:6 133:24

135:5,15
  139:19 143:21
  143:22 153:8
**meaning** 8:4
**means** 21:23
  96:15
**meant** 98:20,20
**media** 157:19
**medical** 149:10
**medications**
  10:14
**meditate** 13:6
**meditation**
  153:12
**meet** 23:16 77:7
  82:7 83:3,4
  150:25 152:23
**meeting** 6:14
  34:17 54:10
  56:22 69:6
  73:4 79:3,7
  81:18,25 82:2
  82:23 83:5,8
  83:14 92:3,6
  128:14 131:7
  136:2,4 140:10
  151:2
**meetings** 56:23
  74:3,7
**member** 33:24
  58:18 59:12
  64:3 101:25
  117:23 128:5
**member's**
  124:14
**members** 75:11
**memo** 75:16
  78:3,4 92:11
  92:24 127:13
  127:23,23
**memo's** 75:10
  92:13
**memoir** 20:11
**memory** 7:6
  12:21,22 13:1

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

13:4,8,16,24 14:4,7,10 39:3 58:16 157:7
**memos** 78:2 118:14
**mental** 149:11
**mentioned** 6:18 22:2 40:3 56:24,24
**mentioning** 40:18
**merged** 67:15
**Mesa** 2:4
**mess** 29:10
**message** 17:16 18:1
**met** 6:6,7,10,25 7:1 69:4 74:23 82:10 104:24
**Mexico** 1:1 4:6 4:10 45:18 86:9 87:22 93:6,11,19,22 93:25 94:12 96:18 133:1 135:1 141:3 161:1
**Mia** 1:20 2:11 4:15,25 161:18 162:2
**middle** 14:18 29:22,23 30:1 30:10 32:11
**Mike** 121:14
**mind** 62:8 103:10 157:16
**mindful** 11:14
**Mineta** 143:2
**minimal** 37:17
**minimum** 24:3 25:9
**minute** 30:3 48:4 71:2 81:10
**minutes** 35:9

**mirror** 141:4
**misconduct** 41:10 63:7 91:24
**misleading** 78:20
**missed** 105:10
**mistake** 78:13
**mlk@modrall...** 2:10 161:17
**model** 24:23
**modeling** 22:22
**Modrall** 2:8 34:2,19,24 161:15
**Moir** 2:13 4:5
**mom** 45:8 52:15 76:1 124:25 127:7,11 132:22 140:8 143:12
**moment** 11:4,24 15:12 21:15 35:22 122:5 144:12 145:18 154:6
**Monday** 108:9 125:4
**Mondra-** 52:19
**Mondragon** 33:18,22 35:4 35:16 45:10 46:7,19,24 47:7 48:9,12 49:6,23 50:2,3 50:20 52:8,10 52:13,20 54:23 55:9,18 60:2 67:4,18 68:9 90:15 118:20 120:11 140:23
**Mondragon's** 51:10
**money** 19:12
**month** 58:6

145:25
**months** 48:2 58:7 65:8 112:2 117:10
**morning** 4:1,15 4:24 6:11 9:4
**Morrow** 2:6 4:14,14 6:4,19 46:14 48:14 61:13 64:11 71:24 94:2 97:1,5 111:20 115:16 116:14 116:16 144:10 148:21,25 149:17 156:24 158:2,4 159:14 159:17 161:23
**Morrow's** 156:24
**mother** 45:16 52:5 72:12
**move** 60:21
**moved** 142:11
**movement** 138:2
**multiple** 51:9,17 54:22 55:17 66:16 101:12 118:2 120:17 135:16 140:7
**music** 127:7
**musical** 127:5 127:12
**Myers** 1:22 4:6 161:13 162:12
**MySpace** 157:25 158:1

___

**N**

**N** 2:1,6,15 161:23
**naked** 54:12,15 142:4,6
**name** 4:4,25 14:18 48:10,17

81:9,12 82:7 83:7 85:5 90:5 91:5 109:10 121:6 125:17 147:13
**names** 14:14,16 156:23
**narrative** 114:7 114:7
**narrow** 5:24
**national** 86:25 87:5 128:24 137:9,25 142:16 150:23 151:18 154:3,5 154:12,15,22 155:3,20
**Nationally** 155:25
**nature** 69:25
**nauseous** 91:12
**necessarily** 41:15
**necessary** 65:10 122:20
**necessity** 29:15 29:16,17,18
**need** 9:14 11:15 17:21 21:8 23:16 24:9 26:11,18 27:7 27:11 34:11 48:10,13 62:10 91:1 96:7,12 96:20 101:22 102:25 104:2 110:10 118:6 118:22 120:12 125:6 126:21 127:10 140:3,5 146:16 156:22 159:3
**needed** 11:14 23:18,20 27:13 31:24 44:15,16

65:13 118:22 123:16,17 147:25
**needs** 13:13 22:15 91:4 126:6 158:11
**negotiated** 77:6 78:5,10,22 80:18 111:3,6
**neither** 38:12 44:2 149:17 162:7
**nephew** 143:11
**neurologist** 141:3
**neurons** 141:5
**never** 9:5 38:9 40:9 50:24 59:15 62:11 73:21 78:21,24 78:25 79:4 82:10,17,17 83:6,14 108:16 120:11 121:20 128:10,15 141:8 143:25
**new** 1:1 4:5,10 45:18 86:8 87:22 89:7,8 89:15,15 93:5 93:10,19,22,25 94:12 96:18 133:1 135:1 141:3 161:1
**news** 43:2 61:9 61:21 68:21,22 121:25 140:2
**nexus** 92:2
**nice** 27:22 42:6
**night's** 7:7
**nine** 104:7 108:6
**NM** 1:14,24 2:9 161:16
**NMPED** 91:22 132:15 133:11

133:12,13,19
134:4 135:6
**No-** 57:1 80:6
**noise** 97:4
**nonrenewal**
  58:19 59:14
**Nope** 99:16
**normally** 26:3
  95:23
**Norman** 143:2
**Northeast** 16:6
**nos** 97:1
**Nosaka** 44:19,21
  44:24 49:4
  50:23 57:3
  60:5 132:22
  140:6 157:8
**notes** 91:13
**notice** 63:10
  75:9 83:2,7
  157:12
**noticed** 107:18
**November** 41:23
  42:2,3,16 43:8
  44:4,11 45:5,6
  53:16 54:21
  55:24 56:9,11
  56:16,23 57:8
  57:22 58:5
  59:6,9 60:2,3
  60:10,14 64:23
  65:11,16,24
  66:5,10 67:3,7
  67:18,19 68:7
  71:20 74:15
  75:22 76:6
  80:7,10 87:13
  87:21 88:6,23
  89:19,20 92:25
  93:11,23 94:8
  94:15,18,22
  104:20,21
  105:6,8,23
  106:4,5 107:2
  109:22 111:13

111:14 116:23
127:20 130:4,7
130:16,23
131:22 132:19
134:22
**number** 4:11
  20:2 48:19
  93:15 123:8
  130:13 132:23
**numbers** 29:16
  29:19
**nurse** 35:10
**NW** 1:14 2:8
  161:16

────────
**O**
────────
**oath** 11:25
  101:25 151:3
  162:3
**objected** 61:14
**Objection** 6:4
  64:11 94:2
  111:20 115:16
  144:10
**obligation** 10:13
**obtaining**
  161:23
**obviously** 96:11
  117:9 120:12
  152:7
**occur** 41:21 55:7
  55:11
**occurred** 45:4
  88:3,3 145:5
**occurrence**
  56:11
**October** 28:3,6
  28:8 32:18,21
  32:23 33:8,10
  33:13,20,21
  35:1,12 37:24
  48:1 50:22
  52:23 55:9
  91:23 92:5,7
  92:12,24

104:21,23
105:8 109:22
111:14 148:4
150:2
**office** 23:21 25:2
  25:7 33:15,23
  35:6 42:20
  47:12,13,24,25
  50:21 52:22
  56:3,7 67:10
  67:13,14,22,23
  85:5 93:23,25
  94:9,14,19,22
  97:12 99:4
  100:20 102:4
  104:18 105:3
  107:25 123:11
  123:24 125:5
  125:10,17,20
  126:2,3 130:8
  130:9,15,19
  135:24
**officer** 101:20
**oh** 5:24 9:1 20:5
  21:13 29:10
  52:14 60:7
  72:1 76:21
  82:5 90:6,14
  91:6 96:17
  97:16 99:14
  100:14 101:5,6
  108:24 111:10
  114:24 115:11
  116:15 117:6
  117:20 118:4
  120:11 137:15
  138:11 139:14
  142:20
**okay** 5:5 6:23
  7:6,14 8:7 9:8
  9:22,23 10:10
  11:5,9 14:6,10
  15:4,6,12,13
  15:23,24 16:3
  16:7,11 17:7

20:6,20 22:7
24:1,3,4,14,20
25:6,21 26:14
26:20 27:14
28:5,12 30:23
30:25 31:7
32:2,8,13,23
34:8,18,22
35:1,5,12,17
36:6 37:5,8,13
37:20 38:12,18
39:4,15,18
40:2,16 41:5,8
41:19 43:7,12
44:3 46:2 47:5
48:4,10,13,21
49:9,13 50:2,5
50:7 51:2,5
52:4,19 54:25
55:10,23 56:21
57:6,21 58:7
60:1,4 61:1,15
62:3,13,17
63:8,13,18,22
64:6,17,21
65:22 66:10,17
66:25 67:17
68:13,19,22,25
69:3,10 71:3
71:16,18,23
72:10 73:3,9
73:13,16,24
74:10 75:19,25
76:4 77:12
78:8 79:18
80:6,16 81:1
81:18,25 82:6
82:11,19 83:1
83:6,14,19,24
84:11,16 85:11
85:16 86:1,16
86:19 87:8,12
87:16 88:6,19
89:5,14,17
90:11 92:1,14

92:22,24 94:18
94:21 96:20
97:3,3,21 98:4
99:5,16,25
100:10,16,22
100:25 101:14
102:3,15,22
103:2,6,23
104:17,22
105:6,9,20
106:2 107:20
108:6,10,14,23
109:4 110:9,17
110:21 116:4,8
116:11 118:9
119:3,25
120:14 121:4
121:10 122:6
122:13,18
124:3,11,22
125:19 126:6
126:13 128:6
129:1,12
130:11,15,18
131:10,14
132:1,3,7,13
132:13 134:24
136:13 139:1
139:17 140:19
141:18,23
142:22 143:15
144:8,22
145:12,16
146:10,18
147:6,12,18
148:5 150:3,11
150:21 151:5
151:12 152:5,9
152:13,16,25
153:7,10
154:21 155:2,6
155:10 156:8
157:4,11,17
**old** 12:25 157:9
**older** 27:25

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 179

**omission** 142:13
**omit** 141:16
**omits** 70:1
  151:24
**omitted** 33:3,25
  114:14 141:12
**omitting** 96:13
  140:12 142:14
**once** 23:17
  64:22 128:18
  132:6 151:4,7
  153:11
**one's** 30:21,22
  83:17
**one-third** 37:23
**one-time** 23:10
  23:12
**one-to-one** 24:5
**ones** 5:18 117:4
**online** 133:17
**onward** 39:10
  40:17
**oops** 62:17
**open** 124:14
  148:10
**opened** 147:23
**Openly** 125:12
**operate** 78:7
  93:19 94:12
**operates** 147:17
**operating**
  106:20
**opinion** 32:24
**opportunities**
  125:21 138:2
  151:22
**opportunity**
  13:6 23:6
  28:24 33:15,23
  35:6 40:1 56:2
  56:6 67:15,15
  67:16,23 85:5
  97:13 99:4
  100:21 102:4
  104:18 123:11

123:13 128:24
135:24 150:24
151:21 152:6
152:23 153:16
153:19 154:3
159:2
**opposed** 153:14
**opposing** 148:17
**oral** 57:25 58:2
**order** 33:16
  34:10 57:11,19
  57:21 58:2,3,9
  58:13,14,15,23
  58:25 59:3,5,6
  59:11,22 63:15
  63:23 65:18,25
  75:8,9 120:8
  159:3
**ordered** 78:21
**organization**
  34:6,11 58:22
  106:21
**origin** 86:25
  87:5
**original** 161:14
  161:24 162:1
**Ortha** 157:9
**outdated** 125:12
**outdoor** 139:24
**outside** 7:17
  9:10 12:15
  15:9 20:20
  36:18 37:18,20
  67:17 149:22
**over-schedule**
  26:13
**overall** 13:4,24
  14:4,9
**overseas** 16:17
  16:22 97:18
**oversee** 94:13

———————
**P**
———————
**P** 2:1,1
**p.m** 115:20,22

122:25 123:2,2
123:4 144:14
144:16,16,17
149:3,7 156:10
156:12,12,13
159:19,21
**P.O** 1:23
**PA** 2:8 161:15
**page** 2:18
  123:20,21
  124:12 127:1,1
  160:2,4,11
**Page/Line** 2:16
**pages** 37:22
  103:1 135:9
  160:18
**paid** 113:23
  115:14
**pain** 117:8,9
  131:21
**painful** 10:11
  13:19 70:6
  143:22,23,24
**paper** 9:7
  134:15
**paperwork**
  30:13 36:8
**paragraph**
  116:12 124:12
  124:20 126:25
**parent** 43:5
  115:2 140:11
**parentis** 22:20
  41:17 42:24
  135:21
**parents** 22:21
  23:4 63:11
  64:1,25 110:11
  114:19 119:16
  121:18 157:5
**park** 9:4
**parking** 6:1
**part** 22:18 24:25
  25:11 27:8,8
  27:15,21 28:7

64:6 66:2,22
66:22 70:24
74:2 111:6
125:21 126:16
126:16 127:13
136:7,8 137:12
151:9 153:8
**participate** 64:7
  64:14 73:6
  152:16
**participated**
  68:15 152:2,9
  152:13
**particular**
  107:14
**Particulars**
  87:17,18
**parties** 161:20
  161:22 162:8
**partly** 58:3
**passed** 23:5 35:7
  140:15 141:19
  142:11
**pattern** 121:25
**Pause** 54:12
  142:4
**pay** 63:6 148:8
**payment** 148:7
**penalized** 54:1
  75:1 92:18
  127:8,25
  128:12
**penalty** 12:11
  58:21
**people** 5:19,19
  12:23,24 16:10
  16:11 17:19
  19:12 31:13
  36:7 38:9 47:4
  50:1 51:17
  79:5,6 101:13
  108:19 112:9
  117:4,4 118:2
  120:17 122:18
  128:16 129:18

129:21 133:1
137:10,14
143:7,10 144:4
147:19,24
150:25 154:25
155:12,22
156:2,4,24
**people's** 44:11
  118:1
**perceived** 65:2,3
**percent** 24:13
  25:1
**percentage** 24:1
  25:13
**perfect** 104:15
**perfectly** 88:22
**performance**
  40:25 41:2
  42:4 44:5
  53:22 73:9,16
  73:20 74:2,10
  90:16 127:18
  155:19
**period** 10:19
**perjury** 12:7,9
  12:10
**permission** 65:6
**pers-** 33:14
**person** 8:5 27:6
  33:2,16 44:20
  45:9 51:8
  52:17 60:4,16
  66:7 82:10
  90:24 91:2,16
  91:22 101:6,8
  101:9,11
  106:11 109:10
  119:14 121:14
  131:5,7 132:12
  138:11,12
  139:15 140:10
  143:1 146:14
  151:24
**person's** 81:23
**personal** 19:20

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 180

19:23 20:1,25
21:13 79:4,6
119:6,19 120:1
120:21,22
121:12 128:13
128:15
**personally**
140:12
**personnel** 5:13
99:1,3,17,24
100:11,16,18
101:2 102:6,9
118:2 137:16
138:15 142:19
154:2
**pets** 16:10,11
**phone** 8:15,21
17:5 18:7,8
82:15 119:5,5
119:10,12,20
120:1,9,21
121:11
**phones** 79:6
**phonetic** 157:10
**photographic**
13:5
**phrase** 49:10
**physical** 10:23
11:5 15:2
139:18,19
140:14,16
141:18,23
142:22 143:16
143:16 144:8
144:20,21
**physically** 5:22
31:7
**pick** 108:18
**picking** 31:12
**Pilot** 151:21
153:19
**PIP** 41:6,20
42:11 53:9,15
54:18 55:3
77:17 106:1

**place** 26:12 42:1
43:5 55:5,12
55:16,22 58:3
61:16 69:7
74:25 78:16
87:13 92:10,16
93:4 107:2
115:3,6,7
138:5 145:23
148:3 152:7
**placed** 30:14,18
31:15,20,24
32:5,8,20 39:9
39:13 44:4
53:8,15,22
54:17 55:3,13
66:1 69:22
72:21 73:10,22
76:24 80:2,11
83:16,25 84:16
99:17 108:4
113:20,22,23
113:25 114:6
114:11,23
115:13 127:18
131:3 139:24
151:14 155:17
**places** 58:22
151:4
**placing** 63:5
65:9 68:13
**plaintiff** 1:5 2:2
4:14 124:13,18
127:2 149:18
161:5
**plaintiff's**
124:16 149:18
**plan** 40:25 41:3
42:4 44:5
53:23 73:10,17
73:20 74:3,11
90:16 91:21
114:3 127:18
155:19
**plant** 157:14

**plate** 9:6
**please** 4:2,12,18
9:16,19,20
10:2 11:15
48:14 53:19
57:13 86:13
88:9 90:12
107:20 148:16
156:9
**point** 16:1 24:20
60:2 73:20
75:13 76:9
79:15,24 80:10
81:19 82:1
**policies** 61:25
62:14 70:1
134:7
**policy** 5:9,10
33:4 42:24,25
43:2 56:1 61:6
61:7 62:4 70:2
92:17 135:21
**ponder** 30:4
**possession**
121:10,17
122:4 133:20
**possibility**
111:23,24
**possible** 23:13
38:10 44:16
70:5 80:22
89:3 104:11
105:17 111:18
111:21 114:25
121:15,16
153:13 154:25
155:22
**possibly** 5:15
69:8
**postpone** 83:5
**postponed** 83:15
**pounds** 116:25
118:19 140:3
140:16 141:21
141:21

**power** 47:4
**pray** 13:6 37:1,2
**prayer** 153:12
**praying** 98:9
**pre-K** 22:6
**precipitated**
61:10
**precise** 49:15
58:5
**preemptively**
71:22
**prefaced** 7:17
15:6,17 19:4
**prefer** 5:2 6:19
66:20
**preferable** 5:4
**preparation**
7:15,18
**prepare** 6:3,12
6:24 7:3 144:2
**prescribed**
10:14
**present** 2:12
85:13 161:22
**pretty** 140:13
**prevent** 10:23
11:6,10 115:4
**Previous** 148:23
**Price** 36:9,14,15
56:12,18,19,21
57:7,23 58:8
58:11 64:23
65:10,17,23
66:4 74:4,7
75:23 89:9
95:14 103:9,14
112:10 118:5
128:15 130:12
157:3
**primary** 51:7,7
**principal** 36:10
36:13 41:16
42:25 43:4,9
44:10,21 55:8
55:18,25 56:5

61:19 66:14
87:23 88:2
89:10 118:20
120:11 139:2
140:4,23
141:11 142:10
**print** 107:16,21
107:23,23
108:7 109:19
109:25 110:1,3
110:10,13,17
110:22 111:4,5
111:10,16,19
112:2,6
**printed** 122:13
122:23
**printer** 107:17
107:21,24,25
108:7 109:7,12
109:20,21,22
109:25 110:5
122:15,19,21
**printing** 108:21
109:7
**prior** 29:21
30:10 32:13
66:3 73:7
88:21,21,22
90:18 103:11
154:21 162:3
**private** 51:13
**privately** 54:4
**privilege** 6:5 7:2
7:13 8:4
102:19
**probably** 5:3 9:6
18:1,13 22:23
27:6,22 29:24
37:23 38:15
39:8 52:15,25
60:17 82:12
83:23 102:8,19
102:20 104:20
104:21,23
105:12 110:6

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 181

120:2,6 121:13 146:2 150:9 154:1,6,19 157:7,8,15
**problem** 143:8
**problems** 114:13,25
**procedural** 61:25 62:4,14
**procedure** 1:19 17:18 106:20
**procedures** 11:22
**proceeding** 162:5
**proceedings** 161:20
**process** 10:7 17:12,17 23:6 23:14,25 30:8 34:20,22 39:8 39:11,16,20,24 39:25 40:18,19 54:6,10 60:20 66:23 69:17 77:13,14,16 80:23 84:2 90:14 92:17 98:23 101:11 106:23 115:12 116:22 126:17 127:24 131:7 136:7 141:16 151:7
**processing** 68:10
**produce** 106:10 112:19 122:19
**produced** 8:2 30:21 89:16 103:20,23 112:14,21 113:1,3 123:10 133:23 134:3
**producing** 15:3

**product** 34:15
**professes** 70:7
**profession** 29:12 30:8
**professionally** 137:14 138:18
**program** 137:13 138:5 152:3,10 152:11,17
**programs** 151:19
**progressive** 77:18 91:20
**prohibitions** 124:15
**prompt** 89:12
**prompting** 124:14
**proof** 120:20 121:10,17 122:4
**properly** 159:4
**property** 49:16 50:16 55:5,6 63:25
**pros-** 5:18
**protect** 5:18 13:21 33:17 46:10 68:12 117:3 146:13 146:17 153:15
**protected** 34:1 41:9 42:22 44:8 45:6 53:25 55:18 56:14 66:15 114:1,2 120:3 127:19 135:7 135:20 140:12 142:10 144:6
**protection** 142:12
**protective** 17:19
**protocol** 74:22 74:25 75:2

95:2 128:1
**provide** 158:11
**provided** 102:14 158:16,16
**provider** 120:24
**providers** 149:19
**pry** 17:22
**psychological** 14:11
**public** 1:7 4:9 4:16 5:1,3,17 12:17 18:16 19:10,16 20:21 21:21,23 24:24 34:13 35:21 36:1,4,18 37:15 39:7 40:3,5 41:11 50:5,8,10 59:5 59:16 62:9 63:12 64:1,25 68:3 69:5 75:14,14 84:21 85:9 86:5 88:24 93:5,9 93:16 94:23,24 95:1,4,6 111:1 122:18 129:19 129:25 130:2 131:15,16 132:21 133:4 137:24 145:5 151:16 161:7
**publicly** 45:7 47:3,19 51:6,8 51:16 54:3,21 56:13,25 60:7 96:2 101:12 126:17 135:13 140:6 143:11 143:14
**pulled** 40:6 100:10
**pullout** 25:18

29:3,14
**pullouts** 25:17
**purchased** 20:18 20:18
**purpose** 8:25
**purposely** 131:10
**PURSUANT** 1:18
**pursue** 151:18
**pursuing** 150:23
**put** 42:4 90:15 91:8,9 93:5 97:18 106:20 109:11 115:10 118:12,13 121:14 123:18 127:13 133:7 137:23 138:14 138:21,23 150:6 154:2,9
**puts** 111:9
**putting** 126:19 127:17 142:13 153:13

— **Q** —

**qualify** 135:9
**quasi** 125:23,23
**question** 5:24 9:22 11:16 15:23 17:13 18:4 20:24 27:17 46:6 47:5,10 48:14 53:19 55:10 56:16 57:14 61:13 62:13 65:22 79:12 80:2 84:11,16 85:11 105:11 117:15 122:3,3 144:11 146:21 148:22,23
**questioning**

91:13
**questions** 9:16 9:18 10:12,24 11:6,10,22 99:11 131:24 158:6,8,16 159:13,14 162:4
**quite** 37:16 56:4 65:6 70:6 107:5 145:19 148:22 151:6
**quote** 41:25

— **R** —

**R** 1:22 2:1 161:13 162:12
**race** 86:21,25 87:5
**racial** 45:8 75:23
**racialization** 75:14 111:1
**racialized** 45:7 56:13,25 96:2 126:17
**racism** 40:10
**racist** 45:25
**raise** 24:8
**raised** 5:1
**range** 30:23
**rates** 27:21,25
**rationally** 94:5
**RCI** 34:4,12,23 34:25 68:16 118:15
**re-** 5:14 55:8 64:7 105:24
**re-director** 27:4
**re-watching** 135:13
**reach** 5:15 53:6 65:6 80:11 98:5,5 147:9
**reached** 41:22

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 182

80:1,7 98:6 102:24 148:15 149:12,18
**reaction** 95:23
**read** 62:25 64:2 65:20 69:13,15 69:18 70:19 71:1 103:9,9 103:12,15,16 116:21 117:13 118:4 129:18 136:19 138:15 139:12 148:22 148:23 159:16 159:17 160:18
**reader** 123:17 153:14
**reading** 115:2 153:12
**reads** 93:14
**ready** 62:21 99:11,13 116:5 116:7
**realistic** 111:24
**realities** 26:9
**reality** 23:20 51:12 90:17 105:24
**realized** 24:18 29:18 32:25 53:2,2 98:19 126:4
**really** 27:3,17 28:3 31:6 43:17 46:25 80:3 97:17 101:22 104:14 104:14 105:11 120:17 128:17 137:15 140:5,5 142:8 147:25 150:24
**reason** 11:9 103:23 105:9 115:14 123:16

128:20 150:16 160:9,11
**reasons** 10:23 11:5 28:22
**rebut** 98:23
**rebuttal** 3:3,5 56:20 77:5,9 77:12 81:3 82:25 96:8,10 96:12,21 98:25 102:12 110:25 111:13,22 112:4,8,15 113:9,15 118:6 122:10,10 131:3 134:13 135:6 138:9,10 138:22 139:9
**rebuttals** 82:13 98:13
**recall** 13:16 40:5 145:25
**receipt** 72:15
**receive** 18:25 33:9 58:24 59:9 68:22 70:22 83:24 84:20,22 89:14 120:18 125:24 133:12 137:25 138:24 149:10 149:12 154:5
**received** 19:7 31:1 33:13 35:3,15 55:8 59:4 64:22 65:9 67:6 68:13,21,23 69:10,12,16 73:11 77:7 78:24,25 83:2 83:21 84:2,2 94:17 110:24 113:20 130:3,6 131:15,20

149:14 154:15 154:17,22
**receiving** 60:24 66:8 73:13,14 79:16 140:8 154:19
**receptive** 29:8
**recess** 26:21 38:23 71:7 115:20 123:2 144:16 156:12
**recognize** 62:20 62:22 63:1 71:14,15 72:7 74:18 86:1 123:9 129:8
**recollection** 128:17
**recommend** 96:9 115:11
**recommendati...** 31:23 104:25 105:1 142:18
**recommending** 114:10 116:3 117:16 118:24
**record** 4:4,13,25 5:3 38:20,22 38:24 70:25 71:6,9,19 113:8 115:17 115:19,21,25 122:24 123:1,5 135:24 144:15 144:18 148:25 149:4,5,6 150:7 156:9,11 156:14 159:20
**recorded** 135:11 135:16 136:1
**recording** 135:18,22
**records** 59:7 120:9 135:25 149:11,13,24

**recover** 44:16 118:22
**recoverable** 162:1
**redacted** 3:1 99:18,21 100:12,14,15 101:14 102:16 104:17 105:13 111:13 112:2 112:11 113:10 135:9 136:9
**reduce** 105:17
**refer** 124:11
**reference** 116:11 124:22
**referenced** 59:22 73:9 122:9
**references** 124:13
**referencing** 70:18 116:9 118:10
**referred** 44:17 44:19 46:22 60:13
**referring** 33:18 63:8 116:20 142:1
**refers** 44:25 78:3,15 92:9 92:11
**refresh** 7:6
**regard** 74:20,21 77:12 96:21
**regarding** 57:22 87:23 107:21 149:24 156:18 156:25 161:23
**registration** 8:11,12,17,24
**regular** 23:11,17 134:15
**regular-type**

134:15
**regulate** 94:13
**rejected** 5:14 69:14
**relate** 8:10
**related** 126:24 162:7
**relates** 55:23 98:25 100:6 147:6 150:14
**relation** 8:18
**relationship** 41:16 51:22 148:1 150:19
**release** 104:16 117:2 147:10 147:11 149:24
**released** 103:4,7 104:4 131:11
**releases** 149:10 149:19
**relied** 110:15
**remain** 64:7,15
**remained** 87:18 106:8
**remember** 12:25 13:11,14,19,21 31:12 44:24 49:19 50:15,15 98:2 139:21 158:1
**remembering** 13:13
**remembers** 54:20
**remind** 27:22
**remote** 110:4
**remove** 112:18
**removed** 107:16 109:25
**Ren** 44:19 49:4 50:23 57:3 60:4 132:22 140:6 157:8
**Renni** 81:15,16

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 183

82:7 83:7
116:12,13,17
**rep** 76:10
103:19 104:25
112:10 129:3
**repeat** 53:19
148:21
**rephrase** 51:3
75:20
**reply** 54:13
**report** 3:1,7
5:18 33:14,22
34:1,4 35:4,16
39:23,23 46:5
46:13 47:7,13
47:25 51:7
52:19,20 55:8
55:20,24 56:2
56:11,13,17,21
57:23 60:14
61:3 67:6,8,10
90:24 91:3,22
93:3,12 95:13
95:14,17,21
96:14,15 97:8
97:11 98:1,22
99:1,16,18,21
100:12,14,15
101:4,15
102:16,17,22
103:1,6,14,17
103:20 104:17
111:13 112:3,9
112:11 113:10
117:3 118:15
126:6 129:11
129:13,16,25
130:4,7 131:10
132:8,17,18
133:10,13,18
134:4,6,9,25
135:3,4,8,9
136:10 141:11
162:4
**reported** 1:22

47:7,15,16,21
50:20,23,24
57:7 61:17
65:15 67:5
**reporter** 4:6,17
9:24 11:21
22:12 97:6
99:8 148:24
159:16
**reporting** 1:23
4:7 51:2,4
96:14 125:1
**reports** 100:4,8
101:2 125:24
**represent** 4:25
34:12 85:22
99:23 100:10
122:13 124:6
**representative**
65:5,20 69:4
100:19 103:8
103:13 104:11
**representatives**
69:5
**represented**
161:20
**representing**
34:19 158:21
**reprimand** 39:5
39:18 40:4,21
59:14 69:11,12
69:15,19,21,23
70:18 71:12
72:7,15 73:14
77:21 96:22
98:16,18
105:25 128:7
132:4 134:11
155:18
**reproducing**
15:21
**reproductive**
15:2
**reputation** 5:16
34:3 43:24

46:11 118:1
128:21 137:8
138:17
**request** 5:14
11:13 110:12
114:21 117:2
120:2,7,9,23
127:6,7,9
147:9 161:14
**requested** 83:5
107:8 127:11
136:14 157:21
161:22
**requests** 115:2
148:15
**res-** 81:3
**reside** 103:7
**residence** 5:25
**resources** 64:8
64:16 68:24
85:4 100:18
112:10
**respect** 44:1
54:2 70:23
**respond** 27:7,10
27:12 106:22
149:19
**responded**
116:17
**response** 3:1
61:17 100:12
117:5 149:14
**responses** 9:15
9:24 10:3
105:13
**rest** 140:3
**restored** 83:23
**result** 5:9 44:12
55:20 58:18
59:12 157:12
**resulted** 39:16
41:2,6,20 42:3
42:11 53:15,22
54:17 55:3,13
81:4 111:19

**retained** 161:14
**retaliation** 87:5
97:21 105:22
110:23 113:24
117:24 126:15
126:23 132:21
**retaliatory**
129:23
**retirement**
155:12
**retracted** 113:5
**retreats** 152:20
152:23
**return** 32:2 74:7
147:10
**returned** 32:10
72:16 84:1
95:18 108:16
108:20
**reveal** 54:4
**review** 7:4,14,18
71:11,19 72:6
74:16 85:24
116:5
**reviewed** 8:7
87:17
**reviewing** 86:13
**revoked** 30:16
**rewrote** 104:24
**Rhode** 16:6
**right** 6:2 9:9
11:3 14:12
15:12 16:1
21:10,23 24:9
24:22 25:18
26:21 27:11,17
28:14,25 29:3
31:15 33:9
34:11 40:22
41:15,18 43:1
43:23 47:4
50:6,19 51:6
51:24 53:8
57:12 58:22
59:17,19 62:17

65:20,20,21
68:11 70:5
71:10 72:5,19
73:1,4,15,22
77:3,5,15
78:19 80:4,9
80:20,22 81:9
81:23 82:14,24
84:5,8,13,15
84:15,15,15,15
84:19 85:21
87:1,3,15
88:14,17 95:2
95:18,20 96:14
97:17 98:20
99:7 100:20
101:9,17,22
102:20 105:7
106:1,6,12,13
111:3,9,22
114:1,22 115:8
117:15,22
118:22 119:4,5
120:19,25
121:25 123:6
123:23 124:11
126:5,11 128:9
128:23 131:1
131:13 133:6,9
137:1,6,6,11
137:18 138:11
138:12,18
140:8 141:10
142:4,20,24
143:4,7 145:18
146:5 147:6
152:12 153:2
153:14 154:1
155:17 156:15
157:16,21
**rights** 47:12,14
47:24,25 50:22
52:22 67:10,13
67:14 86:9
93:20 94:15,19

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 184

94:22 97:12 111:6 130:3,6 130:8,15 133:1 143:2
**Rights'** 130:19
**Rivera** 2:22,23 2:24 3:2 62:25 85:4 103:10,14 112:19 114:8 116:1
**RMR** 1:22 161:13 162:12
**Road** 2:3
**Robert** 98:22 119:22,25 120:20 121:11 122:1 123:20
**ROEHL** 2:8 161:15
**role** 24:25 27:4
**romantic** 54:5 60:25 66:9,20 66:21
**room** 140:21
**RPR** 1:22 161:13 162:12
**Rudolfo** 37:3,5
**ruin** 118:1
**rules** 1:18 9:14 162:8

**S**

**S** 2:1,3,21
**sad** 10:8,10
**sadly** 118:3
**safe** 22:20 24:22 27:20 30:7 78:9 83:10 133:8 157:13 157:13
**safeguarding** 5:16
**safer** 97:15 146:12,16 147:5 157:12

**Sandhu** 141:3
**Sandia** 30:11,12 30:17 31:7,17 32:2,7,13 69:2 72:16,21 89:10 108:16 117:7 155:13,17
**Sandia's** 110:1,2
**Santa** 14:23
**saw** 42:20,20,20 43:7 83:7
**saying** 33:7 41:25 42:22 43:10 47:1 48:25 83:2 84:4 89:10 91:1 101:1 102:8 109:2 117:2,6 118:20 125:6 126:21 128:17 131:8 135:18,23 146:18 147:3
**says** 26:11 33:19 33:19 34:15 46:24 49:24 51:6 56:4 57:19 59:11 64:6,16 65:4,4 70:2,4,23 72:13 75:16 77:17 87:15 89:2 90:6 92:12 93:14 95:13 105:24 106:5,7 113:19 117:18,20,22 118:5 120:11 127:22 128:4 128:15 131:10 137:24 140:4 142:5 144:1
**scale** 12:20 13:9 13:23 14:3,6 143:23

**scan** 9:5
**schedule** 25:23 28:23 29:2,3 82:2 115:1
**scheduled** 82:22
**scheduling** 114:13,25
**school** 5:9,10,11 19:11 21:17,18 21:20,21 22:3 22:24 26:16,17 27:11 28:13,23 29:5,9,22,23 30:1,10,11,12 31:8,17 32:3,7 32:10,11,13,15 33:4 37:3,4,11 42:23 44:16,17 48:23 54:22 55:5,6 59:18 66:11 69:2 70:2,7 72:16 72:21,24 73:7 78:24 79:2,10 88:12 89:10,10 90:20 92:17 93:9 101:10 107:17,21 108:7 117:7 124:15 128:11 129:20 135:21 137:13 138:1,3 138:4 140:4 151:16,20,20 151:21 152:11 152:14,17,24 153:17,20,22 153:24 154:7 155:14,17
**school's** 26:10 26:12
**schools** 1:7 4:9 4:16 5:1 12:17 18:16 19:16 20:21 21:23

27:9 34:13 35:21 36:1,4 36:18,21,22 37:15 39:7 40:3,5 50:5,8 50:10 59:5,16 63:12 64:1 65:1 68:3 69:5 84:21 85:9 86:5 88:24 93:17 94:23,24 95:1,4 129:25 130:2 131:15 131:16 145:6 153:19 161:7
**Schools'** 95:6
**score** 141:8
**scream** 126:20
**screamed** 91:2
**screaming** 44:11 91:1 125:5 139:25
**screen** 122:14
**screwed** 79:9
**sealed** 161:14
**second** 57:21 62:18 107:14 149:1
**seconds** 14:12 14:12
**section** 87:17,18 114:3 128:3
**security** 89:25 90:6
**see** 23:11 24:5 29:9 42:24 60:7 72:14 79:5,6 81:21 86:14 95:3 124:20 137:5 139:10 142:19 146:10 151:7
**seeds** 157:14
**seeing** 24:16,16 54:12 142:3

145:14,16,17 145:18
**seeking** 136:17 136:18,22 137:20 139:17 149:24
**seen** 82:13 120:17 124:9 145:19 151:6
**semester** 116:19
**send** 93:12,16,23 107:24 130:25 131:14
**sending** 81:4 130:24
**sends** 114:9
**sense** 14:18 15:2 47:2 75:9 101:8 106:24 134:18 147:24
**sent** 79:11 81:6 82:19,21 93:22 94:8 95:3,5,7 102:4 109:1 130:19 133:19 135:5 149:19
**sentence** 116:12
**separate** 8:25 34:22
**September** 28:8 28:19 74:23,25 78:16,23 91:22 95:15,18 98:5 109:23 124:13 128:10 148:4 150:2
**September/Oc...** 28:10
**serious** 54:8 58:10
**service** 120:24
**services** 33:15 33:23 35:6 56:3,7 67:23 85:5 99:4

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 185

100:21 102:4 104:18 123:12 123:14 125:21 135:24 148:8
**sess-** 144:24
**session** 23:10,12 25:3 145:22,23 146:6
**sessions** 23:17 25:2 145:2,4,8 146:9,22 147:2 147:4,22 150:22
**set** 23:17 36:7 51:25 89:25 92:23 119:17 162:4
**settings** 89:3,4 90:7
**settled** 28:4
**sex** 86:25 87:6
**sexual** 3:1 45:1 48:5 54:7 66:19 69:23,25 91:11,19,23 100:13 126:22 127:16 128:18 131:6 138:8 144:5
**sexualization** 75:14 111:2
**sexualized** 45:7 56:14,25 96:3 126:18
**sexually** 26:24
**shakes** 10:1
**Shanon** 1:22 4:6 161:13 162:12
**share** 19:11,21 19:24 20:10 23:6 24:21,24 27:23 47:18 101:16 105:14 105:16 123:13 125:9 143:21

**shared** 7:22 8:1 8:5 14:1 49:25 57:2 65:13 102:21 103:3 105:4 112:23 123:11 133:21 143:20,21 158:23 159:1
**sharing** 136:9
**shift** 97:14
**shocked** 69:17
**Shook** 60:6
**short** 138:13
**short-staffed** 26:10,12,16 27:1
**short-term** 14:7 14:10,11
**shorthand** 162:4
**shortly** 77:6 82:24 112:5
**shouting** 125:12
**show** 8:21 77:21 113:5,6
**showed** 89:11
**sibling** 16:22 17:1,4,7,11,14 17:22,23 18:2 18:5,9 90:23
**siblings** 16:12
**sic** 20:18
**sick** 116:25 141:9
**sicker** 35:8
**side** 37:25 115:9
**sign** 36:8 159:16 159:17
**signature** 87:9 161:22,23
**Signature/Cor...** 2:18 160:2
**signed** 106:14 107:11 160:23
**silence** 4:3
**similar** 113:9

125:22 134:18
**simplest** 30:3
**single** 78:22 128:14 152:24 158:23
**Sir** 18:4
**SISK** 2:8 161:15
**sister** 54:13,14 141:25 142:1,4 142:6 157:6
**site** 61:19 152:24
**sitting** 8:5 91:6 104:3
**situated** 138:5
**situation** 58:17
**situations** 144:3
**six** 65:8 93:7 156:2
**sleep** 7:7 46:24
**smart** 94:11
**smiling** 42:21 91:7 135:12
**smog** 8:15
**Snapchat** 157:23,24
**social** 22:15 157:19
**solely** 56:16
**somebody** 23:5 28:24 51:5 96:15 114:16 137:15 144:4 147:16
**somebody's** 117:25 138:16
**someone's** 47:3 48:5 120:8 142:9
**something's** 141:9
**somewhat** 78:20
**soon** 44:16 154:11
**sorry** 6:19 7:11

8:6 31:18 46:21 53:18 59:1 60:7 63:16 67:16 72:1 85:11 88:14,21 92:10 92:12 97:2,7 116:15 133:24 153:11
**sort** 25:23 84:21 98:25
**sound** 35:8 141:5 147:13
**sounds** 34:1 85:10
**source** 51:5
**sources** 37:14
**space** 148:10
**speak** 9:11 11:19 12:10 13:17 52:18 59:12 119:15 121:15 124:18
**speaking** 9:10 13:2,4 146:12
**speaks** 52:6 143:13
**special** 41:16 127:6
**specialist** 125:17
**specials** 29:19
**specific** 12:22 13:1,3,11,25 44:19 45:3 54:2,9 65:12 119:9 134:8
**specifically** 14:8 41:10,22 58:15 79:1 134:21
**spent** 24:1
**Sperling** 2:8 34:2,19,24 161:15
**spiritual** 152:20
**splitting** 37:9

**spoke** 4:24 18:5 52:25 53:1 60:16 76:16 109:10 119:14 149:25
**spoken** 82:17 150:17
**spokes-** 61:5
**spokesperson** 43:3 56:4 61:5 61:7,17 62:3,7 62:8
**spoof** 64:4
**spoofed** 119:12
**sprinklers** 35:9 35:11 141:6
**staff** 63:12 64:1 64:25 75:11
**standard** 95:12 106:19
**standing** 41:25 43:23
**start** 35:25 87:21
**started** 28:18 49:5 130:22,22 153:3 154:7,11 154:18
**starting** 73:7 77:14
**state** 4:12 6:14 7:4 16:17 33:4 41:18 43:9 69:21 70:13 77:6 78:6 111:3,6 135:21 154:7
**stated** 11:1 12:18 48:4,8 48:10 68:15 111:15 115:25 156:19
**statement** 3:3,5 62:7 144:11 160:9

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 186

states 1:1 4:9
58:15 64:17
72:10 86:20,24
87:5,21 88:6
107:15 116:12
127:1 161:1
stating 35:3
statute 45:23
132:25
stay 23:22 138:3
stays 101:19
stemming
127:17,19
stenographic
162:4
stereotypes
125:13
stick 91:21
92:23
stigma 25:4
stop 37:23,24
stopped 88:13
89:1 107:24
story 102:2
115:10 138:13
strategies
146:15
Street 1:14 2:8
16:6 136:5
161:16
stressful 142:25
stronger 59:6
student 22:14
23:3,16 43:15
54:4,14,19
55:1,11 60:10
65:11,16 66:18
66:23 74:23
90:18,20 91:1
91:20,24
104:12 114:3,4
114:5 115:2
119:1 124:17
124:24 125:3,3
125:4,8 126:8

126:11,19
127:4,16,24
132:25 139:23
140:9,11 142:5
143:13
student's 127:9
students 23:10
30:9 31:13
42:17 44:13
52:2 60:18
61:2 63:11,25
64:25 66:5
110:11 114:14
114:17,19
115:1 124:19
125:14
studied 143:9
stuff 26:21
31:12 54:10
75:15 76:9
77:19 98:14
128:18,25
154:2 157:9,14
subject 41:11
119:23 122:2
127:2
subjected
140:11
submit 93:15
99:1 104:17
105:2 112:8
120:9,23
129:24 132:6
132:14 133:10
135:3 156:20
submitted 99:17
99:19,20 100:1
101:3 111:12
112:2,5 120:2
120:6 123:23
132:5 133:10
133:18 135:2
subscribe 20:17
subscription
20:12

substance
147:20 150:15
succinctly 93:4
sued 19:15,18
suffered 139:19
suffering 117:9
131:22
suggest 94:25
suggesting
131:21,23
suggests 84:23
suicidal 40:13
92:18 114:4
suicide 27:21
127:25
Suite 1:14 2:3
summarizing
93:4
summer 53:7
128:23,23
137:12 138:1
151:19 152:3
152:10,10,11
152:14,16,21
152:24,25
153:2,7
Sun 121:7
sup- 78:3
super 128:19
superintendent
67:7,20 130:9
superior 47:3
supervisor 36:6
56:12
supervisors
36:13
supposed 46:9
49:24 52:17
61:19 78:13,14
79:4 94:12,13
95:13 103:25
103:25 110:7
sure 7:7 8:14
10:2,7 18:12
19:6 21:1

22:19 23:1
25:12 30:5
34:16 41:7
43:17 53:20
64:2 65:14
71:23 72:20
76:11 77:2,20
80:13,22 81:11
95:3 102:7
109:12,24
122:12 133:25
134:2 142:1,19
146:11 158:21
surveillance
51:20
suspension
58:20 59:13
118:1
suspicion 113:7
swear 4:18
sworn 3:3,5 4:20
symptoms
141:18 142:22
143:16,18
144:9,19,21
system 95:24
135:14 141:13

_____

T

T 2:21 14:19
T-Mobile
120:24
table 11:16
Tackwell 145:13
145:14,22
146:22 147:7
150:14,17,22
157:1
tail 69:8,9
take 11:14,17
22:16 23:13,14
23:15 59:19
62:21 69:6
70:20,22 71:1
113:18 144:8

151:23 152:7
155:20 156:4
taken 1:20 5:11
10:14,17,19,21
11:25 38:23
42:1 55:5 71:7
73:19 115:20
123:2 144:16
156:12 161:14
takes 153:12
talk 15:1 17:3,5
40:9,12,16
57:21 58:13,16
60:1,4 61:14
82:20 117:23
121:2 136:16
137:4 152:10
talked 6:15,22
16:21 36:23
45:17 46:18
49:9 75:12,13
75:19,22 96:1
105:21 111:1
113:21 128:16
143:19 144:20
145:9 148:12
talking 6:13
8:11 24:4,5
34:4,9 39:21
39:25 40:19
58:14 59:3,10
61:2,8 72:5
76:12,24 85:1
95:8 97:15,23
98:16,18 100:4
116:1 126:2
134:12 145:11
152:11
talks 52:15
target 33:1,11
35:14 45:9
55:9 90:15
116:24 128:25
137:5 138:7
151:23 154:1

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 187

teacher 91:1
124:23 125:5,7
126:10,11,21
127:8
teacher's 125:5
teachers 29:19
teachings 19:9
team 22:17,19
27:7,8
teams 27:9
tech 79:19,20,25
technology
109:3 111:18
tell 9:16 12:1,6
17:11 18:9
24:10,19 43:21
45:3 46:19,21
47:5 57:18
58:4,10 63:14
64:23 65:10,17
65:23 66:4
81:13 88:9
90:12 96:18
97:16 101:17
101:21,23
107:20 118:19
128:8 142:7
157:5,7,8
telling 61:1,1
91:3 101:19
102:16 130:14
tells 78:6
ten 27:22 36:17
36:20 48:2
58:7 78:14
tends 29:12
term 49:7,11
terminate 80:4
84:24
terminated
59:16 85:8
116:2 117:16
152:1
termination
58:19 59:13

114:10 115:12
118:25
terms 9:24 12:23
14:11 88:9
89:23 141:24
158:15
testified 4:21
testimony 64:21
120:16 160:18
160:19
text 17:6,7,9,14
17:16 18:1,7
thank 5:21,24
9:17 11:2 14:6
22:12 23:1
30:6 37:13
45:13 72:4
85:25 89:10
99:14,15 122:6
123:10 144:22
149:8,21
159:20
thanked 150:8
thankful 83:11
thankfully
129:3
thanking 150:12
the1family 20:4
the1family.org
20:9
theory 45:23
110:4,7
therapeutic
147:23 148:1
150:19
therapist 104:15
143:22 145:12
146:14 147:16
147:21 157:1
therapists
145:12
therapy 144:24
145:2,4,8,21
145:23 146:6,9
146:22 147:1,4

147:22 150:21
thereof 161:14
thing 27:23
34:16 51:7
62:9 68:8 84:5
88:16 89:2
92:9,20 128:2
things 7:3 10:12
12:25 13:21
17:20 24:11
30:7 36:24,25
45:2,25 56:25
59:13 63:14
64:4 69:14
70:21 81:22
90:19 91:16
92:19 95:14
96:4,11 104:25
106:20 110:4
110:25 128:7
128:23 129:16
129:21 130:13
132:23 137:16
138:14 139:8
139:12,16
142:13,20
143:9 151:3
153:6,11
thingy 66:2
think 8:15 15:16
22:2,20,24
26:5,11,18
29:18 39:8
49:17 51:15,16
53:24 54:1,8
60:16 63:13
65:1 67:6 69:9
72:18 76:7,16
76:17 78:24
80:6,13,24
81:12,13,16,16
81:22 82:3,12
83:12 85:18,25
86:8,9,18
89:16,16 90:5

91:22 93:3,6
94:11 95:25
98:21 100:19
103:3 105:5,11
106:1 107:3,6
107:18 108:22
109:3 110:6
111:23 113:13
114:7,8 118:4
118:7 122:1
129:4 130:4
133:5,25
135:15 139:1
139:21 141:14
142:12 146:15
149:15 150:1,5
153:1,8,18
154:24 157:21
158:20
thought 44:20
50:7 82:19
97:4 100:11
140:21
threaten 81:4,7
threatening
117:25
threatens 58:9
three 5:14 7:25
16:15 23:15
25:15,16 26:7
35:9 69:13
78:8 86:14
87:18,19 96:1
141:15 156:1
thrown 78:2
118:14 141:5
thrusts 140:11
TikTok 157:20
till 24:12,21
time 4:2,3 9:4
10:6 13:1,3
16:21,23 18:5
24:1 26:2,3
28:11 29:10,25
30:23 31:8,15

32:10 37:9
38:21,25 40:17
43:25 44:12,16
45:5,19 46:12
46:20 50:11
52:23 57:7,24
58:8 59:19
60:9,20 62:21
65:8 66:3
67:17 69:17
70:21 71:1,5,8
72:6,19 73:5
73:13,23 76:19
79:21 80:17
84:20 89:7
93:8 95:16,21
96:5 102:23
104:16 106:24
109:18,24
113:22,25
115:18,22
118:20 122:25
123:4,15
134:22 140:3
140:20,23
141:1 143:10
144:14,17
145:19,21
147:25 148:12
149:3,7,25
150:3,24 151:7
152:2,9,13,17
155:7 156:10
156:13 159:19
timeline 42:8,14
72:20 77:2
147:8
timelines 98:8
times 5:14 54:24
66:16 76:16
80:1 96:1
110:10 141:15
152:21
Title 5:18 84:8
117:3 124:15

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 188

125:9,10,11,16
125:17 126:9
**today** 4:1 5:7,22
5:23 6:10 8:9
8:13,19 10:5
10:25 11:11,23
12:3,13 14:8
14:13 17:14,24
21:22 39:17
40:16 64:21
88:3 104:3
130:14 145:9
145:11 158:6
159:6
**today's** 6:3,13
6:25 159:18
**told** 40:9,9 43:9
43:14,15,16,22
44:10,14 50:7
55:1 56:19
57:9 58:8
65:22 79:3,17
79:18 80:23
90:25 98:7
101:24 102:25
103:8,11
109:10 125:7,7
125:8 128:14
132:9,11 138:9
138:23 140:22
140:24 152:6
154:25 155:8
157:6,15
**Tono** 44:19,21
44:21,24,24
49:4 50:23
57:3 60:4
132:21 140:6
157:8
**TOPS** 151:20
153:17,22,24
**touch** 16:19
54:14 142:6
**touching** 54:12
142:3

**tracking** 154:10
**training** 19:8
**Trambley's** 1:23
4:6
**transcribed**
160:18
**transcript** 10:2
110:12 160:19
161:22 162:5
**transfer** 10:1
30:13
**transferred** 69:1
117:6 155:16
**Transformati...**
151:21 153:18
**transported**
140:20
**traumatic** 13:19
23:4 24:24
**treatment** 140:8
**trial** 12:4 159:2
**tried** 55:19 68:9
82:2 95:11
109:11 139:23
140:23
**tries** 120:4
**true** 85:10 91:17
110:8 118:7
123:18 160:19
162:5
**truly** 104:14
**trust** 44:1
101:18
**truth** 12:1,7
96:13 97:20
122:17 123:18
126:6 136:10
**truthful** 10:25
11:7,11 42:15
49:17 70:8
84:7 98:24
151:2
**truthfully** 12:11
121:15
**try** 11:14 16:20

25:3,8,8 95:10
107:24 137:14
**trying** 20:12
24:23 31:21
42:6,8,11 44:9
46:10 48:24
49:2 53:20
54:6,10 57:11
57:16 66:22
67:2 68:12
80:4 95:3
101:10 105:16
116:18 117:1,2
121:24 128:12
134:2 136:8
141:24 151:1
153:13
**Tudor** 44:21,21
**twice** 141:19
**two** 6:22 20:20
25:15 30:20
32:19 35:9
36:7 77:20
83:17 85:23
86:4 96:1
112:2 151:1
156:1,4,6,7
**two-step** 89:25
90:6
**types** 106:11
**typically** 29:8
146:14
**typographical**
160:3

_____ U _____

**U.S.C** 84:8
**uh-huh** 21:5,7
96:23,25 99:8
122:22 158:4
**Uh-huhs** 9:25
10:1
**ultimately** 81:4
**Um** 82:4
**un-** 42:10 44:18

**unable** 114:17
**uncomfortable**
44:18 45:2
46:21 148:18
**undermine**
124:16
**understand** 6:9
7:23 9:18 10:3
10:13 11:3,17
11:25 12:2,3,6
12:9,10,12,14
12:16,18 33:16
35:7 117:8
146:13 153:15
158:6
**understanding**
10:24 11:7,10
44:3 51:11
58:11 95:9
100:17 102:11
129:20 132:7
132:13 135:10
144:24 145:1
**understands**
146:16
**understood** 9:22
**unemployable**
142:15
**unethical** 32:22
32:24 76:18
82:4 83:12
129:4
**unexpected**
82:22
**unfold** 106:23
**unfolded** 39:16
**unfolding** 20:11
20:11
**union** 32:25
33:12 47:15,15
47:21 50:21
55:19 56:19
57:3,9 65:2,5
65:19,20 67:21
67:25 68:1,9

68:23 69:4,6
76:3,10,16
78:6,22 82:3,8
83:10 89:9
100:19 102:24
103:8,13,19
104:10,24
112:10 129:2
130:12 135:7
136:5
**unit** 142:12
**United** 1:1 4:9
161:1
**University** 19:3
**unlawfully**
129:22
**unlimited** 27:19
**unprofessional**
87:23 88:1
**unquote** 42:1
**unredacted**
102:18,22
**unrelated**
111:22
**unsafe** 30:9
90:19,22
105:19 141:9
**unsubstantiated**
40:23 41:1,5
42:10 53:9,14
53:21 54:17
55:2 118:15
**upstairs** 122:23
**use** 10:2,20
12:14,15 20:1
21:8 79:4
109:21 128:15
**usually** 23:13
37:1
**utilized** 26:17

_____ V _____

**v** 4:8 160:1
**Valle** 21:17,25
22:3,9 25:19

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 189

26:23 28:2,5
28:15 36:10
139:6
**valuable** 19:13
19:14
**valuing** 154:7
**various** 5:9
**vehicle** 5:25
8:11,13
**versus** 155:11
**veteran** 97:18
157:18
**Vicki** 36:9,14,15
56:12,17,19,21
57:7,23 58:8
58:11 64:23
65:10,17,23
66:4 74:3,7
75:13,22 79:2
89:9 95:10,14
96:4,15 103:9
103:12,14
112:10 118:5
128:14 130:12
157:3
**Vicki's** 91:13
**video** 2:13 4:5
42:17 54:22
135:11,16,18
135:22
**VIDEOGRAP...**
4:1,17 38:21
38:24 71:5,8
115:18,21
122:25 123:4
144:14,17
149:3,6 156:10
156:13 159:18
**VIDEOTAPED**
1:12,19
**view** 29:11
**VII** 5:18 117:3
**viol-** 65:3
**violate** 41:18
78:6

**violated** 78:10
105:18 120:15
126:8
**violates** 78:5
84:7 134:7
**violating** 78:8
119:23
**violation** 5:8
65:3 95:2
101:21 119:7
124:15 125:9
125:11,16
**virtue** 130:1
**visible** 143:4
**Vista** 21:17,25
22:3,10 25:19
26:23 28:2,5
28:15 36:10
139:6
**voice** 150:8,9
**vs-** 1:6 161:6
**vulnerable**
90:16

**W**

**wait** 24:11,21
**waiting** 99:15
**waking** 14:13
**walking** 44:23
**Walmart** 106:22
**want** 6:8,15,21
7:1 9:13 15:14
17:22 23:22,23
26:12 34:24
40:7,8,12,16
43:16,17 44:6
45:3 47:1 53:4
58:5,5 62:25
63:20 76:4
77:2 82:23
84:24 87:16,19
88:15 91:3
101:3 104:13
104:14 112:20
113:17 119:8

124:11 126:23
132:1 136:16
136:19 137:19
144:2 146:1,1
149:9 150:15
153:1 154:19
155:2 156:23
157:7
**wanted** 98:19
150:13
**wants** 13:20
**Washington**
16:17 17:1
**wasn't** 8:14
29:17 32:25
45:23 76:10
81:23 93:7
99:20 109:7
122:3
**water** 35:8,10
141:6
**wave** 91:12
**waving** 126:19
**way** 28:19 29:25
36:7 42:6
46:22 50:14
52:6 55:2
62:11 63:20
66:25 76:5
87:9 106:16,18
109:15 127:16
127:20 129:17
131:6 132:3
142:8 143:13
148:16 158:2
158:13
**ways** 44:18
**we'll** 27:7
113:18 115:6,7
159:17
**we're** 14:10
15:16,16 26:11
53:25 99:7
117:18 131:9
135:12 137:2

152:11
**we've** 36:23
105:21
**website** 20:5,9
20:10,12,17
77:17 93:13
95:1
**weeds** 15:15
**week** 18:6 25:16
26:6
**weight** 137:3
**weird** 111:8
**welcome** 63:20
**went** 7:7 9:4
42:20 43:9,14
46:6,6,18 47:6
47:7 96:16
97:12 115:24
122:23 125:8
128:19
**weren't** 105:14
105:15 141:19
**whatsoever**
162:8
**Wherry** 28:16
28:17,21 29:13
29:21 30:2
**whistleblower**
3:7 129:11,12
129:14,25
134:9 135:2,4
135:8,10
**white** 122:14
**willing** 126:5
148:10
**Wiretap** 119:24
**wish** 42:15
106:12 149:17
158:22
**witness** 2:16
4:18,20 6:19
22:11 55:16
61:12 97:7
161:22,22,23
162:3

**witnessed** 91:17
**witnesses** 51:9
51:11 54:22
55:17 135:17
140:7
**woke** 35:8 141:5
**womb** 12:24
**wonderful** 59:13
**wondering** 8:23
**Word** 113:14
**words** 42:10
44:23 49:19
55:4
**work** 20:15,15
21:16 26:24
28:15,24 29:21
32:3 37:5 50:8
50:10 72:16
79:1,1 88:20
88:24 93:7
107:25 108:1,1
109:12,22
110:6 116:18
118:3 125:25
128:22 151:17
**worked** 28:10
28:25 37:3
88:21,22 139:4
145:5 153:24
**working** 31:17
35:25 37:22
50:4,15 88:13
89:1 107:24
109:7,13
137:13 139:7
139:13 140:9
154:11 155:13
**works** 26:3
34:13 48:12
80:23 129:20
132:12
**worksite** 63:11
63:24
**world** 27:19
**worried** 119:16

Trambley's Court Reporting

trambley.cr@gmail.com

(505) 292-2120

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 190

124:24
**worst** 12:21
**worth** 155:1,9
155:10,12
**wouldn't** 47:18
98:12 104:2
139:11,13
**Wow** 82:5
**write** 56:20 96:7
96:7,10,12,20
97:21 98:13
118:5,6 138:8
138:9 139:9
141:2 142:17
**writing** 9:25
**writings** 82:13
**written** 14:18
39:5 65:1
79:11,11 80:24
88:14 105:25
128:10 133:17
**wrong** 9:7 58:6
85:6 86:13
141:9 146:2
**wrote** 31:23
75:5 77:4,10
79:12 81:3
82:25 91:22
93:3

**X**

**X** 2:15,21
**XVIII** 84:8

**Y**

**yeah** 7:8,13,21
7:25 8:15,16
8:16 9:3 13:22
15:14,15,15
16:2 17:10,20
18:12,12,13,14
19:14 20:7,8
24:15,18,18
25:9 26:4,15
26:18,25 27:3

27:12 28:14
29:18 31:5,6,6
32:1,22 33:5
33:17,19,20
34:6 35:7,22
36:2 37:1,2,4,7
37:19 38:12,15
38:18 39:9
40:6,7,8,8,11
46:1,14,17
47:4,16,16,20
49:19,19 50:15
51:15 52:14,22
53:1,2,3 54:19
55:21 56:1,1
56:15,23,24
57:15 58:21,21
59:6,8 60:12
60:19,21 61:15
64:5 65:1,6,7
66:1,2 67:1,7
68:2,4,8,12
69:9,12 70:24
70:24 71:2
72:13,18 73:8
74:9,13,14,14
76:7,11,23
77:8,13 78:9
78:20 79:7,8,9
79:11,11,21
80:5,15 81:16
81:16,17,22
82:5,21,25
83:3,9,11,23
84:3,10,23
85:17,17 86:8
86:11,22 88:17
88:18 89:1
90:2,6 91:7
92:8,11 94:5,5
94:6,20,25
95:7 96:8,9,9
96:19 98:7,10
98:21,22 99:12
100:5,9,23,23

100:24 101:6
102:8,10,11,14
102:20 103:18
103:19 104:1,8
104:10,15
105:5,8,8,19
105:19 106:9,9
106:16 107:9
107:19 108:1,8
108:11 109:8
110:3,7,13
111:14,24
112:6 113:14
114:24 115:12
117:11,13,18
117:24 118:12
118:16,20,21
118:21 119:8
119:12,15
120:5,5,12,24
121:5,23 126:7
126:16 127:12
128:13 130:21
130:22,23
131:8,18
132:22,23
133:1,21,22
134:18 136:25
138:14,16
141:24 142:24
143:7,20,21
145:20,24
146:10,19
147:11 148:18
148:19 150:8
152:1,8 153:5
153:6,6,9
154:9,17,20,25
155:1 157:8,15
158:20,21,24
158:24 159:17
**year** 16:24,25
28:6,13 48:2
72:25 73:7
103:4 137:11

150:25 151:1
155:23 156:2
**years** 7:24,25
12:25 27:22
36:17,20 104:5
104:9 153:20
156:3,4
**yesterday** 7:16
7:17,18 17:2
**younger** 124:25

**Z**

**Zifferblatt**
81:15 82:7
83:7
**Zimmerman**
81:12,14
**Zoom** 136:4,6

**0**

**1**

**1** 2:22 20:2
59:20 62:19
92:11 143:23
**1,000** 154:24
155:1,8,11
**1:07** 144:14,16
**1:09** 144:16,17
**1:15** 149:3
**1:16** 149:7
**1:25-cv-00591**
1:3 4:11 161:3
**1:26** 156:10,12
**1:30** 156:12,13
**1:35** 159:19,21
**10** 3:7 129:6,8
130:25 134:20
143:23
**10,000** 154:18
155:11
**10/03/2023**
92:13 127:24
**10/30/202-** 92:12
**10/30/23** 127:23
**10:48** 71:5,7

**10:56** 71:7,8
**1000** 1:14
**1001** 84:8
**10th** 107:16
108:2 110:9,21
114:19
**11/17/2-** 60:5
**11/6/23** 2:24
**11:59** 115:18,20
**1104** 2:3
**115:23** 3:2
**11th** 34:17
**12** 134:20
**12/31/26** 162:13
**12:20** 115:20,22
**12:29** 122:25
123:2
**12:34** 123:2,4
**122:8** 3:3
**123:3** 3:5
**124:4** 3:6
**129:6** 3:7
**14th** 14:21 73:11
**15th** 61:6 73:12
**16** 87:13
**160:1** 2:18
**161:1** 2:19
**16th** 87:21 93:11
93:23 94:8
106:4,5 107:2
**17** 42:3
**17th** 41:23 42:16
54:21 88:6,23
89:19 105:23
116:23 127:20
131:22
**18th** 77:10 89:20
112:5
**1976** 14:21
**19th** 30:15,19,20
30:21 31:8
77:11 83:17
86:19 87:14
113:20 114:23
**19th/22nd** 31:4

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 191

**1st** 78:23 128:10

**2**

**2** 2:23 70:15,17 72:5 77:15 92:10
**2-** 83:22
**2/9/24** 3:2
**20** 1:13 14:12 116:25 118:19 140:3,16 141:21,21 160:19 161:13
**20-** 39:9 152:4
**200-page** 103:6 103:13,17,20
**200-plus** 103:1 135:8
**2007** 19:1
**2014** 36:2,4 85:13,17
**2015** 32:17 37:7 37:9 40:7,14 85:14 152:4,14 152:17 155:3
**2016** 152:19
**2019** 37:7
**2020** 134:22 140:16
**2021** 41:23,24 42:3,16 43:8 44:4 45:5 53:16 54:21 55:24 56:9,12 56:16 57:8,22 60:2,3,10,14 61:6 64:23 65:11,16,24 66:5,10 67:3 67:18 68:7 75:23 78:23 79:13,15,24 80:7,10 88:3 116:23 127:20 128:10 131:22

**2022** 16:8 32:17 32:18,20,23 33:21 35:1,13 35:15,19 37:9 37:24 44:13 45:12,13,19 46:4,16 47:6 47:22 49:1 50:20 51:24 52:2,10,21 53:13 55:9,12 55:14,20 57:20 58:5 59:22 60:3,13 64:22 65:9 66:4 68:2 68:14 70:10,11 70:12 80:3,11 84:12 88:4 91:23 102:12 104:21 105:7 123:24 140:18 141:20,22,22 143:3 145:15 146:23 152:7 152:17,19 154:9,19
**2023** 30:13,17 34:17 39:3,18 39:22 40:4,17 40:20 42:4 44:5 45:7,11 47:16,21 48:1 50:21,22 52:24 53:7,9,23 56:23 57:1,5,6 59:7,9 67:7,19 67:25 68:4,21 69:8,11 71:11 71:20 72:22,25 73:12 74:15 75:22 76:6 77:11,23 79:16 79:22,25 84:14 87:13,21 88:7 88:23 89:20

92:5,7,12,25 93:11,23 94:16 94:22 95:15 96:5 98:3 103:3 106:4 107:3 109:23 111:13 112:5 124:13 130:5,7 130:16,23 132:19 134:23 141:2,20 148:4 150:2 154:8,9 154:19,20 155:10,15,16
**2024** 29:25 30:15,16,19 31:2,4,4,8,9,16 31:16 32:6,9 39:8,11,20,22 40:18,20 73:25 74:8 76:13,25 83:18,18,22,25 84:17,18 86:20 86:24 87:5,14 107:16 108:2 110:22 113:20 114:12 145:24 146:4,24 147:8 150:18,22 152:25 153:2
**2025** 28:3,14,19 28:20 29:25 123:15 124:1,2 124:8 126:4 131:11,11,17 153:7
**2026** 1:13 4:2 131:19 160:19 161:13
**2047** 103:4,7
**2048** 103:5,7
**20th** 4:2
**21** 82:24 104:5,9
**21st** 114:17 115:5

**22** 118:18
**22-10A-19.3** 132:25
**2222** 2:3
**22nd** 30:15,22 31:8,19 83:18 108:9,13 110:9 114:23
**23rd** 124:7
**25027** 1:23
**26** 30:16 83:22 131:11,16 140:15
**27** 83:22
**275** 1:22 162:12
**27th** 131:11
**28th** 130:4
**2nd** 70:5,11,12 70:23 92:5 117:21

**3**

**3** 2:24 71:22 72:2,3 74:15 78:15 94:17
**30th** 92:12
**320** 16:6
**3rd** 32:20 35:15 35:19 55:20 57:20 64:22 66:2 92:24 118:3,18 140:18 141:20 143:3

**4**

**4** 2:25 85:20,22 105:20
**4:22** 2:17
**40** 24:13 25:1
**48** 10:15,18 124:12
**480** 2:4
**4th** 2:8 86:24 161:16

**5**

**5** 3:1 22:8 37:11 99:6,7,8,10
**5/3/22** 2:22
**50** 78:18 92:19 126:25 128:1
**500** 1:14 2:8 37:22 161:16
**504** 75:4 78:19 92:21 114:3 128:3
**505** 2:9 161:17
**51** 75:2 78:17 92:19 128:1
**536-6122** 2:4
**54** 75:4
**59:20** 2:22

**6**

**6** 3:2 44:13 59:7 71:20 74:15 75:22 76:6 92:25 94:18,22 115:23 116:5 118:10,12 130:23 134:22 139:22
**6/23/25** 3:6
**60** 14:12
**6th** 94:15

**7**

**7** 3:3 122:7,8 123:8
**70:15** 2:23
**72:2** 2:24

**8**

**8** 3:5 123:3,7 124:12
**8/8/23** 2:23
**8:57** 4:2
**848-1800** 2:9 161:17
**85:20** 2:25

Le v. Board of Education for Albuquerque Public Schools

Daniel Le
February 20, 2026

Page 192

**85202** 2:4
**87102** 1:14 2:9
161:16
**87125** 1:24
**8th** 39:3 71:11
72:7 105:25
107:9

_____

**9**

**9** 3:6 124:4,6
127:1
**9:00** 1:13
**9:50** 38:21,23
**9:58** 38:23,25
**99:6** 3:1
**9th** 87:4